# UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF CALIFORNIA

CENTER FOR ENVIRONMENTAL
SCIENCE, ACCURACY AND
RELIABILITY, et al.,

    Plaintiffs,

v.

NATIONAL PARK SERVICE, et al.,

    Defendants,

 and

CITY AND COUNTY OF SAN
FRANCISCO,

    Defendant-Intervenor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 14-cv-02063-LJO-MJS

**FEDERAL DEFENDANTS'
MEMORANDUM IN SUPPORT OF
CROSS-MOTION FOR SUMMARY
JUDGMENT, AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Judge:    Hon. Lawrence J. O'Neill

               Hon. Michael J. Seng
               U.S. Magistrate Judge

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND......................................................... 3

   I.    The Endangered Species Act ............................................................................. 3

   II.   National Environmental Policy Act ................................................................... 4

PROCEDURAL AND FACTUAL BACKGROUND................................................................ 5

   I.    Factual Background ........................................................................................... 5

      A.   The Establishment of Yosemite National Park......................................... 5

      B.   The Raker Act .......................................................................................... 6

      C.   Development of Project Facilities.............................................................. 7

      D.   The Modification of the Tunnel Aqueduct Rights-Of-Way and the
          1961 Stipulation ...................................................................................... 7

      E.   The 1985 Stipulation............................................................................... 9

      F.   The 1987 Stipulation............................................................................... 10

      G.   The 1987-1992 USFWS Flow Studies Pursuant to the
          1987 Stipulation ...................................................................................... 11

      H.   The Origins and Current Status of the Upper Tuolumne River
          Ecosystem Project ................................................................................... 11

   II.   Procedural Background..................................................................................... 13

STANDARD OF REVIEW ............................................................................................. 14

ARGUMENT............................................................................................................... 15

   I.    Plaintiffs Lack Article III Standing................................................................... 15

      A.   Plaintiffs Have Shown No Injury in Fact................................................. 16

         1.    CESAR Has Not Demonstrated Injury-in-Fact to the
             Organization.................................................................................... 16

    2.    Plaintiffs Have Not Demonstrated Any Injury-in-Fact to
CESAR Members..................................................................................... 19

    3.    Jean Sagouspe Has Not Demonstrated a Cognizable
Injury-in-Fact. ....................................................................................... 21

    4.    Even if Plaintiffs Had Shown Mr. Sagouspe Experienced an Economic
Injury-in-Fact, They Would Not Be Able to Show it Was Caused by the
Alleged Violations or Would be Redressible by This Court. .................................. 22

II.    Plaintiffs Fail to Show Any Violation by Federal Defendants or USFWS of
the ESA Section 7(a)(2) Consultation Requirements. ........................................ 24

  A.    Plaintiffs Cannot Obtain Relief For Their ESA Section 7(a)(2) Claims Because
of Deficiencies in their 60-Day Notice and Complaint. ............................... 24

  B.    Plaintiffs Fail to Show Any Affirmative Action by a Federal Defendant or
USFWS Triggering an ESA Section 7(a)(2) Consultation Duty………………….....26

    1.    Plaintiffs Fail to Identify Any Affirmative Agency Action Triggering
ESA Section 7 Consultation Duties. ........................................................ 27

    2.    The City's Water Diversions are Not an Action by Federal
Defendants. ...................................................................................... 27

    3.    Federal Defendants are Under No Obligation to Consult Under ESA
Section 7 Regarding the Adoption of the 1961, 1965, 1985, and
1987 Stipulations. ............................................................................. 29

    4.    The City's Adherence to the Stipulations Does Not Give Rise to Any ESA
Section 7 Consultation Obligation on the Part of USFWS or Any Federal
Defendant.......................................................................................... 31

    (a) The Stipulations Do Not Convey Any Discretion for Federal Defendants or
USFWS to Impose New Instream Flow Requirements for the Benefit of
ESA-Listed Fish Species in the Delta......................................................... 32

    (b) Even if Plaintiffs Had Asserted Any Claim Against USFWS, The Examples They
Cite of Coordination Between the City and USFWS Were Not Affirmative Actions
Triggering ESA Consultation. ................................................................. 36

    5.    None of the Other Authorities Cited by Plaintiffs Establishes Any ESA
Section 7(a)(2) Violation by Federal Defendants ...................................... 39

III.    Plaintiffs' ESA Section 9 Claim Has Been Waived and is Also Unfounded. .................. 41

IV.    Plaintiffs Fail to Show Any Violation of NEPA............................................................. 42

CONCLUSION ............................................................................................................................... 45

## TABLE OF AUTHORITIES

*ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989)..........................................................................22

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
    515 U.S. 687 (1995)................................................................................................................42

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,
    462 U.S. 87 (1983)..................................................................................................................14

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ..................................................................................................4

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*,
    419 U.S. 281 (1974)................................................................................................................14

*Cal. Sportfishing Prot. Alliance v. FERC*,
    472 F.3d 593 (9th Cir. 2006) ..................................................................................................36

*Cappaert v. United States*, 426 U.S. 128 (1976) .......................................................................39

*Chevron U.S.A. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984)................................................................................................................14

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).............................................14

*Environmental Protection Information Center v. Simpson Timber Company*,
    255 F.3d 1073 (9th Cir. 2001) ................................................................................................35

*FCC v. Fox Tel. Stations*, 556 U.S. 502 (2009) .........................................................................14

*FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978) .................................................14

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ......................................................14

*Forest Conservation Council v. Rosboro Lumber Co.*,
    50 F.3d 781 (9th Cir. 1995) ....................................................................................................42

*Found. On Econ. Trends v. Lyng*, 943 F.2d 79 (D.C. Cir. 1991) ...............................................18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..................................................................................................... 16, 19, 21

*Hallstrom v. Tillamook Cnty.*, 493 U.S. 20 (1989)..............................................................passim

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ....................................................... 17, 18

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333, (1977)...............................................................................................................19

*Karuk Tribe of California v. U.S. Forest Service*,
  681 F.3d 1006(9th Cir. 2012) ..................................................................... 27, 32, 36, 40

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Marine Fisheries Serv.*,
  2015 WL 3466314 (N.D. Cal., May 29, 2015) ............................................... 41, 43

*Lane v. Pena*, 518 U.S. 187 (1996) ......................................................................... 25

*Lone Rock Timber Co. v. U.S. Dept. of Interior*,
  842 F. Supp. 433 (D. Or. 1994) ........................................................................ 25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................... passim

*Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996) ....................................... 42

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ............................................. 5

*Meridian, Ltd. v. City & Cnty. Of San Francisco*,
  90 P.2d 537 (Cal. 1939) .................................................................................... 28

*Mountain States Legal Found. v. Espy*,
  833 F. Supp. 808 (D. Idaho 1993) ..................................................................... 41

*Nat'l Taxpayers Union v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ........................................................................... 16

*National Association of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007)........................................................................................... 36

*Natl. Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*,
  786 F.3d 1050 (D.C. Cir. 2015) ......................................................................... 23

*Natural Res. Def. Council*, 749 F.3d 776 (9th Cir. 2014)......................................... 23

*Pacific Coast Federation of Fisherman's Associations v. U.S. Bureau of Reclamation*,
  138 F. Supp. 2d 1228 (N.D. Cal. 2001) ............................................................. 40

*Platte River Whooping Crane Trust v. FERC*,
  962 F.2d 27 (D.C. Cir.1992) .............................................................................. 29

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989).......................................................................................... 4, 5

*Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983) ................................................... 25

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008) ........................................................................... 23

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) .................................................................................................. 15

*San Luis & Delta-Mendota Water Auth. V. Jewell*,
  52 F. Supp. 3d 1020 (E.D. Cal. 2014)...................................................................................... 23

*Save the Peaks Coal. v. U.S. Forest Serv*, 669 F.3d 1025 (9th Cir. 2012) ................................... 4

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988)................................................... 25

*Sierra Club v. Babbitt,* 65 F.3d 1502 (9th Cir. 1995) ............................................. 29, 31, 32, 36

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ....................................................................... 16, 17

*Sierra Club v. Penfold*, 857 F. 2d 1307 (9th Cir. 1988) ............................................................. 5

*Sierra Club v. U.S. Dep't of Energy*,
  26 F. Supp. 2d 1268 (D. Colo. 1998)...................................................................................... 15

*Stewart & Jasper Orchards v. Jewell*, 135 S. Ct. 948 (2015)..................................................... 15

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................................................ 16, 17

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
  143 F.3d 515 (9th Cir. 1998) ............................................................................................ 25, 26

*Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*,
  618 F. Supp. 2d 1262 (W.D. Wash. 2008)............................................................................. 42

*Tenn. Valley Auth. v. Hill*, 437 U.S. at 187.............................................................................. 31

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................................... 14

*United States v. Romm*, 455 F.3d 990 (9th Cir. 2006) ............................................................... 41

*USA Petroleum Co. v. Atlantic Richfield Co.*,
  13 F.3d 1276 (9th Cir. 1994) .................................................................................................. 43

*Western Watersheds Project v. Matejko*,
  468 F.3d 1099 (9th Cir. 2006) ........................................................................................... 27, 28

*Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010) ............................................. 18, 19

## **STATUTES**

5 U.S.C. § 551(13) ...................................................................................................................... 14

5 U.S.C. § 701............................................................................................................................ 5, 14

5 U.S.C. § 706............................................................................................................................... 14

5 U.S.C. § 706(2) ........................................................................................................ 14

5 U.S.C. § 706(2)(A) ................................................................................................... 14

5 U.S.C. § 706(2)(A)-(D) ......................................................................................... 5, 14

16 U.S.C. § 1531(b) ................................................................................................. 3, 23

16 U.S.C. § 1532(15) .................................................................................................... 3

16 U.S.C. § 1532(19) .................................................................................................... 3

16 U.S.C. § 1533 .......................................................................................................... 3

16 U.S.C. § 1536(a)(2) ............................................................................... 3, 23, 27, 28

16 U.S.C. § 1536(a)(4) .................................................................................................. 4

16 U.S.C. § 1536(b)(3)(A) ............................................................................................. 4

16 U.S.C. § 1538(a)(1) .................................................................................................. 3

16 U.S.C. § 1540(g) .................................................................................................... 15

16 U.S.C. § 1855(f)(1) ............................................................................................. 5, 14

28 U.S.C. § 2401 ........................................................................................................ 44

28 U.S.C. § 2401(a) .................................................................................... 5, 31, 37, 44

42 U.S.C. § 4321 .......................................................................................................... 4

42 U.S.C. § 4332(2)(C) ................................................................................................. 4

54 U.S.C. § 100101 ....................................................................................................... 6

54 U.S.C. § 100101(a) .............................................................................................. 6, 29

54 U.S.C. § 100751(a) ................................................................................................... 6

**FEDERAL REGULATIONS**

40 C.F.R. § 1501.1 ........................................................................................................ 4

40 C.F.R. § 1501.4(b) .................................................................................................... 4

40 C.F.R. § 1501.4(e) .................................................................................................... 4

40 C.F.R. § 1508.9 ........................................................................................................ 4

40 C.F.R. § 1508.13 ...................................................................................................... 4

43 C.F.R. § 46.210(j) ................................................................................................... 45

50 C.F.R. § 402.14(a)-(b)..............................................................................................4, 40

50 C.F.R. § 402.14(c)...........................................................................................................4

50 C.F.R. § 402.14(h)(3).....................................................................................................4

50 C.F.R. §§ 402.01-16........................................................................................................3

50 C.F.R. §§ 402.13(a).........................................................................................................4

50 C.F.R. §§ 402.14(g) ........................................................................................................4

50 C.F.R § 224.101-102.....................................................................................................31

55 Fed. Reg. 12191 (Apr. 2, 1990) ...................................................................................31

**INTRODUCTION**

Plaintiffs claim that Federal Defendants are in violation of the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA") due to the alleged failure to comply with those statutes when the agencies "annually approve[] instream flow and other operating requirements for the Hetch-Hetchy Project" ("Project"). Compl. ¶ 20. Plaintiffs contend that such alleged approvals somehow harm ESA-listed fish species in the Sacramento-San Joaquin River Delta ("Delta"), and that these alleged approvals trigger Federal Defendants' duty to consult under Section 7(a)(2) of the ESA and perform environmental review under NEPA regarding such effects. But the fundamental premise of Plaintiffs' lawsuit is erroneous—Plaintiffs can point to no approvals by Federal Defendants of the City's diversions or instream flows that trigger the alleged NEPA and ESA duties.

The Project's water diversions from the Tuolumne River are carried out by the City and County of San Francisco ("the City"), not Federal Defendants. The City obtained the right to divert water from the river under California state law by appropriation. The City obtained lands and rights-of-way within Yosemite National Park ("the Park") and the Stanislaus National Forest ("the Forest") for the construction and operation of portions of the Project, including the Hetch Hetchy reservoir and associated infrastructure such as O'Shaughnessy Dam, pursuant to the Raker Act of 1913, a federal statute. However, the scope of the Secretary of the Interior's ("Secretary") authority under the Raker Act is far narrower than Plaintiffs appear to understand. Section 11 of the Raker Act explicitly preserves the City's right to exercise its state water rights and directs the Secretary to act in conformance with these rights. The Raker Act does not confer authority or discretion upon Federal Defendants to approve or regulate the City's water diversions or instream flows for the benefit of ESA-listed fish species in the Delta.

Federal Defendants have been involved in the development of stipulations setting minimum instream flows in 1961, 1985, and 1987, when the City sought to make major modifications to the Project, and the U.S. Department of the Interior ("Department") exercised its rights under the Raker Act to impose conditions before approving such changes to the Raker Act rights-of-way. These stipulations originated in a request by the City in 1958 to relocate

portions of the Project's rights-of-way within the Park and the Forest. The 1961 Stipulation approved a right-of-way location change, subject to the City's commitment to provide interim flow releases for the benefit of resident fish and recreational and aesthetic values in the 12.5-mile reach ("Hetchy Reach") that runs through Park and Forest lands just below O'Shaughnessy Dam. The 1961 Stipulation contained requirements for additional scientific study and possible modification of the instream flows based on those studies. These studies were carried out and led to new instream flow requirements formalized in 1985 and 1987 Stipulations that amended and supplemented the flow provisions of the 1961 Stipulation. All of the stipulations were directed to the protection of fishery and recreational values on the stretch of the river just downstream of O'Shaughnessy Dam within the Park and the Forest, and do not provide authority for Federal Defendants to modify the existing instream flow requirements for the protection of ESA-listed fish in the Delta. Nor has the continuing applicability of these stipulations to the City's operation of the Project triggered any ESA consultation duty on the part of Federal Defendants. To the extent Plaintiffs assert any claims about the approval of these decades-old stipulations, such claims would be time-barred. In addition, these stipulations were entered into prior to the ESA listing of the Delta fish species at issue in Plaintiffs' suit, so the adoption of these stipulations gave rise to no ESA consultation duty. Nor does the ESA apply retroactively to the adoption of stipulations decades ago.

Plaintiffs have waived their NEPA claims by abandoning them in their summary judgment motion and brief. For the same reason, Plaintiffs have waived their ESA Section 9 claim against Federal Defendants. Apparently recognizing that their actual claims are not viable, Plaintiffs instead improperly attempt to introduce new claims never raised in their complaint, such as alleging for the first time in their brief and motion that the U.S. Fish and Wildlife Service ("USFWS") is an ESA Section 7 "action agency" liable for a failure to consult with the Secretary of the Interior on its alleged approvals of the City's instream flow releases. This claim is baseless, and in any event not justiciable because it was never the articulated in a mandatory 60-day notice of intent to sue under the ESA's citizen-suit provision, and was never asserted in Plaintiffs' complaint. Plaintiffs' new attempt to assert that the City is in violation of ESA Section

9 suffers the same defects. Even if such claims were justiciable, they are still baseless. Furthermore, the Court should also grant Federal Defendants summary judgment due to Plaintiffs' failure to demonstrate that they have Article III standing.

## STATUTORY AND REGULATORY BACKGROUND

### I.       The Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). Congress has directed the Secretaries of the Interior and Commerce ("Secretary") to list endangered or threatened species.[1] 16 U.S.C. § 1533. A listed species is afforded certain legal protections. These include Section 9 of the ESA's prohibitions on illegal or unauthorized "taking" of an endangered animal. 16 U.S.C. § 1538(a)(1). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). To promote conservation of endangered or threatened species, the ESA also authorizes the Secretary to designate certain geographical areas as "critical habitat," which includes areas on which are found those physical or biological features [] essential to the conservation of the species." *Id.* § 1532(5)(A)(i).

ESA Section 7(a)(2) requires each federal agency ("action agency") to insure, in consultation with the agency with ESA authority over a listed species (the "consulting agency"), that any action authorized, funded or carried out by the action agency "is not likely to jeopardize the continued existence" of such species, or "result in the destruction or adverse modification of" its critical habitat. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. §§ 402.01-16. If either the action or consulting agency determines that the proposed action is "likely to adversely affect" a listed

---

[1] The ESA divides responsibility for listing species between the Secretary of the Interior ("Secretary"), who generally is responsible for terrestrial species and inland fishes, and the Secretary of Commerce, who generally is responsible for marine species. 16 U.S.C. § 1532(15). These responsibilities have been delegated to the U.S. Fish and Wildlife Service in the case of Interior, and to the National Marine Fisheries Service ("NMFS") in the case of Commerce.

species or its critical habitat, the agencies must engage in formal consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). Formal consultation typically begins with a written request by the action agency, 50 C.F.R. § 402.14(c), and may conclude with the issuance of a biological opinion by the consulting agency (USFWS or NMFS), assessing the likelihood the action will jeopardize the species, and the likelihood it will result in destroy or adversely modify critical habitat. *See* 50 C.F.R. §§ 402.14(g), (h). If the consulting agency determines that the action is likely to jeopardize the continued existence of the species or result in an adverse modification of critical habitat, it must determine whether any "reasonable and prudent alternatives" exist for the action that will not violate section 7(a)(2). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If the proposed action will not jeopardize the species but will cause incidental "take," then the consulting agency will also prepare an incidental take statement that, among other things, sets forth reasonable and prudent measures to minimize such take. 16 U.S.C. § 1536(a)(4).

## II.    National Environmental Policy Act

NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C); *Save the Peaks Coal. v. U.S. Forest Serv*, 669 F.3d 1025, 1035 (9th Cir. 2012). In order to determine whether an action is one requiring an EIS, the agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4(b). An EA is a concise public document that briefly describes the proposal, examines alternatives, and considers environmental impacts to determine whether an EIS is required. 40 C.F.R. § 1508.9. If, through the EA, the agency determines that an EIS is not required, the agency issues a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1501.4(e); see also 40 C.F.R. § 1508.13. In challenging a FONSI, a plaintiff must raise "substantial questions whether a project may have a significant effect" on the environment. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citation omitted).

NEPA was enacted to foster better decision making and informed public participation for actions that affect both people and the natural environment. See 42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To that

end, the statute does not mandate particular results, but simply establishes procedural requirements for assessing the potential environmental impacts of an agency's decisions. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989); *Methow Valley*, 490 U.S. at 349-50. "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action." *Methow Valley*, 490 U.S. at 351 (footnote omitted).

NEPA actions are judicially reviewable pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A)-(D), and are subject to a six-year statute of limitations per 28 U.S.C. § 2401(a). *Sierra Club v. Penfold*, 857 F. 2d 1307, 1315 (9th Cir. 1988). Accordingly, any NEPA claim based on agency actions that occurred more than six years before Plaintiffs filed their complaint in this action is time-barred.

**PROCEDURAL AND FACTUAL BACKGROUND**

**I.      Factual Background**

      A.      <u>The Establishment of Yosemite National Park</u>

Yosemite National Park as we know it today pre-dates the establishment of the National Park System. The lands where relevant Project features are now located, in addition to much of the land that now comprises the Park, were set aside by Congress in 1890 as "reserved forest lands" subject to "the exclusive control of the Secretary of the Interior" Act of October 1, 1890, § 2 (26 Stat. 650). In 1905, Congress modified the forest reservation by dividing it into two separate areas. One area was named the Sierra Forest Reserve which, for purposes of this case, includes lands within the Stanislaus National Forest ("the Forest") where Project facilities such as Early Intake Dam are located. The larger, remaining portion of the reserve was renamed Yosemite National Park. Act of February 7, 1905, § 1 and 2 (33 Stat. 702). The 1890 Act authorized the Secretary to issue regulations to "provide for the preservation from injury of all timber, mineral deposits, natural curiosities, or wonders within said reservation, and their retention in their natural condition." *Id*.

The delegation of regulatory authority conferred by the 1890 Act became obsolete following the enactment of the National Park Service Organic Act in 1916 and the creation of the

National Park Service ("Park Service") as an agency within the Interior Department. The Organic Act, now codified at 54 U.S.C. § 100101, et seq., provides a broad grant of regulatory authority to the Secretary for the management of all units of the National Park System. The Organic Act directs the Secretary to "conserve the scenery, natural and historic objects, and the wild life in the [Park] System units and to provide the for enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).[2]

B.    The Raker Act

In 1913, Congress enacted the Raker Act which granted certain rights within the Park and the Forest to the City. The Act directed the Secretary to grant the City all necessary rights of way that, in the judgment of the Secretary may be required

> for the purpose of constructing, operating, and maintaining aqueducts, canals, ditches, pipes, pipe lines, flumes, tunnels, and conduits for conveying water for domestic purposes and uses to the city and county of San Francisco and such other municipalities and water districts as, with the consent of the city and county of San Francisco, or in accordance with the laws of the State of California in force at the time application is made, may hereafter participate in the beneficial use of the rights and privileges granted by this act; for the purpose of constructing, operating, and maintaining power and electric plants, poles, and lines for generation and sale and distribution of electric energy.

Act of December 9, 1913, 38 Stat. 242 at § 1(a) ("Raker Act"); AR 1. It similarly directed the Secretary to grant the City use of lands in the Hetch Hetchy Valley and other areas of the Park and Forest as determined necessary for surface reservoirs, diverting and storage dams, power houses, and other Project features. *Id.*

While the Raker Act provided the Secretary with authority to grant use of lands and rights-of-way within the Park and Forest, it restricted the Secretary's ability to regulate the City's water rights under state law. The Act thus states that

---

[2] To fulfill this mandate, the Organic Act directs the Secretary to "prescribe such regulations as the Secretary considers necessary or proper for the use and management" of national parks. 54 U.S.C. § 100751(a). Regulations relating to the use and management of Yosemite National Park (and all other national park areas) are codified in Chapters 1 – 7 of the Title 36 of the Code of Federal Regulations. The source of authority cited for the regulations in Title 36 is the Organic Act, 54 U.S.C. § 100101 and 100751. There are no extant regulations promulgated pursuant to the 1890 Act in Title 36.

nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the State of California relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired thereunder [. . .] and the Secretary of the Interior shall act in conformity with the laws of said State.

Raker Act, § 11, AR 000009-10.

C.    Development of Project Facilities

After the Act's passage, the City applied for rights-of-way and lands that it would need for the Project. Rights-of-way for the Project features most relevant to the Stipulations at issue in this case were issued in 1914 and 1917. In 1914, the Secretary approved rights-of-way for the construction of O'Shaughnessy Dam and a 12-mile tunnel aqueduct in Yosemite National Park and the Stanislaus National Forest between O'Shaughnessy Dam and Early Intake Dam that would be part of the future Canyon Power Project. AR 122-23, 313-314. In 1917, the City received authorization from the Interior Secretary for other components of the Canyon Power Project, including the location of an additional tunnel aqueduct, a pressure pipe, a power plant site, and a diversion dam in the Stanislaus National Forest. AR 123.

By 1930, the City had constructed many of the major components of the Project including O'Shaughnessy Dam and Lake Eleanor Dam within the Park, and Early Intake Dam within the Forest. AR 41-42; 822. As of the late 1950s, however, the Canyon Power Project, including the tunnel aqueduct between O'Shaughnessy Dam and Early Intake and the facilities authorized in the 1917 right-of-way, still remained unbuilt.

D.    The Modification of the Tunnel Aqueduct Rights-Of-Way and the 1961 Stipulation

Upon the completion of the O'Shaughnessy Dam in 1928, water released from Hetch Hetchy reservoir flowed down the natural river bed of the Tuolumne River in the Hetchy Reach, the 12.5-mile stretch of river between the Dam and Early Intake.[3] At Early Intake, the City

_____

[3] The first 6.5 miles of the 12.5-mile Hetchy Reach are in Yosemite National Park, with the remaining six miles in the Stanislaus National Forest. AR 2174. From Early Intake to New Don Pedro Reservoir, is another 27 miles, an area that is within the Stanislaus National Forest in the Upper Tuolumne River watershed. AR 002174, 76. From the point of entry into New Don Pedro Reservoir, it is another 78.5 river miles to the confluence of the Tuolumne River and San Joaquin

diverted water from the river channel into an aqueduct system through which it was ultimately delivered to San Francisco and other customers.[4] AR 314. Had the City constructed the Canyon Power Project as approved by the Interior Department in 1914 and 1917, all water from the Hetchy Reach could have been diverted by the City further upstream at O'Shaughnessy Dam into a 12-mile tunnel aqueduct on the south side of the river, connecting between O'Shaughnessy Dam and Early Intake Dam. AR 314. AR 164-166. Upon reconsideration of engineering features, the City in 1958 sought Interior Department approval to relocate the tunnel aqueduct to the north side of the river. AR 122-23.

Sections 1-2 of the Raker Act provide the Secretary with authority to approve any proposed changes of location of the City's rights-of-way in the Park (and also provide authority for the Department of Agriculture to approve such changes within the Forest). AR 000001-2. The City's proposal to relocate Canyon Power Project tunnel would require an amendment to the City's rights-of-way for the Project, and the Park Service, the U.S. Forest Service ("USFS"), USFWS, and the California Department of Fish and Game used this opportunity to initiate discussions with the City on measures to protect fishery, recreational and aesthetic values in the Hetchy Reach, which had not been provided for in the original rights-of-way. AR 150, 174,177-85, 216-217, 294, 347. The California Department of Fish and Game and the Bureau of Sport Fisheries and Wildlife (a former division of the USFWS) provided expertise on the level of minimum instream flows that should be required to protect aquatic life. AR 294, 233-245. The Park Service and the Forest Service expressed concerns about the need to ensure enough water to preserve recreational and aesthetic values along their respective stretches of the river. AR 221-231. The City initially challenged the federal governments' authority to require a stipulation concerning minimum flows as a condition of modifying the City's 1914 and 1917 rights-of-way, as well as the reasonableness of the proposed conditions, and filed an administrative appeal. AR

River. AR 002176. From there, the San Joaquin flows about 10 more river miles before it enters the Delta (at the boundary of the Delta defined by California Water Code § 12220).

[4] For a diagram of the Hetch Hetchy Project's components, and a map of their locations, *see* AR 2175 and 2177, respectively.

133-34, 166, 187-200, 273-85, 302, 822-24.

On June 21, 1960, after more than two years of negotiations with the federal and state agencies, the City agreed that the United States could lawfully condition a right-of-way modification on a stipulation to the minimum amount of water that must be discharged into the river in the Hetchy Reach. AR 314. In 1961, the City and the Department entered into a stipulation ("1961 Stipulation") providing for specific temporary minimum flow conditions. AR 350-355. Provision 6 of the 1961 Stipulation provided fixed instream flow schedules based on time of year (75 cfs in the summer, 35 cfs in the fall-winter). AR 351. It also provided for the City, the Park Service, and USFWS jointly to perform studies as to whether these flows were adequate for the resident fisheries in the Upper Tuolumne River (specifically, studies of the resulting conditions "for the spawning of trout" in the Hetchy Reach). AR 352. Secretary of the Interior Stewart Udall, acting pursuant to his Raker Act authority, approved the City's relocation of the Canyon Power Project's tunnel aqueduct and penstocks, and its Kirkwood Powerhouse, subject to the provisions of the 1961 Stipulation. AR 340-41,365-66, 370, 824. In 1965, the City and the Department entered a subsequent stipulation ("1965 Stipulation") to allow the inclusion of an additional 2.53 acres of land in the right-of-way for the Canyon Power Project. AR 373-378. The 1965 Stipulation did not alter the provisions of the 1961 Stipulation with respect to the flow studies or the timing or quantity of minimum instream flows. AR 373-378.)

E.      The 1985 Stipulation

Following interagency consultation and field work by the USFWS, NPS, USFS and California Department of Fish and Game, and the completion of the study required by the 1961 Stipulation, the USFWS issued a report, recommending increased releases for fishery, recreational and aesthetic values. AR 408 – 474, at 448-50. The City objected to this recommendation. AR 475-76. After negotiations, the City agreed to a new stipulation incorporating a three-tiered flow schedule with different release levels for normal and better, dry,

and critically dry, water years. AR 1378-79, 1435-37, 1434.[5] In 1985, the Department and the City formalized this agreement ("1985 Stipulation"). AR 1494-99.

F.      The 1987 Stipulation

The 1985 Stipulation provided that should the City ever seek to modify the project in a manner that would alter expected flows in the Hetchy Reach, it would submit to additional fish habitat and flow studies by the USFWS, and the recommendations of the USFWS would become part of the conditions of the 1985 Stipulation unless the City formally objected to the Secretary, in which case the matter would be referred to a special hearing officer in the Department. AR 1496. Shortly after the approval of the 1985 Stipulation, in May 1985, the City applied to the Interior Department to add an additional (third) generator at the Canyon Power Project's Kirkwood Powerhouse near Early Intake, thus triggering the need for additional fish habitat and flow studies. AR 1511-1537, 1728.

After further negotiations, the City and the Interior Department entered into a new Stipulation ("1987 Stipulation") amending and supplementing the 1985 Stipulation. AR 1847-1858. In the 1987 Stipulation, the Department approved the construction of a third generator at the Kirkwood Powerhouse, and the City agreed to pay for four years of studies focused on "habitat for and populations of resident fish species, between O'Shaughnessy Dam and Early Intake." AR 0001850.[6] In Provision 2, the City also agreed to specified increases in minimum flow releases above and beyond levels prescribed in the 1985 Stipulation "[i]f, as a result of the foregoing studies, [USFWS] preliminarily determines [] that flows in the upper region of the

[5] Pursuant to NEPA, the USFWS performed an environmental assessment of the effects of the stipulated flow schedule, AR 817-1370, and on June 8, 1983, the agency issued a finding of no significant impact. AR 1431-54.

[6] Because the Powerhouse was situated on land managed by the Forest Service, the City prepared and submitted an Environmental Assessment in support of its proposal to both the Forest Service and the Interior Department. AR 1556; AR 1564-1649. The Forest Service approved the proposal on September 5, 1985 subject to conditions which, among others, would require the City to release additional volumes of water at O'Shaughnessy Dam whenever power generation from the three units resulted in flows at or above 900 cubic feet per second (cfs). See AR 1682. The USFS issued a Finding of No Significant Impact concerning the new generator on November 15, 1985. AR 1722-1809.

Tuolumne River between O'Shaug[h]nessy Dam and Early Intake should be increased." AR 1850-51. The City further agreed "that water releases made by the City at Hetch Hetchy provided herein shall remain in the Tuolumne River between O'Shaughnessy Dam and New Don Pedro Reservoir, and the timing of these releases will be such as to coincide with the documented causes for the decrease in the habitat for or populations of resident fish species in the affected stretch of the river." AR 1851-52. In Provisions 4 and 5, the 1987 Stipulation also provided that once the aforementioned studies were completed, further increases in minimum instream flows could potentially be required if the studies indicated they were necessary. AR 1854-55.

G.    The 1987-1992 USFWS Flow Studies Pursuant to the 1987 Stipulation

On August 5, 1987, the City and the USFWS entered into agreement under which the City committed to fund the four-year USFWS fish population, habitat and instream flow studies specified in the 1987 Stipulation. AR 1862-64. The agreement anticipated that USFWS would report on the result of the studies by December 1992. AR 1863. In November 1987, the USFWS developed a plan for carrying out the fish and flow-related studies. AR 1871; AR 1872-1881. On July 17, 1992, the USFWS issued a "rough draft" of a report titled "Instream Flow Requirements for Rainbow and Brown Trout in the Tuolumne River Between O'Shaughnessy Dam and Early Intake." AR 1931-2016. The draft report recommended varying minimum flow rates depending on time of year and climatic factors. AR 1965-67. Nothing in the administrative record suggests that the Department or the City ever acted upon that draft report, or any of its recommendations. *See* AR 2135 (noting that the draft USFWS recommendations were not adopted).

H.    The Origins and Current Status of the Upper Tuolumne River Ecosystem Project

In June 2006, the City adopted a "Water Enterprise Environmental Stewardship Policy" to be integrated into the planning and operation of the City's water system infrastructure, including the Project dams and diversions. AR 2063. The policy incorporated a management directive for the City to protect and rehabilitate ecosystems affected by water system operations in the context of meeting water supply, power generation, water quality, and existing minimum instream flow requirements. *Id*. The policy further calls for the City's instream flow releases, to the extent feasible, to mimic "the variation of the seasonal hydrology (e.g., magnitude, timing,

duration, and frequency) of their corresponding watersheds in order to sustain the aquatic and riparian ecosystems upon which native fish and wildlife species depend." *Id.*

Pursuant to that policy, the City commenced what has become known as the "Upper Tuolumne River Ecosystem Project" ("UTREP"), comprised of "conducting a set of long-term, collaborative, science-based investigations designed to (1) characterize historical and current river ecosystem conditions, (2) assess their relationship to Hetch Hetchy Project operations, and (3) provide recommendations for improving ecosystem conditions on a long-term, adaptively managed basis." AR 2128. One of the factors driving the City's new approach was the fact that, subsequent to the 1987 Stipulation, the City began to change operations at Hetch Hetchy in a manner that emphasized water supply over hydropower generation, and in a manner that "better approximates the conditions under which native fish and other aquatic and riparian species evolved in the reach of the Tuolumne River between O'Shaughnessy Dam and Early Intake ('the affected reach') . . . ." AR 2057. UTREP's collection of data and analyses would, among other things, "provide the scientific basis for resolving outstanding issues with the U.S. Department of the Interior related to the 1987 Stipulation under the Raker Act." AR 2063. The UTREP study area includes "reaches of the Upper Tuolumne River mainstem and major tributaries regulated by the Hetch Hetchy Project, from O'Shaughnessy Dam to Don Pedro Reservoir, Cherry Creek downstream of Cherry Valley Dam, and Eleanor Creek downstream of Eleanor Dam." AR 2063.

On July 7, 2009, the City issued a document titled "Upper Tuolumne River Ecosystem Project O'Shaughnessy Dam Instream Flow Evaluation Study Plan" as "an initial study plan towards developing initial flow recommendations for the Hetchy Reach by December 2009 and final recommendations by December 2010." AR 2066. Despite initial hope that final flow recommendations would issue by December 2010, the flow evaluations and anticipated flow recommendations have not been finalized by the City. In April 2014, the City issued a "Stakeholder Draft" of a UTREP "O'Shaughnessy Dam Instream Flow Management Plan." That plan was a draft circulated to interested parties and remains under development. It has not been finalized or implemented by the City, nor has it been approved by the Park Service or even presented to the Park Service for approval. *See* AR 002172.

## II.    Procedural Background

Plaintiffs filed this action on August 8, 2014, in the District Court for the District of Columbia, asserting claims against the Park Service; S.M.R. Jewell, in her official capacity as Secretary of the Interior; Michael Bean, in his official capacity as Principal Deputy Assistant Secretary for Fish, Wildlife and Parks; and Jonathan Jarvis, in his official capacity as Director of the Park Service. *CESAR, et al. v. Nat'l Park Service*, *et al.*, No. 1:14-cv-01409, Doc. 1 (Aug. 18, 2014, D.D.C.) ("Complaint" or "Compl."). On December 10, 2014, that court granted Federal Defendants' motion to transfer venue to this court. *Id*., Order, Doc. 33. Plaintiffs' lawsuit alleges that "Defendant, National Park Service, annually approves instream flow and other operating requirements for the Hetch-Hetchy Project." Compl. ¶ 20. Plaintiffs' first claim for relief alleges that "in approving these instream flows and other operating requirements, including for the current water year, 2014, Defendants have failed to consult with the Fish and Wildlife Service or the National Marine Fisheries Service, as required by Section 7 of the Endangered Species Act." *Id*. The Complaint next alleges that "by authorizing the diversion of water out of the Tuolumne River . . . Defendants have caused, and continue to cause, a take of . . . threatened and endangered species in violation of Section 9 of the federal Endangered Species Act." *Id*. ¶ 23. Finally, the Complaint alleges that "Defendants' decision to prescribe instream flows and other operating requirements for the Hetch-Hetchy Project" without preparing an "environmental impact statement" violates NEPA. *Id*. ¶¶ 26-27.

On January 20, 2015, the Court granted the City's motion to intervene as a defendant pursuant to Federal Rule of Civil Procedure 24(a)(2). Doc. 40. In a March 27, 2015 case management order, this Court stated that "[t]he parties agree that this case will be resolved without trial and instead on rulings on motions for summary judgment based upon review of the administrative record." Scheduling Conf. Order, Doc. 44, at 2. The Court's order stated that "[t]here will be no amendments to the pleadings except upon Court order for good cause." Doc. 44 at 2. Federal Defendants filed the Administrative Record with the Court on July 1, 2015, *see* Doc. 46, and filed a supplement to the Administrative Record on October 21, 2015, *see* Doc. 64. On September 14, 2015, the Court denied Plaintiffs' motion seeking discovery and seeking to

further supplement the administrative record. Doc. 61.

**STANDARD OF REVIEW**

Final actions by an administrative agency are subject to limited judicial review in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A)-(D). Under the APA, the standard for judicial review of agency action whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). A reviewing court should determine agency compliance with the law solely on the record on which the decision was made. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-744 (1985). In reviewing the reasonableness of the agency action, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706(2).

Under the APA standard of review, the agency decision is "entitled to a presumption of regularity." *Overton Park*, 401 U.S. at 415. The court's only function is to determine whether the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted). A reviewing court "is not to substitute its judgment for that of the agency," and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Tel. Stations*, 556 U.S. 502, 513-14 (2009) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc*., 419 U.S. 281, 286 (1974)). An agency's interpretation of an ambiguous statute is entitled to deference as long as it is a "permissible interpretation." *See Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984); *United States v. Mead Corp*., 533 U.S. 218, 226-27 (2001). Where the agency's technical expertise is involved, the court defers to the agency's expertise. *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813-18 (1978).

The APA scope and standards of judicial review also apply where a plaintiff challenges an allegedly unlawful failure to act. *See* 5 U.S.C. § 706 (actions to "compel agency action unlawfully withheld or unreasonably delayed" are reviewed based on "the whole record or those parts of it cited by a party"); 5 U.S.C. § 551(13) (APA definition of "action" includes "failure to

act"); *Sierra Club v. U.S. Dep't of Energy*, 26 F. Supp. 2d 1268, 1271 (D. Colo. 1998) ("The judicial review provisions of the APA do not distinguish between a claim that an agency unlawfully failed to act and a claim based on action taken"). Likewise, claims brought under the ESA's citizen suit provision at 16 U.S.C. § 1540(g) are also governed by the APA scope and standards of review. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) *cert. denied sub nom. Stewart & Jasper Orchards v. Jewell*, 135 S. Ct. 948 (2015) ("Neither the ESA nor NEPA supply a separate standard for our review, so we review claims under these Acts under the standards of the APA.") (citations omitted).[7]

## ARGUMENT

## I.    Plaintiffs Lack Article III Standing.

While Plaintiffs' claims have no merit, summary judgment should also be granted to Federal Defendants because Plaintiffs lack Article III standing. The constitutional minimum of standing contains three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). First, a plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest that is both: (1) concrete and particularized; and (2) actual or imminent, and not conjectural or hypothetical. *Lujan*, 504 U.S. at 561. Second, there must be a causal connection between the injury and the conduct complained of. *Id*. In other words, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id*. (internal marks & citations omitted). Third, it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision. *Id*. Standing allegations are not "mere pleading requirements but rather an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id*.. Plaintiffs fail to

---

[7] Accordingly, Plaintiffs are mistaken in their assertion that "[c]itizen suits to compel an agency to comply with Section 7 of the Endangered Species Act are governed by Section 11 of the ESA, not the Administrative Procedure Act." Pls.' Br. at 13; *see also* Fed. Defs.' Opp. to Pls.' Mot. to Supp. Administrative Record, Doc. 50, at 21-25.

demonstrate all three elements.

> A.    Plaintiffs Have Shown No Injury in Fact.

A claimant lacks standing unless he or she has suffered an "injury in fact"—an invasion of a legally protected interest which is concrete and particularized and affects the plaintiff "in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. at 560-61, n.1 . The injury-in-fact must also be "actual or imminent," and not "conjectural or hypothetical." *Id*. At the summary judgment stage, "the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence," that he himself is among the injured, as opposed to merely possessing an interest in the subject matter. *Id*. at 561. The "requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst*., 555 U.S. 488, 497 (2009). Thus, while the ESA citizen-suit provision allows "any person" to bring suit, the Supreme Court has held that this does not represent a "congressional conferral upon all persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." *Lujan*, 504 U.S. at 573; *see also Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (holding that a generalized grievance or "an interest in 'seeing' the law obeyed or a social goal furthered" is insufficient to support standing). As shown further below, none of the Plaintiffs have demonstrated any injury-in-fact to CESAR, CESAR's members, or Plaintiff Jean Sagouspe.

> *1.   CESAR Has Not Demonstrated Injury-in-Fact to the Organization.*

Plaintiffs assert that the alleged violations "deprive[] the [fish] species, in which the Center [is] keenly interested, of the possible benefits that could be obtained from maximizing the species-conserving aspects of Hetch Hetchy operations." Pls.' Br. at 28-29. Alleged injury to the fish cannot alone constitute injury-in-fact to CESAR, who, like any plaintiff, must show that it is itself "among the injured." *Lujan*, 504 U.S. at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing . . . is not injury to

the environment but injury to the plaintiff"). As for CESAR's asserted "interest[]" in the fish, conservation of fish or imperiled species is not part of CESAR's stated organizational mission.[8] Moreover, even if it were, an organization's general "interest" in fish conservation would not be sufficient. An organization's "mere 'interest in a problem'" is not enough to support standing in the absence of a personal, concrete injury. *Morton*, 405 U.S. at 739. CESAR might assert that its organizational mission is to ensure that correct ESA procedures are followed. But there is no standing to sue for "failure to follow the assertedly correct [ESA] consultative procedure, notwithstanding [the plaintiffs'] inability to allege any discrete injury flowing from that failure." *Lujan*, 504 U.S. at 572. Similarly, the Supreme Court held in *Summers* that standing cannot be based on an alleged procedural injury "in vacuo," without any link to a resulting concrete injury to the Plaintiff's own interests. *Summers*, 555 U.S. at 496. In the context of organizational standing, this means that an organization, like an individual, cannot simply assert that some governmental action conflicts with their broad policy goals, or that it represents "a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). An organization must show that the alleged violations have resulted in "concrete and demonstrable injury to the organization's activities," which CESAR entirely fails to do. *Id*. CESAR's vague assertions do not come close to establishing an injury to itself that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 561.

CESAR also attempts to ground its injury-in-fact on its alleged desire for "data" that would be created if it could compel the performance of an ESA consultation. *See* Pls.' Br. at 28 (alleging that the failure to consult "deprives the Center . . . of the scientific data necessary to evaluate" the Project's effects on fish); Decl. of Craig Manson, Doc. 65-2 ("Manson Decl."), ¶ 6 (alleged failure to consult results in the Center being "deprived of the vital scientific data that a

---

[8] CESAR's organizational purpose "is to educate the American public about the science underlying public policy decisionmaking concerning threatened and endangered species under state and federal endangered species laws and regulations; to give guidance and information to persons in and outside of government on the use of 'best available science' in public policy decisionmaking; and to ensure adherence to the laws and regulations concerning 'best available science' in public policy decisionmaking." Fed. Defs.' Exh. 2 at 1.

consultation would provide"); Decl. of Jean Sagouspe, Doc. 65-3 ("Sagouspe Decl."), ¶ 4 (the alleged violation deprives CESAR's "programs to insure that agency decisionmakers are furnished the best available scientific data on which to make their decisions, and that the Center's members . . . also have access to this data"). CESAR's asserted interests here are indistinguishable from those of any member of the public who might assert a desire for the government to carry out an ESA consultation that generates new "data." Such a desire is so abstract as to be nothing more than a generalized, widely held public interest in having "the Executive observe the procedures required by law." *Lujan*, 504 U.S. at 573. CESAR's allegations that it engages in the dissemination of "data" does not raise this interest beyond the level of "a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379. CESAR does not show the alleged violations have resulted in "concrete and demonstrable injury to the organization's activities." *Id.*

Article III does not permit plaintiffs to manufacture an injury-in-fact by couching their general interest in a subject as a desire to obtain information (or "data"). Such a maneuver "simply reframes every procedural deprivation in terms of informational loss" and "would allow an end run around the Supreme Court's procedural injury doctrine and render its direction in *Summers* meaningless." *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010). Such an attempt to found standing on a mere desire for information impermissibly vitiates the injury-in-fact requirement, because "'informational injury,' in its broadest sense, exists day in and day out, whenever federal agencies are not creating information a member of the public would like to have." *Found. On Econ. Trends v. Lyng*, 943 F.2d 79, 86 (D.C. Cir. 1991).

As the Ninth Circuit explained in *Rey*, informational standing exists only in narrow circumstances not present here: "[t]o ground a claim to standing on an informational injury, the [statute] must grant a right to information capable of supporting a lawsuit." *Rey*, 622 F.3d at 1259 (emphasis added). For example, in *Rey*, the plaintiff asserted violations of the U.S. Forest Service Decisionmaking and Appeals Reform Act ("ARA"), which requires the Secretary of Agriculture to establish notice and comment procedures for projects implementing land and resource management plans. *Id.* at 1253. Like CESAR, the plaintiff alleged that the alleged

violations deprived it of information that "would have assisted [it] [in furthering [its] goals of forest conservation, and in educating [its] members and the public in general about environmentally harmful Forest Service projects." *Id*. at 1259. The Ninth Circuit rejected this theory because the ARA did not confer upon plaintiff any enforceable right to the information in question. The Ninth Circuit cautioned that "[i]nformational injury" may support standing only where Congress has explicitly conferred an "explicit right to information" that is "capable of supporting a lawsuit." *Id*. Examples of such statutes are the Freedom of Information Act, Federal Advisory Committee Act, or Federal Election Campaign Act. *Id*. at 1258–59. There is no such explicit, enforceable right to information under the ESA provisions that CESAR purports an interest in enforcing. CESAR's alleged desire for the "data" that might be produced in an ESA consultation process does not equate to a cognizable injury-in-fact under Article III.

2.    *Plaintiffs Have Not Demonstrated Any Injury-in-Fact to CESAR Members.*

CESAR also fails to establish representational standing to sue on behalf of members. An organization has standing to bring suit on behalf of its members when (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc.*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343, (1977)). Plaintiffs have not shown that any members of CESAR have suffered an injury-in-fact. CESAR's articles of incorporation state that CESAR "has no members." *See* CESAR 2011 Articles of Incorporation, Fed. Defs.' Exh. 2 (attached), at 2. Plaintiffs submit affidavits by Craig Manson and Jean Sagouspe, who are, respectively, the Executive Director and President of CESAR. *See* Manson Decl. ¶ 1; Sagouspe Decl. ¶ 1. Plaintiffs provide no authority for the proposition that an organization may have standing to file suit on behalf of its executives and officers.

Even if Mr. Manson is somehow a "member" of CESAR, his affidavit does not provide any evidence that he has suffered any cognizable injury-in-fact such that he would have standing in his own right. *See Friends of the Earth*, 528 U.S. at 181. He asserts that he has "a profound personal interest in seeing that sound scientific data is generated and used in the identification,

conservation, and recovery of threatened or endangered species, particularly those dependent on the San Joaquin River and Sacramento Delta." Manson Decl. ¶ 2. Mr. Manson does not describe how these abstract concepts translate into "concrete and particularized" injuries that affect him "in a personal and individual way." *Lujan*, 504 U.S. at 561 & n.1. Rather, he merely evinces "a generally available grievance about government." *See id.* at 573.

Mr. Manson's affidavit also asserts that the "Center's members also have aesthetic and professional interests in the endangered species in the Sacramento-San Joaquin River Delta because the Hetch Hetchy project challenges the ecological integrity of all downstream species and habitats." Manson Decl. ¶ 5. However, Plaintiffs largely provide no evidence as to the alleged injuries of such members, or even their identities. The Manson affidavit names one individual, Bryan Manly, said to be a member of CESAR, who "studies delta smelt habitat selection and factors contributing to the smelt's decline." Manson Decl. ¶ 5. Mr. Manly himself has provided no affidavit, and Plaintiffs provide no evidence that Mr. Manly has suffered or will suffer any injury-in-fact. *See Lujan*, 504 U.S. at 566 (rejecting the "vocational nexus" theory of standing, "under which anyone with a professional interest in such animals can sue").

In *Lujan*, like this case, plaintiffs alleged harms from an alleged failure to consult under the ESA. But the plaintiffs lacked standing even though their affidavits were much more specific and detailed regarding injury than those submitted by Manson and Sagouspe. In *Lujan*, the affiants were members of Defenders of Wildlife, an organization that, unlike CESAR, is specifically devoted to wildlife conservation. *Id.* at 559. Moreover, in *Lujan*, the affiants, unlike Manson and Sagouspe, testified to their aesthetic and recreational interest in observing the imperiled species in the wild; testified to having traveled to observe and enjoy the species in their native habitat; and testified that their interest in doing so again in the future would be harmed if the species were not conserved. *Id.* at 563-64. Even that level of specificity was insufficient, however, to establish that they faced imminent injury-in-fact. *Id.* If the affidavits in *Lujan* were insufficient, the vague expressions of interest in ESA-listed species supplied by CESAR and by Manson and Sagouspe clearly fall even further short of the mark.

Moreover, as regards CESAR members' alleged aesthetic and scientific interests in the

Delta smelt or other fish, none of these, even if established by evidence, would be "germane to the organization's purpose." *Friends of the Earth, Inc.*, 528 U.S. at 181. CESAR is not an organization dedicated to the conservation of fish, let alone to the scientific study or aesthetic appreciation of fish. *See* Fed. Defs.' Exh. 2 at 1.

### 3. Jean Sagouspe Has Not Demonstrated a Cognizable Injury-in-Fact.

CESAR's President, Jean Sagouspe, is identified as a member of CESAR, and also is named individually as a plaintiff to the suit. Either way, his participation provides no basis for standing because Plaintiffs fail to show that he has any injury-in-fact. Mr. Sagouspe, like Mr. Manson, recites vague allegations as to abstract interests he believes are somehow promoted by the suit. *See, e.g.*, Sagouspe Decl. ¶ 3 (asserting that "I am committed to a balanced use of the available water to supply both human needs and species' requirements"); Sagouspe Decl. ¶ 5 (alleging that Federal Defendants have impacted his "profound commitment to species protection"). As already discussed, such abstract descriptions of Mr. Sagouspe's alleged public policy goals do not equate to a concrete and particularized, and actual or imminent, injury-in-fact to Mr. Sagouspe himself.

Mr. Sagouspe also alludes vaguely to his "economic interests as a farmer." Sagouspe Decl. ¶ 5. He states in his affidavit that he grows almonds, pistachios, and pomegranates on 2,600 acres of cropland in the Central Valley of California, and asserts that these "crops are dependent on irrigation water supplied by the Central Valley Project." *Id*. ¶ 2. He asserts that "the extraction of water from the Tuolumne River directly impacts my farming operations and my economic interests by reducing the quantity of water flowing downstream through the San Joaquin River and out into the Delta." *Id*. This is far too vague to be construed as a "concrete and particularized" injury-in-fact. Plaintiffs do not articulate how the extraction of water from the Tuolumne River "directly impacts" Mr. Sagouspe's farming operations, nor do they articulate the nature of the resulting harm to Mr. Sagouspe. Such vague allegations do not satisfy Plaintiffs' burden to show "set forth by affidavit or other evidence," that Mr. Sagouspe has experienced a concrete and particularized injury that is actual or imminent. *Lujan*, 504 U.S. at 561.

4. *Even if Plaintiffs Had Shown Mr. Sagouspe Experienced an Economic Injury-in-Fact, They Would Not Be Able to Show it Was Caused by the Alleged Violations or Would be Redressible by This Court.*

Even if Mr. Sagouspe had alleged any economic injury-in-fact, Plaintiffs would be unable to show it was caused by the alleged violations, i.e. that it was "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." 504 U.S. at 561. Nor would they be able to show that it was not merely speculative that the injury would be redressed by a favorable decision of this Court. *Id.* at 561.

Mr. Sagouspe asserts that "the extraction of water from the Tuolumne River directly impacts my farming operations and my economic interests by reducing the quantity of water flowing downstream through the San Joaquin River and out into the Delta." Sagouspe Decl. ¶ 2. As noted, he never explains *how* the extraction of water from the Tuolumne River impacts his operations or economic interests. The Court may not simply assume, without any explanation or evidence, that any removal of water from the vast Delta watershed automatically has a "direct" and injurious impact on Mr. Sagouspe's farming operations.[9]

Such a presumption would be particularly unwarranted here, because no entity that controls or regulates Mr. Sagouspe's water supply is a party to this case. His alleged economic interests pertain to "irrigation water supplied by the Central Valley Project," which is operated by the U.S. Bureau of Reclamation. As the Supreme Court has noted, when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 56. Such responses are matters "the courts cannot presume either to control or to predict." *Id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

[9] According to the Environmental Protection Agency, the Delta watershed covers more than 75,000 square miles, extends nearly 500 miles from the Cascade Range in the north to the Tehachapi Mountains in the south, and is the conduit to the Pacific Ocean for "[n]early half of the surface water in California [that] starts as rain or snow that falls within the watershed." *See* EPA, "About the Watershed," http://www2.epa.gov/sfbay-delta/about-watershed (last viewed Dec. 9, 2015).

Plaintiffs note that "[o]ne who challenges the violation of 'a procedural right to protect his concrete interests can assert that right without meeting all the normal standards' for traceability and redressability.'" Pls.' Br. at 26 (quoting *Natural Res. Def. Council*, 749 F.3d 776, 782 (9th Cir. 2014)). This is beside the point. In order to assert standing under this procedural rights doctrine, a plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008)(citation omitted). In this case, the procedures in question are designed to conserve threatened and endangered species. *See* 16 U.S.C. § 1536(a)(2); *see also id*. § 1531(b) (purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species may be conserved"). The ESA consultation procedures are not designed to protect Mr. Sagouspe's economic interest in growing almonds, pistachios, and pomegranates. As the Court noted in *San Luis & Delta-Mendota Water Auth. v. Jewell*, the ESA Section 7 consultation procedures "directly promote the goal of species protection." 52 F. Supp. 3d 1020, 1041 (E.D. Cal. 2014). Thus, "a plaintiff organization with the stated purpose of preserving an endangered species may invoke ESA § 7 procedural protections to achieve standing," but not an organization whose interest "is in ensuring the continued delivery of water to their members, not in species protection." *Id*.; *see also Natl. Ass'n of Home Builders v. U.S. Fish & Wildlife Serv*., 786 F.3d 1050, 1053 (D.C. Cir. 2015) (declining to apply procedural standing's relaxed redressability and causation standards, because the ESA listing procedures in question were designed to expedite the protection of imperiled species, not as "an escape hatch for beleaguered landowners"). Similarly, the ESA consultation procedures were not designed to protect Mr. Sagouspe's economic interest in growing almonds, pistachios, and pomegranates. The relaxed requirements for procedural injuries do not apply here.

Plaintiffs have failed to meet their burden of proving that Mr. Sagouspe's alleged economic injuries are caused by the actions of Federal Defendants and are redressible by this Court. *Lujan*, 504 U.S. at 561 (noting that a plaintiff "bears the burden of proof" on standing). They have also failed to show that CESAR has standing in its own right, or on behalf of any

member. Plaintiffs' case must be dismissed for lack of Article III standing.

**II.    Plaintiffs Fail to Show Any Violation by Federal Defendants or USFWS of the ESA Section 7(a)(2) Consultation Requirements.**

Plaintiffs assert that Federal Defendant the Park Service, as well as USFWS, which is not a party to this suit, have violated Section 7(a)(2) of the ESA. In a nutshell, their theory is as follows:

> [T]he National Park Service and the U.S. Fish and Wildlife Service, both of which have discretion to regulate instream fish flows from the Hetch Hetchy Project, have failed to determine whether these reduced Delta fresh water flows affect downstream species listed under the Endangered Species Act and to consult with the relevant agency (National Marine Fisheries Service for anadromous fish or Fish and Wildlife Service for delta smelt) as required by Section 7 of the Endangered Species Act. Because Section 7's consultation requirement is mandatory, this Court should now order these federal agencies to comply with their statutory duties.

Pls.' Br. at 14; *see also id*. at 1. Plaintiffs' ESA Section 7(a)(2) theory fails for several reasons. Plaintiffs state that the Park Service and USFWS "have discretion to regulate instream flows from the Hetch Hetchy Project," but fail to actually point to any such discretionary authority, nor any manner in which such discretion has allegedly been exercised in an affirmative action that would trigger ESA Section 7(a)(2) obligations. Moreover, they failed to provide the mandatory 60-day notice of their intent to sue regarding their claims. In addition, their assertions regarding alleged violations by USFWS are not justiciable here, because Plaintiffs neither did not name USFWS as a defendant, and never asserted any such claim against USFWS in their Complaint.

A.  Plaintiffs Cannot Obtain Relief For Their ESA Section 7(a)(2) Claims Because of Deficiencies in their 60-Day Notice and Complaint.

The Court has no jurisdiction to consider Plaintiffs' Section 7(a)(2) claim against the Park Service, nor their new purported claim of an ESA Section 7(a)(2) violation against USFWS, because Plaintiffs failed to provide the mandatory 60-day notice of any such alleged violations. In addition, Plaintiffs' Complaint neither named USFWS as a defendant, nor asserted any claim against USFWS.

Under the ESA's citizen-suit provisions, a plaintiff asserting an ESA violation must give *both* the alleged violator of the ESA *and* the Secretary of Commerce or Interior written notice 60

days prior to filing suit in Federal court. 16 U.S.C. § 1540(g)(2)(A)(i). Strict compliance with the notice requirements is "a mandatory, not optional, condition precedent for suit." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26 (1989); *see also Lone Rock Timber Co. v. U.S. Dept. of Interior*, 842 F. Supp. 433, 440 (D. Or. 1994). As a waiver of sovereign immunity, the citizen suit provision must "be strictly construed . . . in favor of the sovereign," *Lane v. Pena*, 518 U.S. 187, 192 (1996), and not "enlarged . . . beyond what the language requires." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685 (1983). The failure to "strictly comply" is a jurisdictional defect and an "absolute bar" to bringing suit under the ESA. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998) (citing *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988)). The notice must "sufficiently alert" the potential defendants "to the actual violation" that will be alleged in the complaint. *Sw. Ctr.*, 143 F.3d at 520.

Plaintiffs attached to their Complaint a 60-day notice of intent to sue that was sent to the Park Service, the Secretary, USFWS, the Department, the Secretary of Commerce, and the Assistant Administrator for Fisheries of NMFS. *See* Exh. A to Compl., Doc. 1-1. Their notice claims that the Park Service violated ESA Section 7(a)(2) with respect to alleged "National Park Service-permitted diversions" of water from the Project.[10] *Id*. However, their Complaint and summary filings focus instead on a different theory, NPS's alleged "discretion to regulate instream fish flows" from the Project. Pls.' Br. at 14. Their case thus now centers on a claim never mentioned in their notice. Their notice also makes no allegation of any violation of the ESA by USFWS, let alone the specific ESA Section 7(a)(2) violation that Plaintiffs now assert in their motion and brief. When Plaintiffs' notice did mention USFWS, it was only in the context of alleging that the <u>Park Service</u> regulates water diversions from Hetch Hetchy, and alleging that the <u>Park Service</u> violated its purported obligation to consult with USFWS regarding purported impacts on ESA-listed fish. *See id*. In other words, Plaintiffs 60-day notice asserts that the Park Service, as an ESA "action agency," violated its ESA Section 7(a)(2) duty to initiate consultation

---

[10] Moreover, to the extent Plaintiffs might try to argue that Federal Defendants have violated ESA Section 7(a)(1), their notice did not mention any such violation.

with USFWS or NMFS, in USFWS's or NMFS's capacity as ESA "consulting agencies." *See supra* at 3-4. In Plaintiffs' brief, however, they allege a completely different theory: that USFWS, as an ESA action agency, violated some obligation to initiate consultation with the Secretary (serving as consulting agency). *See, e.g.*, Pls.' Br. at 1 (alleging that "the U.S. Fish and Wildlife Service [is] violating Section 7 of the Endangered Species Act by failing to consult with the Secretary regarding ongoing water extraction from the Tuolumne River and the O'Shaughnessy Instream Flow Management Plan for future operations of the Hetch Hetchy Project"). The action agency and the consulting agency have totally different roles under the ESA statutory scheme, with the latter in essence acting as a regulator and the former as the regulated entity. Legal claims that an agency violated its duties as an ESA action agency are obviously not interchangeable with legal claims that it violated the different duties of the consulting agency. Plaintiffs' brief posits an ESA violation by USFWS that is unmentioned in their notice, and such a claim is therefore not justiciable here. *See Tillamook Cnty.*, 493 U.S. at 23-24 (notice must be provided to each individual alleged violator specifying, in detail, the nature of the alleged violation); *Sw. Ctr.*, 143 F.3d at 522 (same).[11]

In addition, Plaintiffs' Complaint neither named USFWS as a defendant, nor asserted such a claim against USFWS.[12] The Court cannot grant summary judgment or relief regarding a claim that Plaintiffs never made in their Complaint, against a party they did not name as a defendant.

    B.  <u>Plaintiffs Fail to Show Any Affirmative Action by a Federal Defendant or USFWS Triggering an ESA Section 7(a)(2) Consultation Duty.</u>

---

[11] The fact that the addressees of Plaintiffs' 60-day notice letter included USFWS cannot be construed as showing that the letter noticed USFWS that it was in alleged violation of an ESA duty in the capacity of action agency. All ESA 60-day notices regarding species under USFWS's jurisdiction as consulting agency must be addressed to the Secretary, so such letters are routinely sent to USFWS as the agency acting as the consulting agency under the authority delegated by the Secretary.

[12] Nor would it now be permissible for Plaintiffs to seek to amend their Complaint. *See* Scheduling Order, Doc. 44, at 2 ("The parties agree that the pleadings are at issue. There will be no amendments to the pleadings except upon Court order for good cause."); *see also* Jt. Scheduling Report, Doc. 42 ("The parties do not anticipate amending their pleadings, but propose March 26, 2015 as the deadline for any amendments.").

Determining that a Federal agency has triggered the ESA Section 7(a)(2) consultation duty requires a two-fold "agency action inquiry": first, "we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity." *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1020-21 (9th Cir. 2012) (*en banc*); *see also* 16 U.S.C. § 1536(a)(2) (requiring consultation for "any action authorized, funded, or carried out" by the agency that may affect ESA-listed species). Second, there is no ESA consultation requirement unless, in undertaking the affirmative action, the federal agency "had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe*, 681 F.3d at 1020-22. No Federal Defendant, nor USFWS, meets these two necessary criteria for an ESA Section 7(a)(2) consultation duty regarding the City's Hetch Hetchy diversions.[13]

        1.   *Plaintiffs Fail to Identify Any Affirmative Agency Action Triggering ESA Section 7 Consultation Duties.*

Plaintiffs ignore the first part of the above two-part test for an ESA consultation duty, that is, the requirement for an affirmative federal action. *See Karuk Tribe,* 681 F.3d at 1020-21. Instead, they erroneously argue that an ESA Section 7 consultation duty arises any time a Federal agency has "discretion" to take an action for the benefit of an ESA-listed species. *See, e.g.*, Pls.' Br. at 14 (arguing that Federal Defendants are in violation of ESA Section 7 because they supposedly "have discretion to regulate instream fish flows from the Hetch Hetchy Project"). But the as the Ninth Circuit has held in similar circumstances, "even assuming the [agency] could have had some type of discretion here to regulate the diversions . . . the existence of such discretion without more is not an 'action' triggering a consultation duty." *Western Watersheds Project v. Matejko*, 468 F.3d 1099, 1108-09 (9th Cir. 2006).

        2. *The City's Water Diversions are Not an Action by Federal Defendants.*

---

[13] The discussion that follows will rebut Plaintiffs' claims that USFWS has somehow violated the ESA. However, the discussions of USFWS herein are not meant to concede that USFWS is a party to this suit or that any claim against USFWS is presently under the Court's jurisdiction in this case. Moreover, when this brief refers to Federal Defendants, it is referring only to the defendants actually named in Plaintiffs' Complaint: the Park Service; Sally Jewell, Secretary of the Interior; Michael Bean, the Department's Principal Deputy Assistant Secretary for Fish, Wildlife and Parks; and Jonathan Jarvis, Director of the Park Service.

Plaintiffs allege that "[t]he City's annual diversion of an average 220,000 acre-feet of water from the Tuolumne River harms endangered and threatened fish species by reducing fresh water flows in the Delta." Pls.' Br. at 14. However, the City's diversion of water is not an action authorized, funded, or carried out by Federal Defendants. *See* 16 U.S.C. § 1536(a)(2).

The City's Hetch Hetchy water diversions are authorized and regulated under State of California water rights acquired by the City early in the 20th Century. *See* AR 166; *See also Meridian, Ltd., v. City & Cnty. Of San Francisco*, 90 P.2d 537 (Cal. 1939); Raker Act, §11, AR 9-10 (stating that Raker Act does not interfere with existing State water rights). The presence of the Project's O'Shaughnessy Dam and the first segment of the Canyon Power Tunnel in the Park, does not, as Plaintiffs allege, give Federal Defendants discretion to "annually approve" in-stream flows. The Raker Act, in granting lands and rights-of-ways for the Hetch Hetchy Project within the National Park, states that "nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the State of California relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired thereunder, and the Secretary [], in carrying out the provisions of this Act, shall proceed in conformity with the laws of said State." Raker Act, § 11, AR 9-10. The situation is similar to that addressed in *Western Watersheds v. Matejko*, in which an 1866 statute authorized private landowners to enter into right-of-way agreements with the Bureau of Land Management ("BLM"), under which the landowners could construct works to divert water from streams and rivers on BLM land in Idaho. 468 F.3d 1099, 1103 (9th Cir. 2006). As in this case, the water diversions involved an exercise of vested water rights "recognized and acknowledged by the local customs, laws, and the decision of courts." *Id*. (quoting 14 Stat. 253, July 26, 1866). And the BLM in *Matejko*, like the Park Service here, did not fund or carry out the diversions. *Matejko*, 468 F.3d at 1109. Like the BLM in *Matejko*, the Park Service is thus not an ESA action agency with respect to such diversions.

Plaintiffs note that the Raker Act "required that the City 'shall conform to all regulations adopted and prescribed by the Secretary of the Interior governing the Yosemite National Park.'" Pls.' Br. at 17 (citing AR 2, Raker Act § 4). A requirement that the City conform to the Park's

regulations is not in itself a grant of authority to regulate the City's water diversions. Plaintiffs offer no reason to conclude that the authority of the Park Service to make regulations "governing Yosemite National Park" encompasses the authority to regulate the City's exercise of its State water rights in order to compel the City to provide water for the benefit of ESA-listed fish in the Delta, 150 miles away. Nor does the ESA provide such authority, since the ESA "does not expand the powers conferred on an agency by its enabling act." *Sierra Club v. Babbitt,* 65 F.3d 1502, 1510 (9th Cir. 1995) (quoting *Platte River Whooping Crane Trust v. FERC*, 962 F.2d 27 (D.C. Cir.1992)). Also unavailing is Plaintiffs' citation to the 1890 statute that set aside lands that would later become Yosemite National Park. Pls.' Br. At 17. That statute provided for "the preservation from injury of all . . . natural curiosities, or wonders within said reservation." 51 Cong. Ch. 1263, 26 Stat. 650, 651 (1890). Plaintiffs fail to explain how this statute's language could support their claims. Furthermore, as noted above (*see supra* at 5-6), this statute has been superseded by the National Park Service's 1916 organic statute, which provides authority to regulate the management of all units of the National Park system, and directs the Secretary to "conserve the scenery, natural and historic objects, and wild life in the [Park] System units . . . ." 54 U.S.C. § 100101(a). Plaintiffs do not mention this statute, let alone show how it supports their claims. Moreover, whatever authority the Secretary or NPS has to issue regulations under the Park Service's organic statute, any regulations would have to be consistent with the entirety of the Raker Act, which preserves the City's right to exercise its state water rights and directs the Secretary to act in conformance with these rights. *See* Raker Act § 11, AR 10. Nor do Plaintiffs point to any actual regulations promulgated by the Secretary or NPS that regulate the City's water diversions.

### 3. Federal Defendants are Under No Obligation to Consult Under ESA Section 7 Regarding the Adoption of the 1961, 1965, 1985, and 1987 Stipulations.

Plaintiffs assert that "the Park Service and the City have entered into a number of agreements or stipulations modifying the rights-of-way for the Hetch Hetchy Project, each of which gives the Park Service discretion to require the City to provide instream flows from Hetch Hetchy to benefit fish in the Tuolumne River." Pls.' Br. at 18. But neither the adoption of these

stipulations, nor the City's continued adherence to the instream flow provisions of the 1985 and 1987 stipulations, have given rise to any ESA Section 7(a)(2) consultation duty for Federal Defendants.

The Raker Act granted the City rights-of-way and lands in the Park and Forest "as in the judgment of the Secretary may be required" to construct and operate the Project. Raker Act, § 1, AR 1. Rights-of-way related to the construction of O'Shaughnessy Dam and a tunnel between that dam and Early Intake Dam were initially approved by the Department in 1914, and amended in 1914 and 1917. AR 346. In 1961 and 1965, the City and the Department entered into stipulations approving rights-of-way related to the Canyon Power Project—most notably, in 1961, a stipulation regarding relocation of the planned Canyon Tunnel from the south side of the river to the north side. AR 350-59; *see also supra* at 7-9. In the 1961 Stipulation, the City agreed to interim instream flow requirements for the benefit of recreational and aesthetic values and resident fish in the Hetchy Reach.[14] *Id*. The 1985 and 1987 Stipulations modified the 1961 interim flows, and are, as Plaintiffs note, what presently govern "the existing instream flow requirements." Pls.' Br. at 22. The 1985 Stipulation was the result of provisions in the 1961 Stipulation requiring scientific study and possible modification of the instream flows based on those studies. *See id*. The 1985 Stipulation included a provision under which the minimum instream flows could be further adjusted if the City undertook any further modifications to the Project that would alter flows in the Hetchy Reach. 1985 Stipulation, Provision 6, AR 1495. That provision was triggered when the City proposed to add a new hydroelectricity generator to the Project's Kirkwood Powerhouse, leading to the instream flow requirements formalized in the 1987 Stipulation. AR 1847-58; *see also* AR 1511-1537, 1728. The instream flow requirements in the 1985 and 1987 Stipulations thus grew out of the flow study provisions in Provision 6 of the 1961 Stipulation, which reflected the Department's authority under the Raker Act to establish

---

[14] The 1965 Stipulation relates to the inclusion of an additional 2.53 acres of land in the right-of-way for the Canyon Power Project, and does not alter the provisions of the 1961 Stipulation with respect to the timing or quantity of instream flows. AR 373-378.)

conditions on its approval of right-of-way location changes.

At the time these stipulations were adopted, none of the listed fish species at issue in this suit (salmon, Delta smelt, green sturgeon) had yet been listed under the ESA.[15] Thus, the adoption of the stipulations could not have possibly triggered any ESA Section 7 consultation duty at the time. Nor are Federal Defendants required to retroactively consult on the adoption of stipulations finalized decades earlier. As the Ninth Circuit has noted, "Congress did not intend for section 7 to apply retroactively, but only to 'projects which remain to be authorized, funded, or carried out' by the federal agency." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1510 (9th Cir. 1995) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. at 187 n.32). Furthermore, since the most recent of the stipulations was entered into 28 years ago, any claim that approval of such stipulations by the Department violated the ESA (or NEPA) would be time-barred, since Plaintiffs' Complaint was not "filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a).

> 4.  *The City's Adherence to the Stipulations Does Not Give Rise to Any ESA Section 7 Consultation Obligation on the Part of USFWS or Any Federal Defendant.*

Plaintiffs imply that Federal Defendants or USFWS, which is not a defendant, triggered ESA Section 7 obligations simply by coordinating with the City on the City's continued adherence to the stipulations. Thus, Plaintiffs mistakenly allege that Federal Defendants and USFWS exercised "discretionary authority over Hetch Hetchy operations when they authorized the City to deviate from the prescribed fish flow regime in 1987, 1988, 1989, 1990, 1991, 1992, 2009, and 2010." Pls.' Br. at 19. One reason this argument fails is that the examples cited by Plaintiffs concern USFWS coordination with the City, and Plaintiffs have asserted no justiciable ESA claim against either of these entities. *See supra* at 24-26. Furthermore, these examples do not reveal any ESA violation, because they do not reflect any actions triggering an ESA consultation obligation. No ESA consultation obligation arises unless two criteria are met: (1) a federal agency "affirmatively authorized, funded, or carried out" an activity that may affect listed

---

[15] Delta smelt was listed 1993; green sturgeon and Central Valley Steelhead in 2006, and Central Valley spring-run chinook salmon in 2013. *See* 50 C.F.R § 224.101-102. Winter-run Chinook salmon was first listed in 1990. *See* 55 Fed. Reg. 12191 (Apr. 2, 1990).

species, and (2) in undertaking the affirmative action, the federal agency "had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe*, 681 F.3d at 1020-2. Neither criteria are met here. Because it will help provide useful context on the nature of the stipulations, we will discuss the second criterion first.

**(a) The Stipulations Do Not Convey Any Discretion for Federal Defendants or USFWS to Impose New Instream Flow Requirements for the Benefit of ESA-Listed Fish Species in the Delta**.

The stipulations do not confer any ongoing authority or discretion on the part of Federal Defendants or USFWS to "influence or change the activity for the benefit of" the ESA-listed fish species at issue in this case. *Karuk Tribe*, 681 F.3d at 1020-21. The City's operation of the Project in conformance with the stipulations is not a new federal agency action, but even if it was, it would not trigger a new ESA consultation duty for the species at issue here. As the Ninth Circuit noted, if "an agency cannot influence a private activity to benefit a listed species, there is no duty to consult because 'consultation would be a meaningless exercise.'" *Karuk*, 681 F.3d at 1025 (quoting *Sierra Club v. Babbitt*, 65 F.3d 1502, 1508-09 (9th Cir. 1995)).

The stipulations, including the 1985 and 1987 stipulations now governing the City's minimum instream flow requirements, provide no discretion for Federal Defendants to impose additional instream flow requirements upon the City for the benefit of ESA-listed fish species in the Delta. These stipulations provide specifically delineated and quantified instream flows for the benefit of resident fish and recreational and aesthetic values in the Hetchy Reach. Although Plaintiffs have alleged that Federal Defendants annually approve instream flows, the stipulations do not create any such authority or requirement. The stipulations do provide for the possibility of additional flow requirements, but only under the conditions and terms specified in the stipulations. Those terms make clear that such additional flows could only be required if studies called for by the stipulations identify such flows as necessary to protect resident fish and aesthetic and recreational values in the Hetchy Reach below O'Shaughnessy Dam. They provide no authority or discretion to impose new instream flow requirements to benefit other fish far away in the Delta.

As Plaintiffs acknowledge, these stipulations were "calculated to benefit game fish in the

Upper Tuolumne River." Pls.' Br. at 20. Because the Canyon Tunnel as originally approved by the Department in 1914 and 1917 included no provision for the protection of resident fish or recreational and aesthetic resources in the Hetchy Reach, the Department used the opportunity presented by the City's application for amended rights-of-way in 1958 to impose minimum instream flows "to insure adequate protection to the aquatic life that exists in the Tuolumne River between the dam and the site of the new powerhouse [at Early Intake]," AR 124-127, and to protect recreational and aesthetic values. AR 221-231. As the Secretary noted in his letter approving the 1961 Stipulation:

> The interests of sport fishery and recreation can be protected by requiring continuing releases of water from O'Shaughnessy Dam to maintain the Tuolumne as a·live stream between the dam and Early Intake. This will be of great importance as there is· no requirement for release of water to maintain a live stream under the original, south side right-of-way.

Letter from Stuart Udall to the City, 4-27-61, AR 347. To meet these objectives, Provision 6 of the 1961 Stipulation provided fixed, interim instream flow schedules based on time of year (75 cfs in the summer, 35 cfs in the fall-winter). 1961 Stipulation, Provision 6, AR 351. It provided for the City, the Park Service, USFS, and USFWS to jointly carry out studies as to whether these flows were adequate for the resident fisheries in the Upper Tuolumne River (specifically, studies of the resulting conditions "for the spawning of trout" in the Hetchy Reach). 1961 Stipulation, Provision 6, AR 352.

These studies led to the 1985 Stipulation, which amended Provision 6 of the 1961 Stipulation, adding new minimum instream flow requirements based on three "Schedules" A, B, and C, depending on the amount of precipitation in the preceding year. AR 1495-98. In addition to quantifying the minimum instream flows, the 1985 Stipulation again noted that they were limited to "the Tuolumne River from O'Shaughnessy Dam to Early Intake." AR 1495. It also provided for additional fishery, wildlife, recreational and aesthetic studies to assess the adequacy of such flows, in the event that the City sought to later construct or expand facilities that would alter the flows in the Hetchy Reach. AR 1503-04. The purpose of these requirements was "to protect fishery, recreation and esthetic values of the Tuolumne River within Yosemite National Park and Stanislaus National Forest while minimizing impacts to municipal water supplies and

hydroelectric generation." AR 1434.

In 1987, the City and the Department entered into a new stipulation ("1987 Stipulation") as a result of the City's proposal to add a third generator at the existing Kirkwood Powerhouse. AR 1847-1858. The 1987 Stipulation supplemented the 1985 Stipulation and stated that its purpose was "provide for additional protection of fishery resources and . . . to enhance park resources and visitor enjoyment." AR 1849. It called for additional studies of the effects of the new generator on "habitat for and populations of resident fish species, between O'Shaughnessy Dam and Early Intake." AR 1849-50. Provision 2 stated that "[i]f, as a result of the foregoing studies, [USFWS] preliminarily determines . . . that flows in the upper region of the Tuolumne River between O'Shaughnessy Dam and Early Intake should be increased, the City will adjust its minimum releases as set forth" in Provision 2. AR 1850. Such increases would be "to mitigate any deficiency in the existing flow release schedule shown to be required as a result of the studies." AR 1850-1852. The 1987 Stipulation then specifies additional blocks of instream flows that can be triggered and added to the minimum instream flows that were quantified in Schedules A, B, and C of the 1985 Stipulation. AR 1850-52. The 1987 Stipulation states that such flows "shall remain in the Tuolumne River between O'Shaughnessy Dam and New Don Pedro Reservoir." AR 1852.

Plaintiffs misleadingly allege that under the 1987 Stipulation, "the United States may 'dictate an increase to the present flow regime,' and the Secretary has final authority to 'determine what additional flows, if any, shall be required.'" Pls.' Br. at 18-19 (citing AR 1852).[16] The 1987 Stipulation actually says something different: "In the event that the results of all studies dictate an increase to the present flow regime as determined by the U.S. Fish and Wildlife Service, such an increase shall be implemented by the City, without right to any appeal, . . . up to the limits set forth in paragraph 2 above." AR 1854. This clause, limiting changes to those pre-determined levels, does not provide some carte blanche to a Federal agency to "dictate

---

[16] Plaintiffs cite the 1987 Stipulation at Provision 2, AR 1852, for the "dictate" language. But this citation is incorrect. The quoted language actually appears in Provision 4 at AR 1854.

an increase to the present flow regime," as Plaintiffs suggest. Under this provision of the 1987 Stipulation, additional flows could only be required as determined necessary by the studies, and such studies would only address the needs of resident fish in the Hetchy Reach, not fish in the Delta. Moreover, this clause specifically determines the *amount* of such additional flows, which will be "up to the limits set forth in paragraph 2" of the 1987 Stipulation. AR 1854.

Other terms, in Provision 5 of the 1987 Stipulation, leave open the possibility that USFWS might eventually recommend additional changes to this flow release schedule, based again on the above-referenced studies of the needs of resident fish in the Hetchy Reach just below O'Shaughnessy Dam. AR 1854-55. Such additional requirements would be subject to the City's right to administrative appeal. AR 1854-55. After such a hearing, "[t]he Secretary, after considering the proposed findings of fact and the record, shall determine what additional flows, if any, shall be required." AR 1854-55. The studies that would underlie such requirements were never finalized, *see supra* at 11, and this provision has never been triggered, so no Federal agency action has ever occurred under its terms that could be alleged to have triggered an ESA consultation obligation. Nor do these terms confer discretion upon Federal Defendants to impose new instream flows for the benefit of the ESA-listed salmon, Delta smelt, or green sturgeon in the Delta, since any such changes would only be to address needs identified in studies of the habitat needs of resident fish in the Hetchy Reach in the Upper Tuolumne River. AR 1854.

In short, the stipulations do not confer any authority or discretion on any Federal Defendant to impose new instream flow requirements for the benefit ESA-listed salmon, Delta smelt, and green sturgeon in the Delta. The fact that the flow provisions of the 1985 and 1987 stipulations are still in effect cannot alone give rise to the ESA consultation duty alleged by Plaintiffs. Courts have already reached the same conclusion in analogous situations. In *Environmental Protection Information Center v. Simpson Timber Company*, the Ninth Circuit held that there was no ESA consultation duty where "the FWS [had] not retained discretionary control over Simpson's incidental take permit that would inure to the benefit of the marbled murrelet or the coho salmon." 255 F.3d 1073, 1082, 1083 (9th Cir. 2001). In *Sierra Club v. Babbitt*, the Ninth Circuit found that implementation of a right-of-way granting access over BLM

land to build a logging road, subject to BLM's approval, did not trigger ESA Section 7 consultation because the right-of-way terms conferred a "continuing ability to influence the private conduct" only with respect to "three factors unrelated to the conservation of the threatened spotted owl." 65 F.3d 1502, 1508 (9th Cir. 1995). In *National Association of Home Builders v. Defenders of Wildlife*, the Supreme Court found no ESA Section 7 obligation for an EPA decision to transfer permitting authority to a state, because "[n]othing in the text of [the statute] authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating" the decision. 551 U.S. 644, 671 (2007). Similarly, the instream flow provisions of the 1985 and 1987 Stipulations do not authorize USFWS or Federal Defendants to impose new instream flow requirements for the benefit of fish in the Delta.

### (b) Even if Plaintiffs Had Asserted Any Claim Against USFWS, The Examples They Cite of Coordination Between the City and USFWS Were Not Affirmative Actions Triggering ESA Consultation.

Plaintiffs cite instances in which the City corresponded with USFWS about the City's adherence to the stipulations. *See* Pls.' Br. at 6-7, 19-20. However, such coordination between the City and USFWS does not constitute any affirmative agency action by Federal Defendants that would trigger ESA consultation obligations. As just discussed, the stipulations did not confer any authority or discretion for Federal Defendants or USFWS to "influence or change the activity for the benefit of" the ESA-listed fish in the Delta. *Karuk Tribe*, 681 F.3d at 1020-21. Moreover, most of Plaintiffs examples involve interactions between the City and USFWS, neither of which is a Federal Defendant subject to any of Plaintiffs' claims. *See supra* at 24-26. Furthermore, the City's ongoing adherence to the stipulations does not give rise to a new Federal agency action triggering ESA consultation duties for Federal Defendants or USFWS. *See Cal. Sportfishing Prot. Alliance v. FERC*, 472 F.3d 593, 595 (9th Cir. 2006) (holding that where a licensee operates a dam under a Federal Energy Regulatory Commission ("FERC") license, "the ESA imposes no duty to consult about activities conducted by [the utility] pursuant to a previously issued, valid license from FERC")*; see also Karuk Tribe*, 681 F.3d at 1021 (noting that there is not a new federal agency action where a licensee is simply "proceeding pursuant to a vested right or to a previously issued license"); *Sierra Club v. Babbitt*, 65 F.3d at 1510 (exercise

of pre-existing right-of-way did not trigger ESA Section 7, because "Congress did not intend for section 7 to apply retroactively").

The series of communications between the City and USFWS cited by Plaintiffs merely show operational level coordination regarding the terms of the 1985 and 1987 Stipulations. For example, in 1987, USFWS initiated the fishery studies called for in the 1987 Stipulation, and determined that based upon its review of data, including air and water temperature data, that summer water temperatures might become "detrimental to trout growth" in the reach between O'Shaughnessy Dam and Early Intake. AR 1859. USFWS therefore "recommend[ed]" on July 16, 1987 that some additional flows be provided pursuant to the requirements of Schedule C of Provision 2 of the 1987 Stipulation. AR 1859-60. A few weeks later, on August 5, 1987, USFWS informed the City that because July 1987 air temperatures had been cooler than normal, USFWS recommended that the instream flows could be reduced. AR 1865-66. Similar communications occurred in 1988 AR 1882-83), 1989 AR 1909-10), 1990 AR 1917-18), 1991 AR 1923), and 1992 AR 2017-18). The agencies were simply carrying out the stipulations' provisions for adjusting instream flows by specified amounts, according to pre-determined schedules and criteria.[17] None of these communications reflect the exercise of any authority or discretion on the part of a Federal Defendant or USFWS to impose new instream flow requirements, or to take additional action for the benefit of ESA-listed fish in the Delta.

As described earlier, in the period from the early 1990s to the 2000s, the City began to change its operation of the Project to more closely resemble natural flows, adopting a new stewardship policy in 2006, and in 2009, establishing a new scientific study plan to pursue such goals. *See supra* at 11-12. In July 2009, the City asked USFWS to "confirm that the study plan meets USFWS needs for the instream flow evaluation." AR 3301-02. It also informed the Park Service and USFWS that the proposed habitat studies would require short-term, temporary

---

[17] As noted above, none of the fish species at issue in this case were listed under the ESA until 1990. Moreover, the interactions between the City and USFWS cited by Plaintiffs largely occurred more than six years before Plaintiffs filed suit, so any claims regarding them would be time-barred. 28 U.S.C. § 2401(a).

changes to the minimum instream flows normally provided under the stipulations. AR 3301, 3334.[18] The stipulations provide that the City must notify these agencies "in advance of any anticipated noncompliance with the schedule of minimum reservoir releases." AR 1495. USFWS responded to this notification by informing the City that this "study plan meets the [USFWS] needs for the instream flow evaluation." AR 3303. In March 2010, the City again informed USFWS and NPS of a need to temporarily deviate from minimum instream flows for study purposes, reducing flows, for a period of up to four days, from the Schedule A rate of 60 cfs to 35 cfs. AR 2115. It requested that USFWS "confirm that this year's approach to implementing the 2009 study plan is supported by the USFWS." AR 2115. USFWS responded that it was "in agreement with the deviation . . . to complete the final habitat mapping and data collection for 2-D habitat modeling." AR 3335.

In sum, when the City communicated with USFWS about instream flows in 1987-1992, the agencies were coordinating implementation of the flow schedules and studies called for in the 1985 and 1987 stipulations. The exchanges in 2009-2010 reflected the City making minor, short-term deviations from the minimum flow levels in order to carry out further studies (again addressing fish habitat needs in the Upper Tuolumne River), and informing USFWS, USFS and NPS in advance of these minor deviations, as required by the stipulations. On none of these occasions did any Federal Defendant or USFWS take a new, affirmative agency action regulating the City's diversions, nor on any of these occasions did Federal Defendants or USFWS exert some discretionary authority under which it could have imposed new flow requirements to benefit ESA-listed fish species in the Delta. Thus, none of these instances gave rise to a duty for Federal Defendants or USFWS to initiate an ESA Section 7(a)(2) consultation.

---

[18] These changes would occur on particular days in August, September, and October 2009 in order to assist with mapping fish habitat in the River. On some days, instream flows would fall below the minimums, and on other days they would be more than the required minimum. AR 3305. The net effect of the changes proposed by the City would be to add a net 69 more acre-feet of instream flow between August and October 2009 *Id*. This represented a 0.1% increase in the instream flows for 2009 relative to the 59,235 acre-feet required for a Schedule A year under the 1987 Stipulation. *See* AR 1498.

*5.    None of the Other Authorities Cited by Plaintiffs Establishes Any ESA Section 7(a)(2) Violation by Federal Defendants*

Plaintiffs cite various other authorities or documents that they claim or imply somehow show that Federal Defendants possessed and exercised discretion to regulate instream flows. But in each instance, Plaintiffs have failed to provide any basis for finding an ESA violation.

Plaintiffs claim that "the Park Service has discretion to protect its senior water right, created in 1890 when Congress withdrew Yosemite National Park from the public domain, against excessive Hetch Hetchy withdrawals." Pls.' Br. at 20-21 (citing *Cappaert v. United States*, 426 U.S. 128, 138 (1976)). But Yosemite National Park's reserved water rights do not encompass the ability to claim water for the preservation of fish in the Delta: "The implied-reservation-of-water-rights doctrine . . . reserves only that amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert*, 426 U.S. at 141. In *Cappaert*, for instance, the court held that a federal reservation of land to a national monument encompassed water rights to protect an endangered fish, but that was because the proclamation establishing the reservation explicitly stated that the reservation's specific purpose was to protect that very fish ("a peculiar race of desert fish" found "nowhere else in the world") and the pool that it lived in. *Id*. at 132. The situation here could hardly be more different. The land that became Yosemite National Park was reserved to preserve the natural resources "within said reservation." 51 Cong. Ch. 1263, § 2, 26 Stat. 650, 651 (1890). The fish in the Delta are <u>not</u> "within" Yosemite National Park, or anywhere near it. There is no basis to conclude that this reservation of lands provided the Park with discretion to enforce federal reserved water rights for protection of the fish in the Delta.

Also unavailing is Plaintiffs invocation of a 2010 Memorandum of Agreement in which the Park Service and the City agreed to "collaborative efforts to improve environmental stewardship of the Upper Tuolumne River ecosystem . . . [that] will [] assist in carrying out stipulations entered into by the SFPUC with the Department of the Interior . . . ." Pls.' Br. at 10 (quoting AR 2090). Plaintiffs claim that the Memorandum of Agreement "states that water releases, including Hetch Hetchy, will 'mimic the variation of the seasonal hydrology (e.g.,

magnitude, timing, duration, and frequency) of their corresponding watersheds in order to sustain the aquatic and riparian ecosystems upon which these native fish and wildlife species depend.'" Pls.' Br. at 10 (quoting AR 2109, at app. C). In fact, the Memorandum of Agreement says nothing of the sort. The language Plaintiffs quote is from one of its *appendices*, consisting of a copy of the City's own Environmental Stewardship Policy adopted years earlier. That document does not confer any regulatory authority upon Federal Defendants.

Plaintiffs also argue that "[t]he federal Defendants also must consult on the effects of the O'Shaughnessy Dam Instream Flow Management Plan." Pls.' Br. at 21. Plaintiffs never asserted any such claim in their Complaint or their notice of intent to file suit, and thus such a claim is not justiciable here. *See supra* at 24-26. Nor have Plaintiffs pointed to any action by a Federal Defendant that would trigger a duty to initiate consultation. The Draft Plan is only a stakeholder draft that has not been finalized, and is thus does not yet reflect any affirmative agency action by any agency, let alone a federal agency. *See Karuk Tribe*, 681 F.3d at 1020-21; *see also* AR 2172, 2354 (noting that "required environmental review" with input from agencies and the public is needed before any of Draft Plan's recommendations could be implemented). As this Court has stated, "the 2014 Draft Flow Plan is just that, a <u>draft</u>. The 2014 Draft Flow Plan is therefore not a 'decision' subject to this Court's jurisdiction under the APA." Order Denying Mot. to Supp. the Record, Doc. 61, at 7 (emphasis in original). Since the plan has not yet been finalized, there cannot be an ESA Section 7 violation for, to use Plaintiffs' phrase, failure to "consult before finalizing" it. See Pls.' Br. at 3.

Plaintiffs quote regulations requiring an ESA action agency to review its actions "at the earliest possible time" to determine whether an action may affect listed species. Pls.' Br. at 21 (quoting 50 C.F.R. § 402.14(a)). But Plaintiffs cite no authority for the unlikely proposition that a federal agency could be held in violation of ESA Section 7(a)(2) for failure to consult simply because a non-Federal agency has written a draft plan that it has never finalized, adopted, submitted to any federal agency for approval, or implemented. The only case Plaintiffs cite is readily distinguishable. In *Pacific Coast Federation of Fisherman's Associations v. U.S. Bureau of Reclamation*, the action agency had months earlier already *completed and implemented* the

Klamath Project 2000 Operations Plan, and was found in violation of ESA Section 7 because it never consulted on it, despite the fact that the plan "has been in effect now for almost a year." 138 F. Supp. 2d 1228, 1243-44 (N.D. Cal. 2001). Here, in contrast, the plan in question has not yet been completed, let alone put into effect. AR 2152. Nor is there any reason to doubt that the relevant agencies can comply with ESA Section 7 by commencing consultation, if such is required, prior to the plan being put into effect. As the Draft Plan plainly states, the City will not put the plan into effect until "after required environmental review and input from collaborators, resource agencies, the Upper Tuolumne River Stakeholder Group, and other interested parties." AR 2172, 2354. Plaintiffs do not show that any Federal Defendant has violated any ESA Section 7(a)(2) duty with respect to the Draft Plan.

**III.    Plaintiffs' ESA Section 9 Claim Has Been Waived and is Also Unfounded.**

In their Complaint, Plaintiffs pleaded an ESA Section 9 claim against Federal Defendants. *See* Compl. ¶ 23 (alleging that by "authorizing the diversion of water out of the Tuolumne River," Federal Defendants "have caused, and continue to cause, a take of . . . threatened and endangered species in violation of Section 9 of the federal Endangered Species Act"). But Plaintiffs did not include that claim in their summary judgment motion, and made no argument in support of that claim in their opening brief. Because Plaintiffs failed to assert or argue their ESA Section 9 claim against Federal Defendants, it has been waived and abandoned. *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("[A]rguments not raised by a party in its opening brief are deemed waived.") ; *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Marine Fisheries Serv.*, No. 13-CV-03717-NC, 2015 WL 3466314, at *9 (N.D. Cal., May 29, 2015) ("The Court finds that KS Wild's failure to raise the third claim on their summary judgment motion constitutes a waiver."); *Mountain States Legal Found. v. Espy*, 833 F. Supp. 808, 813 n.5 (D. Idaho 1993) (deeming claims not raised in summary judgment motion abandoned and granting judgment for defendants).

Plaintiffs might assert that they did in fact assert an ESA Section 9 claim in their motion and brief. However, it is plain that they only assert such a claim in their motion and brief <u>against the City</u>. An assertion that the City is "taking" ESA-listed fish is obviously a different claim than

a claim that a Federal Defendant is "taking" ESA-listed fish.[19] *See* Pls.' Mot. for Summ. J. Doc. 65, at 1; Pls.' Br. at 2, 29.

While Plaintiffs have waived their ESA Section 9 claim against Federal Defendants, such a claim would also fail on the merits. As already discussed, Federal Defendants do not carry out or authorize the Project water diversions that Plaintiffs allege are harmful to the ESA-listed salmon, smelt, and sturgeon in the Delta. Furthermore, Plaintiffs have not proven that the diversions "take" any of these species. To prevail on an ESA Section 9 claim, a Plaintiff must prove by a preponderance of the evidence that a "reasonably certain threat of imminent harm to a protected species" exists. *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996). Habitat modification may constitute "harm" to a listed species, but only if it "actually kills or injures wildlife." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 691 (1995) (quoting and affirming the definition in 50 C.F.R. § 17.3). A "potential" injury to the species is "inadequate to establish Section 9 liability." *Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1270 (W.D. Wash. 2008) (quoting *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995)). Plaintiffs have provided no evidence whatsoever of any take of ESA-listed species due to the violations they allege. In fact, they admit that "neither the Center nor its members has any information regarding the nature and extent to which extraction of water from the Tuolumne River through the Hetch Hetchy Project may affect downstream species including the Delta smelt, salmon, steelhead, and green sturgeon—all listed as threatened or endangered." Manson Decl. ¶ 6. Plaintiffs have provided no basis at all for finding Federal Defendants to be in violation of ESA Section 9.

**IV.    Plaintiffs Fail to Show Any Violation of NEPA.**

In their complaint, Plaintiffs also purport to present a claim for alleged NEPA violations by Federal Defendants. Specifically, they allege that

---

[19] In addition, Plaintiffs' Complaint did not assert any ESA Section 9 claim against the City, or name the City as a defendant with respect to *any* claim. Furthermore, the ESA 60-day notice of intent to sue that Plaintiffs reference in their Complaint is not addressed to the City, and makes no mention of ESA Section 9 violations by the City. See Doc. 1-1.

> Defendants' decision to prescribe instream flows and other operating requirements for the Hetch-Hetchy Project is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law because, in making this decision, Defendants made no effort to comply with the NEPA requirement that requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public of the environmental concerns that went into the agency's decision-making.

Doc. 1 at ¶ 26. According to Plaintiffs, Defendants failed to comply with an asserted NEPA "obligation to prepare an environmental impact study before prescribing the annual instream flow and other operating requirements for the Hetch Hetchy Project." *Id.* at ¶ 27. In their prayer for relief, Plaintiffs seek an injunction prohibiting further Hetch Hetchy operations until Federal Defendants comply with NEPA. Doc. 1 at 14.

Yet in their opening merits brief (and in contrast to their complaint), Plaintiffs utterly fail to make any attempt to sustain these NEPA allegations and claims. Specifically, Plaintiffs make no effort to support the complaint's allegations that the Park Service "annually approves" the City's diversions from the Tuolumne River in violation of NEPA. Likewise, they cite no record evidence in support of any alleged NEPA violation. Indeed, there is not even a single reference to the NEPA statute itself throughout their October 31, 2015 brief. See Doc. 65-1 at 4 (table of statutes). In these circumstances, Plaintiffs have abandoned their NEPA claims. Consequently, the Court should declare that Plaintiffs have waived their NEPA claims, and that Federal Defendants are entitled to dismissal of those claims for failure to prosecute. See *Klamath-Siskiyou Wildlands Center*, 2015 WL 3466314 at *9 ("KS Wild's failure to raise the third claim on their summary judgment motion constitutes a waiver"); *see also USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994) ("It is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment.").

Compounding the NEPA deficiencies in Plaintiffs' opening brief is a statute of limitations problem which dooms their NEPA claims. There has been no showing by Plaintiffs that they have brought their NEPA claims within six years of any Interior Department action "approving" minimum flow releases to protect fish species in the Hetchy Reach. As previously stated, the record establishes that the minimum release restrictions on the City were imposed by way of three conditioning stipulations, one in 1961, another in 1985, and yet a third in March

1987, the last one occurring nearly 28 years before Plaintiffs brought their NEPA claims.[20] Per 28 U.S.C. § 2401(a), the latest Plaintiffs could have mounted a NEPA challenge to the most recent of those stipulations was March 1993. Thus, even if Plaintiffs' complaint might otherwise be treated as stating an actionable claim for NEPA violations, it must be deemed time-barred under the six year limitations period established by 28 U.S.C. § 2401.

In any event, even if Plaintiffs were to challenge the City's 2009 and 2010 temporary deviations from the 1985 and 1987 stipulations' minimum flow schedules as violative of NEPA, Plaintiffs make no showing that such deviations could trigger a NEPA review on the part of the Park Service. The Park Service played no official role in "approving" the deviations. And, as explained *supra* at 24-26*,* the entity with whom the City dealt directly here, the USFWS, is not a party.

Plaintiffs utterly fail to explain how such temporary deviation needed to perform scientific study of the effects of such deviations on habitat could rise to the level of a major federal action having a significant impact on the quality of the human environment, requiring NEPA review. The first deviation below the stipulation minimum releases, designed for habitat mapping research purposes was scheduled to occur on just seven days in August 2009, and four days in October 2009. AR 3305. On all other days in August 2009 and September 2009 the habitat mapping releases were planned to exceed the minimum stipulation releases, and, in all, would result in 69 acre-feet more than the minimum stipulated releases would have been during the August – October 2009 period. Id. The 2010 deviations for final habitat mapping research purposes were to occur over just four days in March of that year, and were expected to have "no adverse effect on the aquatic ecosystem. AR 2115. The USFWS actions concerning those deviations are better described as "acquiescences," a discretionary form of contractual forbearance, rather than approvals. Even if such deviations were somehow considered subject to

[20] The 1961 Stipulation predated NEPA's enactment. NEPA studies were performed for both the 1985 Stipulation AR 817 -1370, 1431-54, 1455-77) and the 1987 Stipulation AR 1564-1649, and 1722-1809). The minimum release restrictions traceable to those three stipulations are still in effect.

NEPA scrutiny, USFWS already had in place at least one categorical exclusion from NEPA review, i.e., the very type of actions that the City undertook with USFWS acquiescence. *See* Fed. Defs.' Exh. 1 (attached) at 4 (establishing NEPA categorical exclusion for "[r]esearch, inventory, and information collection activities directly related to conservation of fish and wildlife resources which involve negligible animal mortality or habitat destruction . . . . " ).[21]

Finally, Plaintiffs cannot be heard to claim that the Park Service's actions with respect to the City's development of the 2014 draft O'Shaughnessy Plan ("Draft Plan") are somehow actionable under NEPA. That Plan is not referenced in the complaint. That plan is not final even at the City level. It has not been presented for Park Service approval. See AR 2172, 2354 (noting that "required" environmental review" with input from agencies and the public is needed before any of the Draft Plan's recommendations could be implemented). There has been no final federal action or irretrievable commitment of federal resources concerning the Draft Plan that could impose any NEPA responsibilities for the Park Service. Any NEPA objections to the Draft Plan are therefore fatally unripe. Accordingly, Plaintiffs' NEPA claims are without merit, and the Court should either dismiss those claims for failure to prosecute them in their opening brief, or grant summary judgment on those claims in favor of Federal Defendants.

## CONCLUSION

For the reasons stated above, Plaintiffs have not shown any violation of the ESA or NEPA by Federal Defendants, and the Court should therefore grant summary judgment to Federal Defendants, deny Plaintiffs' summary judgment motion, and dismiss Plaintiffs' action with prejudice.

Dated: December 9, 2015                    Respectfully Submitted,

                                           JOHN CRUDEN,
                                           Assistant Attorney General

---

[21] See also 43 C.F.R. § 46.210(j) (establishing NEPA categorical exclusions for "Activities which are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.")

/s/ *Edward S. Geldermann*

EDWARD S. GELDERMANN
Senior Litigation Counsel
ANNA K. STIMMEL
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Tel: (202) 305-0242
Fax: (202) 305-0506

SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Assistant Chief


/s/ *Daniel Pollak*

DANIEL POLLAK, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369, Ben Franklin Station
Washington, D.C. 20044-7611
Tel: (202) 305-0201

Fax: (202) 305-0275

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2015 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record:

Roger J. Marzulla
roger@marzulla.com

Leah R. Zabel
Lrzlaw@gmail.Com

Ella Foley Gannon
Ella.Gannon@morganlewis.Com

Jonathan Pais Knapp
Jonathan.Knapp@sfgov.Org

Sandra Patricia Franco
Sandra.Franco@morganlewis.Com

Sarah M. Keane
Sarah.Keane@morganlewis.Com

/s/ *Daniel J. Pollak*
DANIEL J. POLLAK
Trial Attorney