Roger J. Marzulla, SBN 51113
Nancie G. Marzulla
M. Rhead Enion, SBN 272098
Marzulla Law, LLC
1150 Connecticut Ave. NW
Suite 1050
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)
roger@marzulla.com
nancie@marzulla.com
rhead@marzulla.com

Counsel for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY & RELIABILITY, et al. | ) ) ) | Case No. 14-cv-02063-LJO-MJS |
| NATIONAL PARK SERVICE, et al., | ) ) ) ) | PLAINTIFFS' COMBINED REPLY IN  SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' CROSS-MOTIONS |
| Defendants, | ) ) | |
| and | ) | Hon. Lawrence J. O'Neill |
| CITY & COUNTY OF SAN FRANCISCO, | ) ) | Hon. Michael J. Seng |
| Defendant-Intervenor. | ) ) | U.S. Magistrate Judge |

**Table of Contents**

Table of Authorities ................................................................................................................... iii

I.      The Secretary has both a duty under the ESA and statutory authority to prevent harm to the ESA-listed fish species resulting from operation of the Hetch Hetchy Project .............1

      A.      The Secretary has the affirmative duty under the ESA to use all her legal authorities to conserve listed species .......................................................................1

      B.      The Secretary has the legal authority to protect the listed fish species here............3

            1.      The Yosemite Park Act and National Park Service Organic Act ................3

            2.      Federal reserved water right........................................................................6

            3.      The Raker Act ..............................................................................................8

      C.      The Secretary's pre-listing approval of Hetch Hetchy operations did not exempt the project from consultation when the species were listed and critical habitat designated .........................................................................................10

II.     The City's continued water extraction from the Tuolumne is a take of the listed species under ESA Section 9 ......................................................................................................12

      A.      The record shows that the City's water extraction harms the species ...................14

      B.      The City's adverse effects on habitat and the species are a take prohibited by Section 9......................................................................................................18

III.    The Center's 60-day notice was adequate for its ESA claims—and was not required for its APA claims ...........................................................................................................18

      A.      The Center's claims against Federal Defendants are properly brought under the APA, not the ESA citizens' suit provision........................................................19

      B.      The City, as intervenor, may not raise the argument that the 60-day notice is inadequate..........................................................................................................19

      C.      The Center's notice letter was more than adequate to apprise Defendants of the Center's claim that Hetch Hetchy water extraction was adversely affecting downstream listed fish species, in violation of ESA .............................20

      D.      Nothing in the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure required the Center to specifically name FWS in its complaint.................................................................................................................24

IV.    The individual Plaintiffs and the Center have standing to bring these claims...................25

      A.    The Center has injury-in-fact sufficient to establish organizational and
            associational standing ...................................................................................................26

            1.    The Center has organizational standing.....................................................27

            2.    The Center has associational standing ......................................................30

      B.    Plaintiff Sagouspe has injury-in-fact sufficient to support standing......................33

      C.    Federal Defendants' waived any argument concerning redressability ..................35

Conclusion ..................................................................................................................................36

Certificate of Service

**Table of Authorities**

**Cases**

*Am. Rivers v. Nat'l Marine Fisheries Serv.*,
    126 F.3d 1118 (9th Cir. 1997) ................................................................................................ 19

*Babbitt v. Sweet Home Chapter of Communities for a Great*
    *Ore.*, 515 U.S. 687 (1995)....................................................................................................... 13

*Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*,
    849 F.Supp. 717 (1993) ........................................................................................................... 18

*Bennett v. Spear*,
    520 U.S. 154 (1997)........................................................................................................... 19, 34

*Cappaert v. United States*,
    426 U.S. 128 (1976)................................................................................................................... 7

*Carson-Truckee Water Conservancy Dist. v. Clark*,
    741 F.2d 257 (9th Cir. 1984) .................................................................................................... 3

*Cent. Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002) ............................................................................................ 28, 32

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*,
    305 F.3d 943 (9th Cir. 2002) ............................................................................................ 20, 21

*Coal. for a Sustainable Delta v. F.E.M.A.*,
   711 F. Supp. 2d 1152 (E.D. Cal. 2010) ................................................................ 31, 32, 35, 36

*Conservation Congress v. Finley*,
   774 F.3d 611 (9th Cir. 2014) ................................................................................ 20

*Council for Endangered Species Act Reliability v. Jackson*,
   No. 3:10-cv-08254, 2011 WL 4479082 (D. Ariz. Sept. 27, 2011) ........................ 25

*District of Columbia v. Merit Sys. Prot. Bd.*,
   762 F.2d 129 (D.C. Cir. 1985) .............................................................................. 20

*Ecological Rights Found. v. Pacific Lumber Co.*,
   230 F.3d 1141 (9th Cir. 2000) .............................................................................. 28

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*,
   255 F.3d 1073 (9th Cir. 2001) .......................................................................... 6, 10

*Friends of the Earth v. Gaston Copper Recycling Corp.*,
   204 F.3d 149 (4th Cir. 2000) ................................................................................ 28

*Glacier Park Found. v. Watt*,
   663 F.2d 882 (9th Cir. 1981) ................................................................................ 24

*Hunt v. Wash. State Apple Adver. Comm'n*,
   432 U.S. 333 (1977) ........................................................................................ 30, 32

*Hynes v. Grimes Packing Co.*,
   337 U.S. 86 (1949) ................................................................................................ 25

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
   681 F.3d 1006 (9th Cir. 2012) ........................................................................ 1, 5, 8

*Kerr v. Jewell*,
   549 Fed. App'x 635 (9th Cir. 2013) ..................................................................... 24

*Lane Cty. Audubon Soc'y v. Jamison*,
   958 F.2d 290 (9th Cir. 1992) ................................................................................ 11

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................................................. 26

*Marbeled Murrelet v. Babbitt*,
   83 F.3d 1068 (9th Cir. 1996) ................................................................................ 21

*Marcaida v. Rascoe*,
   569 F.2d 828 (5th Cir. 1978) ................................................................................ 19

*Natural Res. Def. Council v. Jewell*,
   749 F.3d 776 (9th Cir. 2014) ..................................................................................... 34

*Nat'l Assoc. of Home Builders v. U.S. Fish & Wildlife Serv.*,
   786 F.3d 1050 (D.C. Cir. 2015) ................................................................................. 35

*Pac. Coast Fed. of Fisherman's Assocs. v. Gutierrez*,
   606 F. Supp. 1195 (E.D. Cal. 2008) ............................................................................. 3

*Pac. Coast Fed. of Fishermen's
   Assocs.*, 606 F. Supp. 2d ...................................................................................... 12, 13

*Pac. Rivers Council v. Thomas*,
   30 F.3d 1050 (9th Cir. 1994) ..................................................................................... 11

*Pub. Interest Research Grp. v. Hercules, Inc.*,
   50 F.3d 1239 (3d Cir. 1995) ................................................................................. 20, 21

*Romero-Barcelo v. Brown*,
   643 F.2d 835 (1st Cir. 1981) ....................................................................................... 2

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) ............................................................................. 27, 33

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   52 F. Supp. 3d 1020 (E.D. Cal. 2014) ........................................................................ 35

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................................. 9, 12, 13

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ............................................................................... passim

*San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*,
   637 F. Supp. 2d 777 (E.D. Cal. 2008) ........................................................................ 12

*San Luis & Delta-Mendota Water Auth. v. United States*,
   672 F.3d 676 (9th Cir. 2012) ................................................................................. 3, 14

*Schneider v. Dumbarton Developers, Inc.*,
   767 F.2d 1007 (D.C. Cir. 1985) ................................................................................. 20

*Sierra Club v. Glickman*,
   156 F.3d 606 (5th Cir. 1998) .............................................................................. passim

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) ........................................................................... 33, 36

*Stamas v. Cty. of Madera*,
795 F. Supp. 2d 1047 (E.D. Cal. 2011)..................................................................................... 15

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
143 F.3d 515 (9th Cir. 1998) ...................................................................................................... 20

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978)................................................................................................ 2, 9, 11, 12

*TOMAC v. Norton*,
193 F. Supp. 2d 182 (D.D.C. 2002) .......................................................................................... 28

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
517 U.S. 544 (1996).................................................................................................................... 30

*United States v. Glenn-Colusa Irr. Dist.*,
788 F. Supp. 1126 (E.D. Cal. 1992)........................................................................................... 18

*United States v. Oregon*,
657 F. 2d 1009 (9th Cir. 1989) .................................................................................................. 20

*William v. Fanning*,
332 U.S. 490 (1947).................................................................................................................... 25

*Wyoming v. United States*,
279 F.3d 1214 (10th Cir. 2012) .......................................................................................... 24, 25

**Statutes**

16 U.S.C. § 1............................................................................................................................... 4

16 U.S.C. § 478........................................................................................................................... 8

16 U.S.C. § 1532......................................................................................................................... 13

16 U.S.C. § 1536.................................................................................... 1, 5, 7, 19, 22, 27

16 U.S.C. § 1540................................................................................................................ 19, 21

43 U.S.C. § 372........................................................................................................................... 9

43 U.S.C. § 383........................................................................................................................... 9

54 U.S.C. § 100101..................................................................................................................... 4

California Water Code § 12220 ................................................................................................... 16

Pub. L. No. 113-287..................................................................................................................... 4

Pub. L. No. 79-404...................................................................................................................... 18


**Rules**

Fed. R. Civ. P. 8........................................................................................................................ 24

Fed. R. Civ. P. 24...................................................................................................................... 19


**Regulations**

50 C.F.R. § 17.3........................................................................................................................ 13

50 C.F.R. §§ 402.01 ................................................................................................................... 2

50 C.F.R. § 402.02 ..................................................................................................................... 5

50 C.F.R. §§ 402.04 ................................................................................................................... 2

50 C.F.R. § 402.14 ..................................................................................................................... 6

50 C.F.R. § 402.16.................................................................................................................... 10


**Other Authorities**

Listing of the Sacramento River Winter-run Chinook Salmon as Threatened,
   55 Fed. Reg. 49,623 (Nov. 30, 1990)................................................................................... 11

Determination of Threatened Status for the Delta Smelt,
   58 Fed. Reg. 12,854 (Mar. 5, 1993)..................................................................................... 11

Designated Critical Habitat; Sacramento River Winter-Run Chinook Salmon,
   58 Fed. Reg. 33,212 (June 16, 1993) ................................................................................... 11

Critical Habitat Determination for the Delta Smelt,
   59 Fed. Reg. 65,256 (Dec. 19, 1994) ............................................................................. 11, 17

Listing of Several Evolutionarily Significant Units of West Coast Steelhead,
   63 Fed. Reg. 32,996 (June 17, 1998) ................................................................................... 11

Final Listing Determinations for 16 ESUs of West Coast Salmon, and Final 4(d) Protective
   Regulations for Threatened Salmonid ESUs,
   70 Fed. Reg. 37,160 (June 28, 2005) ................................................................................... 11

Designation of Critical Habitat for Seven Evolutionarily Significant Units of Pacific Salmon and Steelhead in California,
70 Fed. Reg. 52,488 (Sep. 2, 2005) ......................................................................................... 11

Threatened Status for Southern Distinct Population Segment of North American Green Sturgeon,
71 Fed. Reg. 17,757 (Apr. 7, 2006) ......................................................................................... 11

Final Rulemaking to Designate Critical Habitat for the Threatened Southern Distinct Population Segment of North American Green Sturgeon,
74 Fed. Reg. 52,300 (Oct. 9, 2009)......................................................................................... 11

Review of Native Species That are Candidates for Listing as Endangered or Threatened,
78 Fed. Reg. 70,104 (Nov. 22, 2013)................................................................................ 11, 17

7A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1920 (1972)..................... 19

FED. PRAC. & PROC. CIV. § 1622............................................................................................... 25

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' CROSS-MOTIONS**

Plaintiffs, the Center for Environmental Science, Accuracy & Reliability, and Jean Sagouspe (collectively, the Center), reply and respond to Federal Defendants' and the City's cross-motions as follows.

**I.     The Secretary has both a duty under the ESA and statutory authority to prevent harm to the ESA-listed fish species resulting from operation of the Hetch Hetchy Project**

No party seriously disputes that removing 220,000 acre-feet of water from Delta inflows each year adversely affects the listed species of smelt, salmon, and sturgeon that the Endangered Species Act (ESA) is supposed to protect.  Nor do they deny that Section 7 of the ESA imposes on all federal agencies an affirmative obligation to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species."[1]  Instead, Federal Defendants argue that the Secretary of the Interior and the agencies under her control (including the National Parks and the Fish and Wildlife services) have no authority to require additional instream flows from O'Shaughnessy Dam, and so have no power or duty to conserve the species.  This argument is wrong, refuted by the administrative record and by the same statutes they cite.

**A.     The Secretary has the affirmative duty under the ESA to use all her legal authorities to conserve listed species**

Federal Defendants do not contest that Section 7 of the ESA requires all federal agencies to "utilize their authorities in furtherance of the purposes of" the  Act, and that the ESA thus creates an affirmative duty for the agency to act if it has authority to do so.[2]

---

[1] 16 U.S.C. 1536(a)(1).

[2] *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) ("Section 7 imposes on all agencies a duty to consult with either the Fish and Wildlife Service or the NOAA

The Supreme Court described the comprehensive scope of the ESA in *TVA v. Hill*,[3] the snail-darter case, in which the Court halted construction on a nearly completed dam to protect an endangered downstream fish:

> [T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation. Its stated purposes were "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such . . . species . . . ."[4]

To accomplish this purpose, the ESA created a new, affirmative duty for all federal agencies, including Federal Defendants, to conserve listed species: "Given the plain language of the statute and its legislative history, we conclude that Congress intended to impose an affirmative duty on each federal agency to conserve each of the species listed pursuant to § 1533."[5]

In the ESA, Congress required every federal agency to use all methods and procedures which are necessary to bring any endangered species or threatened species back to a healthy condition:

> Congress expressly stated in § 2(c) that "all Federal departments and agencies *shall seek to conserve endangered species* and threatened species . . . ." Lest there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined "conserve" as meaning "to use and the use of *all methods and procedures which are necessary to bring any endangered species or threatened species* to the point at which the measures provided pursuant to this chapter are no longer necessary."[6]

The Ninth Circuit similarly upheld the Secretary's decision to dedicate all of the water of

Fisheries Service before engaging in any discretionary action that may affect a listed species or critical habitat"); *Sierra Club v. Glickman*, 156 F.3d 606, 616 (5th Cir. 1998) ("§ 7(a)(1) imposes a duty on all federal agencies to consult and develop programs for the conservation of each endangered and threatened species."); *Romero-Barcelo v. Brown*, 643 F.2d 835, 856–57 (1st Cir. 1981), *rev'd on different grounds sub nom. Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982); 50 C.F.R. §§ 402.01 and 402.04.

[3] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978).
[4] *Tenn. Valley Auth.*, 437 U.S. at 180.
[5] *Glickman*, 156 F.3d at 616.
[6] *Tenn. Valley Auth.*, 437 U.S. at 180 (internal citations omitted) (emphasis in original).

a Reclamation project to protect a listed fish species, stating that the ESA

> directs the Secretary to use programs under his control for conservation purposes where threatened or endangered species are involved.  Following this directive, the Secretary here decided to conserve the fish and not to sell the project's water. Given these circumstances, the ESA supports the Secretary's decision to give priority to the fish until such time as they no longer need ESA's protection.[7]

**B.     The Secretary has the legal authority to protect the listed fish species here**

Contrary to what Federal Defendants argue in their cross-motion, the Secretary has the authority and the affirmative duty to protect the listed species affected by the Hetch Hetchy Project.  In short, Federal Defendants have ample power to help conserve the downstream species by providing additional instream fish flows in the upper Tuolumne to augment fresh water flows in the Delta, just as they have done in the Stanislaus and San Joaquin.[8]  Their failure to do so violates their affirmative duty to use all their authorities to help conserve listed fish— including their authority over instream flows in the Tuolumne River that are controlled by O'Shaughnessy Dam.  Nothing in the ESA, the National Parks Organic Act, the Yosemite Park Act, or any other statute exempts Hetch Hetchy water diversions from Federal Defendants' affirmative duty to use all their authorities to conserve the species—and their failure to do so violates Section 7.

**1.     The Yosemite Park Act and National Park Service Organic Act**

In the 1890 statute establishing Yosemite National Park, Congress gave the Secretary of the Interior the power to "make and publish such rules and regulations as [s]he may deem

---

[7] *Carson-Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 262 (9th Cir. 1984).
[8] *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 682–94 (9th Cir. 2012) (describing the history of restrictions and flow requirements on the San Joaquin River); *Pac. Coast Fed. of Fisherman's Assocs. v. Gutierrez*, 606 F. Supp. 1195, 1242 (E.D. Cal. 2008) (discussing restrictions and flow requirements on the Stanislaus River).

---

necessary or proper for the care and management"[9] of Yosemite National Park, including

protection "against the wanton destruction of the fish, and game found within said reservation."[10]

And far from abrogating the 1890 Act, as Federal Defendants incorrectly contend, the Secretary

also has power under the 1916 National Park Service Organic Act to "make and publish such

rules and regulations as [s]he may deem necessary or proper for the use and management of the

parks, monuments, and reservations under the jurisdiction of the National Park Service."[11]

These two statutes provide the Secretary with ample power to require instream flows from

O'Shaughnessy Dam to benefit fish, and the administrative record shows she has exercised that

authority on multiple occasions.

The proof that Federal Defendants have the discretionary power to require the City to

provide instream fish flows in the Tuolumne River is that they have actually done so. The

administrative record shows, for instance, that in 1987 the Secretary amended the easements

under which the City operates O'Shaughnessy Dam to require the City to provide instream flows

for fish as prescribed by the Secretary:

> It is understood and agreed that water releases made by the City at Hetch Hetchy
> provided herein shall remain in the Tuolumne River between O'Shaughnessy
> Dam and New Don Pedro Reservoir, and the timing of these releases will be such
> as to coincide with the documented causes for the decrease in the habitat for or
> populations of resident fish species in the affected stretch of the river. The extent
> of these releases shall be determined by the U.S. Fish and Wildlife Service, in
> consultation with the City, Commission staff, appropriate state and federal
> agencies, and interested members of the public.[12]

The administrative record also reveals that Federal Defendants have approved deviations

---

[9] An act to set apart certain tracts of land in the State of California as forest reservations, 26 Stat. 650, 651 (1890).

[10] 26 Stat. at 651.

[11] 16 U.S.C. § 1, *reorganized by* National Park Service and Related Programs, Pub. L. No. 113-287 at § 2(b), 128 Stat. 3094, 3094 (Dec. 19, 2014) (codified at 54 U.S.C. § 100101).

[12] AR 1852, 1987 Stipulations at 5.

from the Secretary's prescribed instream flow requirements on multiple occasions.[13]  These

Secretary-approved deviations constitute an exercise of regulatory power that could and should

be used to benefit the listed fish by requiring additional instream flows consistent with her

affirmative duty under Section 7(a)(1):

> The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter.  All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.[14]

Federal Defendants argue that their authority to require instream flows from

O'Shaughnessy Dam arises from the easements the Secretary conveyed to the City rather than

from statute.  But the source of the authority makes no difference.  "[P]rivate activities can and

do have more than one source of authority, and more than one source of restrictions on that

authority.  *See* 50 C.F.R. § 402.02 (agency 'action' under the ESA includes all private activities

authorized 'in part' by a federal agency)."[15]  If the agency has the authority to require instream

flows—no matter what its source—it has have the affirmative duty under Section 7 to use that

authority to conserve the listed species.[16]

 While admitting that they have the power to impose additional instream flow

requirements for fish, which will also benefit the listed fish species downstream, Federal

Defendants argue that they cannot do so until after the fish-flow study they commenced in 1987

is completed, and they have no intention of completing the study.[17]  But Federal Defendants'

duty to conserve the fish is mandatory.  They cannot avoid their duty by refusing to complete the

---

[13] AR 1859–61, 1909–11, 1917–18, 1923–24, 2017–18, 3303, 3335; *see also* Pls.' Mem. at 19–20 (Doc. 65-1).
[14] 16 U.S.C. § 1536(a)(1).
[15] *Karuk Tribe*, 681 F.3d at 1023.
[16] *Glickman*, 156 F.3d at 617.
[17] Fed. Defs.' Mem. at 35 (Doc. 69-1).

fish study, just as they cannot avoid their duty to consult with the Fish and Wildlife Service (FWS) by failing to complete the biological assessment needed to begin the consultation.[18]

Similarly, Federal Defendants admit that they have the power to approve additional stream flows under the Upper Tuolumne River Ecosystem Project, but again have left that plan in draft form—avoiding, so they argue, their ESA duty to use all their authorities to conserve the species.[19]  But the mandatory requirements of ESA Section 7 cannot be so easily defeated.  ESA regulations require that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat.  If such a determination is made, formal consultation is required."[20]  And Federal Defendants offer no reason why they have not complied with this requirement—nor why they have failed to adopt the Upper Tuolumne River Ecosystem Project instream flow requirements that would benefit the fish within Yosemite and the downstream listed species as well.

And even if Federal Defendants had not initiated these 1987 fish studies and Upper Tuolumne River Ecosystem Project to develop new instream flow requirements for the Tuolumne River, they were affirmatively obligated to develop these or similar programs to conserve all endangered fish species they can under their statutory authority because "under § 7(a)(1), each federal agency must consult with FWS and develop programs for the conservation of each endangered species that it can affect within its authorities."[21]

### 2.    Federal reserved water right

In addition, the United States has a federal reserved water right that includes instream

---

[18] *Glickman*, 156 F.3d at 617; *see also Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001) ("Reinitiation of consultation requires either the FWS or the NMFS to issue a new Biological Opinion before the agency action may continue.").
[19] Fed. Defs.' Mem. at 12, 41 (Doc. 69-1).
[20] 50 C.F.R. § 402.14(a).
[21] *Glickman*, 156 F.3d at 617 n.7.

flows necessary to conserve salmon that inhabited the upper Tuolumne River in 1890, when Congress created Yosemite National Park.[22]  To the extent the City's exercise of its junior water right to divert water out of the Tuolumne infringes the United States' senior water right to retain that water in the river, the Secretary has the power to enforce that right to conserve the salmon. Her failure to do so violates her affirmative duty under Section 7 to use all of her authorities to conserve the species.[23]

Federal Defendants mistakenly contend that the United States' Yosemite National Park reserved water right does not include the protection of listed salmon runs.  But this overlooks that there were substantial salmon runs in the Upper Tuolumne, within the Park boundaries, at the time this reserved water right was created.  "Besides an abundance of trout, bass, and catfish species, '[t]he Tuolumne River once supported annual runs of chinook salmon ranging upward of 100,000 fish.'"[24]  The federal reserved water right includes flows necessary to protect these fish from harm.[25]

Federal Defendants and the City acknowledged these reserved water rights in the 1961 Stipulations, which states that "[t]his paragraph shall not be construed to add to or to limit any rights of the Government to the use of the water of the Tuolumne River System . . . ."[26]  The City's water rights are junior to the United States' reserved water rights because Congress

---

[22] *See Cappaert v. United States*, 426 U.S. 128, 138 (1976) ("This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.  In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators.").

[23] 16 U.S.C. § 1536(a)(1); *Glickman*, 156 F.3d at 617.

[24] AR 413, U.S. Fish & Wildlife Serv., Tuolumne River Flow Study: Canyon Power Project, California at 3 (1976).  As of 1974, chinook salmon were present upstream of Don Pedro Dam.  AR 413 at 3.

[25] *Cappaert*, 426 U.S. at 138.

[26] AR 365, 1961 Stipulations at 2.

---

established Yosemite as a national park in 1890, but the City did not perfect its water rights to the Tuolumne River until the early 1900s.[27]

### 3.    The Raker Act

Contrary to what Federal Defendants argue, nothing in the Raker Act deprives Federal Defendants of their ESA regulatory authority over Hetch Hetchy—nor does it relieve them of their ESA duties.  Instead, the Act provides authority to Federal Defendants to regulate Hetch Hetchy.  Section 4 of the Raker Act explicitly requires the City to comply with all federal regulations governing Yosemite National Park:  "[T]he said grantee shall conform to all regulations adopted and prescribed by the Secretary of the Interior governing the Yosemite National Park and by the Secretary of Agriculture governing the Stanislaus National Forest . . . ."[28]  Since ESA regulations govern activities in Yosemite National Park and Stanislaus National Forest (ESA does not exempt them), the Raker Act requires that the City must comply with the ESA at Hetch Hetchy—as elsewhere.[29]

The Secretary's regulatory authority, reserved by the Raker Act, specifically included fish protection.  When Congress enacted the Raker Act, as previously discussed, it had already granted the Secretary broad statutory authority under the 1890 Yosemite Park Act to protect "against the wanton destruction of the fish, and game found within said reservation."[30]

Nor does the Raker Act purport to exempt Hetch Hetchy operations from later-passed

---

[27] *See* Proceedings before the Secretary of the Interior in re use of Hetch Hetchy Reservoir Site, in the Yosemite National Park, by the City of San Francisco (Government Printing Office 1910), *available at* https://books.google.com/books?id=xlwAAAAAYAAJ.

[28] AR 2, Raker Act § 4.

[29] *See, e.g.*, *Karuk Tribe*, 681 F.3d at 1023 (holding that the U.S. Forest Service and miners must comply with the ESA because the Mining Law requires that "miners entering federal forest lands 'must comply with the rules and regulations covering such national forests'" (quoting 16 U.S.C. § 478)).

[30] An act to set apart certain tracts of land in the State of California as forest reservations, 26 Stat. 650, 651 (1890).

---

PLS.' COMBINED RESP. & REPLY                    8

legislation, including the ESA.  As the Supreme Court stated when it halted construction of the nearly completed Tellico Dam:  "It may seem curious to some that the survival of a relatively small number of three-inch fish among all the countless millions of species extant would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million. . . .  We conclude, however, that the explicit provisions of the Endangered Species Act require precisely that result."[31]

Federal Defendants also incorrectly argue that Section 11 of the Raker Act, which disclaims Congress's intent to interfere with California water law, somehow limits the Secretary's ESA authority.  But that provision merely states that "nothing herein"—that is, nothing in the Raker Act—is intended "to interfere with the laws of the State of California related to the control, appropriation, use, or distribution of water."[32]  It says nothing about the ESA, which was not adopted until 60 years later, affecting the distribution of water in California. The ESA has profoundly affected water distribution from federal reclamation projects despite a parallel provision of the federal Reclamation Act that "[n]othing in this act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water  . . . ."[33]

In addition, nothing in the Raker Act promises the City a minimum amount of water for hydropower or municipal use.[34]  Rather, the Raker Act explicitly limits the City to an amount

---

[31] *Tenn. Valley Auth.*, 437 U.S. at 172–73.

[32] AR 9–10, Raker Act § 11.

[33] Reclamation Act § 8, 32 Stat. 390 (codified at 43 U.S.C. §§ 372, 383); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014) (upholding a biological opinion that would reduce water supplied to rightsholders in the Central Valley); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014) (same).

[34] *See* AR 6, Raker Act § 9(e) and (f) (limiting only the amount of water San Francisco must supply to senior appropriative rights holders in certain circumstances).

"necessary for its beneficial use"[35] and makes no promises that the City will be able to divert any water at all.

### C.     The Secretary's pre-listing approval of Hetch Hetchy operations did not exempt the project from consultation when the species were listed and critical habitat designated

Federal Defendants' argument that Hetch Hetchy Project operations are not subject to the ESA because the species at issue had not been listed when the Hetch Hetchy Project became operational runs afoul of the ESA regulation that requires an agency to reinitiate consultation "where discretionary involvement or control over the action has been retained or is authorized by law and . . .  a new species is listed or critical habitat designated that may be affected by the identified action."[36]

Because water extraction from the Tuolumne may affect Delta species and their habitat, Federal Defendants were required to consult regarding those possible effects each time a new species was listed or its critical habitat designated:

---

[35] AR 6, Raker Act § 9(h).
[36] *Envtl. Prot. Info. Ctr.*, 255 F.3d at 1076 (quoting 50 C.F.R. § 402.16) (emphasis omitted).

| Species | Listed[37] | Critical Habitat Designated[38] |
|---|---|---|
| Sacramento River winter-run Chinook salmon | November 30, 1990 | June 16, 1993 |
| Delta smelt | March 5, 1993 | December 19, 1994 |
| Central Valley Steelhead | June 17, 1998 | September 2, 2005 |
| Central Valley spring run Chinook salmon | June 28, 2005 | September 2, 2005 |
| North American green sturgeon | April 7, 2006 | October 9, 2009 |

The Ninth Circuit has flatly rejected Federal Defendants' argument that they need not consult regarding the effect of ongoing activities on federal lands that may adversely affect listed species, holding that listing of the Snake River chinook salmon required the Forest Service to initiate a Section 7 consultation regarding ongoing timber harvesting that the agency had approved prior to the listing.[39]

---

[37] AR 2987, Listing of the Sacramento River Winter-run Chinook Salmon as Threatened, 55 Fed. Reg. 49,623 (Nov. 30, 1990); AR 2988–98, Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854 (Mar. 5, 1993); AR 3031–33, Listing of Several Evolutionarily Significant Units of West Coast Steelhead, 63 Fed. Reg. 32,996 (June 17, 1998) (listing the Central Valley Steelhead evolutionarily significant unit as threatened); Final Listing Determinations for 16 ESUs of West Coast Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs, 70 Fed. Reg. 37,160 (June 28, 2005) (listing the Central Valley spring run Chinook salmon); AR 3179–88, Threatened Status for Southern Distinct Population Segment of North American Green Sturgeon, 71 Fed. Reg. 17,757 (Apr. 7, 2006); AR 3289–90, Review of Native Species That are Candidates for Listing as Endangered or Threatened, 78 Fed. Reg. 70,104, 70,151–52 (Nov. 22, 2013) (finding that reclassification of the delta smelt to endangered continues to be warranted but precluded by other high priority listings).
[38] AR 2999–3006, Designated Critical Habitat; Sacramento River Winter-Run Chinook Salmon, 58 Fed. Reg. 33,212 (June 16, 1993); AR 3007–30, Critical Habitat Determination for the Delta Smelt, 59 Fed. Reg. 65,256 (Dec. 19, 1994); AR 3039–3178, Designation of Critical Habitat for Seven Evolutionarily Significant Units of Pacific Salmon and Steelhead in California, 70 Fed. Reg. 52,488 (Sep. 2, 2005) (identifying critical habitat for the Central Valley Steelhead and Central Valley spring run Chinook salmon); AR 3189–3240, Final Rulemaking to Designate Critical Habitat for the Threatened Southern Distinct Population Segment of North American Green Sturgeon, 74 Fed. Reg. 52,300 (Oct. 9, 2009).
[39] *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994) (quoting *Tenn. Valley Auth*, 437 U.S. at 186; *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992)).

---

And recently the Ninth Circuit upheld the biological opinions prepared by FWS and NMFS for the ongoing operation of the Central Valley Project and State Water Project that were triggered by the listing of some of the same Delta fish species at issue in this case.[40]  As the Ninth Circuit explained, "[i]n *Delta Smelt* we reversed the district court and upheld a 2008 BiOp in which the Fish and Wildlife Service ('FWS') concludes that continued water extraction from the Central Valley's rivers would jeopardize the Delta Smelt and offers reasonable and prudent alternatives that Reclamation should take to ameliorate this impact."[41]  Recognizing "the enormous practical implications of this decision,"[42] the Ninth Circuit stated that Congress, by requiring conservation of listed species "whatever the cost,"[43] mandated that species protection take priority over the benefits of water projects.[44]

The Secretary's failure to consult on the effects of the City's Hetch Hetchy water extraction violates the consultation requirements of Section 7 because this is an ongoing project that may affect the species or their habitat.

## II.     The City's continued water extraction from the Tuolumne is a take of the listed species under ESA Section 9

The City's argument that its extraction of hundreds of thousands of acre-feet of water from the Central Valley each year does not harm the listed fish species or their habitat cannot be squared with the numerous decisions concluding that reducing fresh water flows into the Delta harms these fish species and their habitat.[45]

---

[40] *Locke*, 776 F.3d at 981; *Jewell*, 747 F.3d at 593.

[41] *Locke*, 776 F.3d at 981; *see also Jewell*, 747 F.3d at 593.

[42] *Jewell*, 747 F.3d at 593.

[43] *Tenn. Valley Auth.*, 437 U.S. at 184 (1978).

[44] *Jewell*, 747 F.3d at 593 (internal citations omitted); *see also Locke*, 776 F.3d at 988.

[45] *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 637 F. Supp. 2d 777 (E.D. Cal. 2008), *reconsidered*, 624 F. Supp. 2d 1197 (2009), *aff'd sub nom San Luis & Delta-Mendota Water Auth. v. United States*, 627 F.2d 676 (9th Cir. 2012); *Pac. Coast Fed. of Fishermen's Assocs.*, 606 F. Supp. 2d at 1143 (stating that because the Central Valley

---

PLS.' COMBINED RESP. & REPLY                    12

ESA regulations define "take," prohibited by Section 9 of the ESA, to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."[46]  Take "includes significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."[47]

The Ninth Circuit states that the San Francisco Bay-Delta "is an essential conduit for anadromous fish that return to California's inland rivers and lakes to reproduce."[48]  The decline of endangered and threatened species is due, in part, to water projects like Hetch Hetchy that reduce water flows, "creat[ing] water shortages in the Delta that harm salmon by exposing them to unnatural stressors"[49] and destroy their habitats.[50]

The Ninth Circuit has also stated that diversion of water increases the threat to the continued survival of the already endangered and threatened fish species in the Delta:  "As more water is diverted from the rivers that feed the Delta . . . the salinity of the Delta and its estuaries increases along with the threat to the species that thrive there."[51]  This Court has previously stated that "the factual proposition that 'water diverted out of the Tuolumne decreases the amount of fresh water flowing into the delta' is indisputable and has been relied upon in numerous prior cases."[52]  The Ninth Circuit has also commented on the conflict between fish and people over water:  "But by extracting the water, people dramatically alter the rivers' natural

Steelhead's remaining habitat continues to be degraded by water diversions from dam projects, the population is on the verge of extinction).

[46] 16 U.S.C. § 1532(19).

[47] *Babbitt v. Sweet Home Chapter of Communities for a Great Ore.*, 515 U.S. 687, 691 (1995) (quoting 50 C.F.R. § 17.3).

[48] *Locke*, 776 F.3d at 987.

[49] *Locke*, 776 F.3d at 987.

[50] *See Pac. Coast Fed. of Fishermen's Assocs.*, 606 F. Supp. 2d at 1147 (finding that there is "widespread inland salmon habitat destruction" due in part to "the construction of dams and diversions of water as part of the CVP  and SWP.")

[51] *Jewell*, 747 F.3d at 595.

[52] Order Denying Pls.' Mot. to Suppl. & Complete the Record at 8 (Sept. 14, 2015) (Doc. 61).

state and threaten the viability of the species that depend on them.  People need water, but so do fish."[53]

Congress also recognized this fact when it required 800,000 acre-feet per year of CVP water to be left in the streams that feed the Delta to protect listed fish species.[54]

**A.      The record shows that the City's water extraction harms the species**

Contrary to the City's assertions, the record contains ample evidence that its water extraction from the Tuolumne River harms downstream fish species.[55]  As early as 1976 the California Department of Fish and Game warned that the City's increased diversions may eliminate salmon completely from the Tuolumne River,[56] and recommended that FWS provide for fish flows that would flow past the Don Pedro Dam, down the full length of the Tuolumne River:

> A problem of considerable importance is the relationship between water diversions from the Tuolumne (including present and ultimate diversions by the City of San Francisco) and the reproduction of the Tuolumne River king salmon.
>
> * * *
>
> Increasing demands on Tuolumne water by the City of San Francisco and the irrigation districts may make it impossible to maintain adequate spring flows in the river.  We would recommend that the flows stipulated in the Canyon Power Project agreement be considered as "fish water" releases and be allowed to flow the entire length of the Tuolumne River.  These flows are to be added to the flow releases made below the New Don Pedro Project that are stipulated in the FPC license for that project.  The benefits to the fisheries from such a water release

---

[53] *Locke*, 776 F.3d at 981.

[54] Central Valley Project Improvement Act § 3402, 106 Stat. at 4706; *see also San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 684 (9th Cir. 2012); *San Luis & Delta-Mendota*, 672 F.3d at 718 (Smith, J., concurring and dissenting in part) ("On its face, section (b)(2) [of the CVPIA] allows 800,000 AF of CVP water to be used 'or the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title.'").

[55] The Center respectfully reserves its objection that this Section 9 claim against the City should be tried de novo, not on the administrative record.

[56] AR 413, U.S. Fish & Wildlife Serv., Tuolumne River Flow Study: Canyon Power Project, California at 3 (1976).

---

warrant support from the Secretary of Interior and the U.S. Fish and Wildlife Service.[57]

The record also shows that "[t]he Tuolumne River once supported annual runs of chinook salmon ranging upward of 100,000 fish."[58] FWS estimated the 1974 spawning run of adult chinook salmon in the Upper Tuolumne at 1,000 fish. [59]

Although not in the record, the Court can take judicial notice[60] that the National Marine Fisheries Service (NMFS) has also "identifie[d] the Upper Tuolumne River above Don Pedro Reservoir as a candidate area for reintroduction of steelhead and spring-run Chinook salmon to further recovery of these species,"[61] and is considering requiring that Don Pedro Dam include fish passage to allow movement between the Lower and Upper Tuolumne River below Hetch Hetchy.[62] The Recovery Plan identifies a number of important stressors to listed anadromous species, including "the high demand for limited water supply resulting in reduced instream flows, increased water temperatures, and highly altered hydrology in the Sacramento-San Joaquin Delta, [and] barriers to historic habitat."[63]

---

[57] AR 1011–12, Ltr. from Director, Cal. Dep't of Fish & Game, to Kahler Martinson, Regional Director, U.S. Fish & Wildlife Serv. at 1–2 (May 18, 1976).

[58] AR 413, U.S. Fish & Wildlife Serv., Tuolumne River Flow Study: Canyon Power Project, California at 3 (1976).

[59] AR 413, U.S. Fish & Wildlife Serv., Tuolumne River Flow Study: Canyon Power Project, California at 3 (1976).

[60] *See Stamas v. Cty. of Madera*, 795 F. Supp. 2d 1047, 1061 (E.D. Cal. 2011) ("Courts may take judicial notice of public records.").

[61] Nat'l Marine Fisheries Serv., Request for Information or Study Quantifying Existing Upper Tuolumne River Habitats for Anadromous Fish as They Pertain to Fish Passage Blockage at La Grange Dam at 2(July 22, 2014) (Accession # 20150223-5175), *at* http://elibrary.ferc.gov:0/idmws/file_list.asp?document_id=14304759.

[62] Nat'l Marine Fisheries Serv., Notice of Study Dispute for the La Grange Hydroelectric Project, P-14581-000 (Feb. 23, 2015) (Accession # 20150223-5175), *at* http://elibrary.ferc.gov:0/idmws/file_list.asp?document_id=14304759.

[63] NMFS, Recovery Plan for the Evolutionarily Significant Units of Sacramento River Winter-Run Chinook Salmon and Central Valley Spring-Run Chinook Salmon and the Distinct Population Segment of California Central Valley Steelhead, at ii (July 2014), *at*

---

NMFS states that modifications to streamflow and diversion schedules, such as "moving water diversions lower in the Tuolumne River in order to provide higher flows in the upstream reaches,"[64] and "develop[ing] and implement[ing] flow fluctuation criteria for the Tuolumne River that are protective of anadromous fishes"[65] would positively affect downstream listed anadromous species. The City's failure to alter its water extraction regime negatively impacts those species.

The O'Shaughnessy Instream Flow Management Plan recognized the importance of water flows to the downstream ecosystem.[66] The purpose of the Plan is "to describe the development and implementation of a new instream flow regime for O'Shaughnessy Dam that is designed to mimic natural hydrology and provide broad support for physical processes, habitats, and native species within the Hetch Hetchy Reach of the upper Tuolumne River."[67]

The Final Rule for critical habitat designation of the Green Sturgeon states that the presence of the sturgeon has been confirmed in a broad geographic range, which includes the Sacramento-San Joaquin Delta.[68] "The Delta provides important rearing habitat for juveniles

---

http://www.westcoast.fisheries.noaa.gov/publications/recovery_planning/salmon_steelhead/domains/california_central_valley/final_recovery_plan_07-11-2014.pdf.

[64] NMFS, Recovery Plan for the Evolutionarily Significant Units of Sacramento River Winter-Run Chinook Salmon and Central Valley Spring-Run Chinook Salmon and the Distinct Population Segment of California Central Valley Steelhead, at 308–11 (July 2014), *at* http://www.westcoast.fisheries.noaa.gov/publications/recovery_planning/salmon_steelhead/domains/california_central_valley/final_recovery_plan_07-11-2014.pdf.

[65] NMFS, Recovery Plan for the Evolutionarily Significant Units of Sacramento River Winter-Run Chinook Salmon and Central Valley Spring-Run Chinook Salmon and the Distinct Population Segment of California Central Valley Steelhead, at 308–11 (July 2014), *at* http://www.westcoast.fisheries.noaa.gov/publications/recovery_planning/salmon_steelhead/domains/california_central_valley/final_recovery_plan_07-11-2014.pdf.

[66] AR 2170, O'Shaughnessy Dam Instream Flow Management Plan at 1 (stakeholder draft Apr. 14, 2014).

[67] AR 2152, O'Shaughnessy Dam Instream Flow Management Plan at 3.

[68] AR 3192; *see also* California Water Code § 12220 (defining the legal boundaries of the Sacramento-San Joaquin Delta); Final Biological Report at 26, National Marine Fisheries

---

PLS.' COMBINED RESP. & REPLY                 16

and subadults and important feeding and migratory habitat for juveniles, subadults, and adults."[69] The Biological Opinion voices concern for activities that alter "water flow, reduce water quality, and affect food resources in the Delta."[70] The San Joaquin River and its watershed are therefore areas of importance to the Green Sturgeon.[71]

The delta smelt has historically occurred from Suisun Bay upstream to the City of Sacramento to the San Joaquin River.[72] FWS's reclassification of the delta smelt from threatened to endangered resulted from "the significant declines in delta smelt abundance that have occurred since 2001."[73] The primary threats FWS cites as contributing to delta smelt population declines are "summer and fall increases in salinity and water clarity resulting from decreases in freshwater flow into the estuary."[74]

In contrast, nothing in the administrative record supports the City's claim that its extraction of 220,000 acre-feet of water each year from the Tuolumne/San Joaquin/Delta system has no adverse effect on any of the ESA-listed fish species. The record, quite simply, does not support a finding of fact that the City's actions are not a take of the ESA-listed fish species.

---

Service Designation of Critical Habitat for the threatened Southern Distinct Population Segment of North American Green Sturgeon at 19 (Oct. 2009), http://www.westcoast.fisheries.noaa.gov/publications/protected_species/other/green_sturgeon/g_s_critical_habitat/gschd_finalbiologicalrpt.pdf [hereinafter "Green Sturgeon Final Biological Report"].

[69] Green Sturgeon Final Biological Report at 26.
[70] Green Sturgeon Final Biological Report at 26.
[71] Green Sturgeon Final Biological Report at 94 (showing map of critical habitat).
[72] AR 3007, Critical Habitat Determination for the Delta Smelt, 59 Fed. Reg. 65,256 (Dec. 19, 1994).
[73] AR 3289, Endangered and Threatened Wildlife and Plants; Review of Native Species That are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions; Proposed Rule, 78 Fed. Reg. 70,104, 70,151 (Nov. 22, 2013).
[74] AR 3289, 78 Fed. Reg. at 70,151.

---

**B.    The City's adverse effects on habitat and the species are a take prohibited by Section 9**

The City cites no case to support its claim that its state-granted water right is immune from ESA regulation, allowing it to take ESA-listed fish with impunity.  And the City fails to explain cases like *United States v. Glenn-Colusa Irrigation District*,[75] in which this Court found that irrigation under a state-granted water right that harmed listed salmon was governed by the ESA and constituted a Section 9 violation.  In this case, the United States—which brought the *Glenn-Colusa* suit—is silent regarding the City's argument that its water right is exempt from ESA regulation.

The City's continued diversion of water out of the San Joaquin watershed impacts listed smelt, salmon, and sturgeon downstream of that diversion.[76]  These impacts are comparable to the impact of other agricultural contractors of Central Valley Project Water, which this Court held are subject to restrictions on their contractual water supply in order to protect listed salmon and smelt in the Sacramento-San Joaquin Delta.[77]

**III.    The Center's 60-day notice was adequate for its ESA claims—and was not required for its APA claims**

Federal Defendants' arguments regarding the sufficiency of the Center's 60-day notice are irrelevant because these claims against Federal Defendants are brought under the Administrative Procedure Act (APA),[78] not the ESA's citizens' suit provision.  And the City has

---

[75] *United States v. Glenn-Colusa Irr. Dist.*, 788 F. Supp. 1126 (E.D. Cal. 1992).

[76] *See, e.g.*, *Locke*, 776 F.3d at 987; AR 1011–12, Ltr. from Director, Cal. Dep't of Fish & Game, to Kahler Martinson, Regional Director, U.S. Fish & Wildlife Serv. at 1–2 (May 18, 1976); NMFS, Recovery Plan for the Evolutionarily Significant Units of Sacramento River Winter-Run Chinook Salmon and Central Valley Spring-Run Chinook Salmon and the Distinct Population Segment of California Central Valley Steelhead, at  ii (July 2014), *at* http://www.westcoast.fisheries.noaa.gov/publications/recovery_planning/salmon_steelhead/domains/california_central_valley/final_recovery_plan_07-11-2014.pdf.

[77] *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, 849 F.Supp. 717, 720–21, 732 (1993).

[78] Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946).

---

no standing to raise the 60-day-notice argument because it voluntarily intervened in this case.

**A.      The Center's claims against Federal Defendants are properly brought under the APA, not the ESA citizens' suit provision**

In *Bennett v. Spear*,[79] the Supreme Court held that the ESA citizens'suit provision[80] did not allow a claim that the Secretary had violated ESA Section 7 (16 U.S.C. § 1536): "The foregoing analysis establishes that the principal statute invoked by petitioners, the ESA, . . . does not support their claims based upon the Secretary's alleged failure to comply with § 1536."[81] Instead, the Supreme Court held that a Section 7 claim against the Secretary, like this one, is properly brought under the APA: "Nothing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so."[82] Because a 60-day notice is required only to file a citizens' suit claim, and not an APA claim,[83] Federal Defendants' arguments regarding the adequacy of the Center's notice are irrelevant.

**B.      The City, as intervenor, may not raise the argument that the 60-day notice is inadequate**

When the City intervened as a defendant in this ongoing lawsuit, it subjected itself to this Court's jurisdiction—including this Court's orders:

> Intervenors under Fed. R. Civ. P. 24(a)(2), such as the Yakima Tribe, enter the suit with the status of original parties and are fully bound by all future court orders. *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978); 7A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1920 (1972); 3B MOORE'S FEDERAL PRACTICE ¶ 24.16(6), at 24-671 to 24-673 (2d ed. 1981).  By successfully intervening, a party "makes himself vulnerable to complete adjudication by the federal court of the issues in litigation between the intervener

---

[79] *Bennett v. Spear*, 520 U.S. 154 (1997).
[80] 16 U.S.C. § 1540(g).
[81] *Bennett*, 520 U.S. at 174.
[82] *Bennett*, 520 U.S. at 175.
[83] *See Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124–25 (9th Cir. 1997) ("Such actions under the Administrative Procedure Act do not require the sixty-day notice requirement set forth in the Endangered Species Act.").

---

and the adverse party." *Id.* at 24-671.[84]

As the D.C. Circuit stated, "the possibility that the plaintiff will be able to obtain relief against the intervenor-defendant" is part of the "price" paid for intervention.[85]  Contrary to the City's suggestion, the Center was not required to amend its Complaint,[86] nor by that same analysis to go back and start the 60-day notice process all over again to name the City.

The City cannot have it both ways—claim it has a right to intervene, but that the Court may not grant relief against it.  Otherwise, intervention is transformed into a rule that the intervenor can only win, but never lose a lawsuit.

**C.      The Center's notice letter was more than adequate to apprise Defendants of the Center's claim that Hetch Hetchy water extraction was adversely affecting downstream listed fish species, in violation of ESA**

Under the ESA, "the citizen is not required to list every specific aspect or detail of every alleged violation.  Nor is the citizen required to describe every ramification of a violation."[87]  A 60-day notice need not provide detailed legal arguments, but merely provide notice to advise the agency of a perceived violation and provide it with an opportunity to take corrective action:

> The purpose of the Endangered Species Act's notice provision is "to put the agencies on notice of a perceived violation of the statute" and to give them the "opportunity to review their actions and take corrective measures if warranted." However, a notice need not provide the exact details of the legal arguments that the plaintiffs intend to eventually make.[88]

---

[84] *United States v. Oregon*, 657 F. 2d 1009, 1014 (9th Cir. 1989).

[85] *District of Columbia v. Merit Sys. Prot. Bd.*, 762 F.2d 129, 132 (D.C. Cir. 1985).

[86] *See Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985) ("Although [the intervenor] may not have anticipated that the court would hold it liable, unpleasant surprise is not the same as unfair surprise and certainly does not constitute a due process violation in circumstances such as these.  The district court therefore reasonably rejected [intervenor's] claim of inadequate notice and opportunity to defend.").

[87] *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (quoting *Pub. Interest Research Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995)).

[88] *Conservation Congress v. Finley*, 774 F.3d 611, 618 (9th Cir. 2014) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998)).

---

In *Marbled Murrelet v. Babbitt*,[89] for example, an environmental organization (EPIC) asserted that FWS's involvement in a lumber salvage operation violated Sections 7 and 9 of the ESA.[90]  The defendant lumber companies argued that EPIC's notice letter was deficient because it made only brief mention of Section 7.  The Ninth Circuit rejected this argument, focusing not on the specific statutory references, but rather on how the letter as a whole identified the factual assertions, allowing the agency and the lumber companies to fix the alleged violations:

> The letter clearly gives notice of an intent to sue under the ESA.  Although section 7 was referenced in only one part of the letter, the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations.  This was sufficient to satisfy the jurisdictional requirement of notice under 16 U.S.C. § 1540(g)(2)(A)(i).[91]

Here, the Center's notice and subsequent litigation has consistently challenged whether Federal Defendants have an obligation under Section 7 and Section 9 of the ESA to impose streamflow requirements on San Francisco's Hetch Hetchy Project in order to protect downstream listed species, as Federal Defendants do with respect to every other major water diversion project in the Central Valley.  That the Center's notice does not explicitly cite to Section 7(a)(1) of the ESA, as Federal Defendants and the City emphasize,[92] is not the test put forward by the Ninth Circuit—instead, the issue is whether the notice provides "opportunity to review their actions and take corrective measures if warranted."[93]

The Center put Federal Defendants on notice, as described in its 60-day notice letter, that they had authority over the Hetch Hetchy Project and responsibility to use their authority and discretion to benefit listed downstream species—precisely what Section 7(a)(1) requires.  The

---

[89] *Marbeled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996).
[90] *Marbeled Murrelet*, 83 F.3d at 1070.
[91] *Marbeled Murrelet*, 83 F.3d at 1073.
[92] Fed. Defs.' Mem. at 25 n.10 (Doc. 69-1); Doc. 74-1, Def.-Intervenor's Mem. at 16 n.15 (Doc. 74-1).
[93] *Cmty. Ass'n for Restoration of the Env't*, 305 F.3d at 951 (quoting *Pub. Interest Research Grp.*, 50 F.3d at 1248).

first paragraph of the notice advises that Federal Defendants of their

> continued failure to comply with the federal Endangered Species Act with respect to National Park Service (NPS)-permitted diversions of approximately 265,000 acre-feet of water annually from the Tuolumne River for consumptive use in San Francisco and surrounding communities. These diversions are jeopardizing several species of threatened fish whose critical habitat consists of the Tuolumne and San Joaquin Rivers and the Sacramento Delta by depriving the rivers and Delta of much-needed water for fish flows, salinity control and similar purposes related to conservation and recovery of these species.[94]

The notice identifies the project at issue, why it is subject to federal oversight, and how the Park Service failed in its obligation to regulate the project to protect endangered species:

> Operated by the city of San Francisco under a lease from the National Park Service, the Hetch Hetchy Project is located within Yosemite National Park and is thus subject to regulation by NPS. Yet in its lease negotiations, regulation of operations, and management of the Hetch Hetchy Project, the Park Service has never considered the adverse effects of Tuolumne River diversions on the endangered species whose habitat is the San Joaquin River and Sacramento Delta.[95]

The notice also makes repeated references to the responsibility of Federal Defendants to regulate Hetch Hetchy to protect endangered species. For example: "It is time for the Secretaries of Interior and Commerce [to] step up to their species protection responsibilities and ensure the operation of Hetch Hetchy contributes to the conservation of listed species."[96] This language closely mirrors the Section 7(a)(1) requirement: "All other Federal agencies shall . . . utilize their authorities . . . by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title."[97] And Federal Defendants do not—and could not—challenge the fact that the notice letter explained why they were falling short of their obligation to protect endangered species by failing to impose streamflow requirements and diversion restrictions on the Hetch Hetchy Project.

---

[94] Compl. Ex. A at 1.
[95] Compl. Ex. A at 4.
[96] Compl. Ex. A at 2.
[97] 16 U.S.C. § 1536(a)(1).

The Center also sent the notice to the Secretary of the Department of the Interior as well as agencies overseen by the Secretary—FWS and the National Park Service—providing Interior and its agencies sufficient information about the alleged violations.  FWS and NPS—as signatories to and participants in the various agreements with San Francisco regarding Hetch Hetchy—are in the best position to understand their respective responsibilities with regard to those agreements and cannot now claim ignorance of their respective roles and obligations under Section 7 of the ESA.

In reality, what Federal Defendants object to is not a failure of notice—the 60-day notice described how their failure to regulate Hetch Hetchy to protect listed species violated Section 7—but rather a shift in the legal focus of this case because Federal Defendants now admit that they have done nothing to regulate Hetch Hetchy.  When the Center filed its Complaint, it believed that Federal Defendants at least annually approved the Hetch Hetchy operations, as the Center's First Claim for Relief makes clear:  "At a minimum these annual approvals [of Hetch Hetchy operations] 'may affect' listed species which also require formal consultation under the implementing regulations of the ESA."[98]  That Federal Defendants have not taken even this minimal action to prevent harm to the listed fish species is not a ground for dismissing the Center's claim.

Federal Defendants also argue that they are not required to issue (and have not issued) regulations to protect listed species using their authority under the Raker Act or the National Park's organic statute.[99]  But Section 7(a)(1) does not allow Federal Defendants to take such a laissez-faire attitude to the protection of endangered and threatened species.[100]  Because Federal

---

[98] Compl. ¶ 20.
[99] Fed. Defs.' Mem. at 29 (Doc. 69-1).
[100] Pls.' Mem. at 14, 18–19 (Doc. 65-1).

Defendants in fact have discretion to regulate Hetch Hetchy under the Raker Act and the 1987 Stipulations, their admission that they have chosen not to do so is an admission that they have violated and continue to violate their obligations under Section 7(a)(1) as well as Section 7(a)(2).

Federal Defendants were aware at the time they received the Center's 60-day notice letter that they were taking no action to regulate the Hetch Hetchy Project, and the notice letter asserted that in fact they had a responsibility to regulate the Project under Section 7, which is sufficient notice under the law.

D.     **Nothing in the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure required the Center to specifically name FWS in its complaint**

Federal Defendants argue, citing no authority in support, that the Court does not have jurisdiction to grant relief regarding claims against FWS because the Center did not name FWS as a party in the Complaint.[101]   Because FWS has only delegated authority from the Secretary of the Interior, the Court may enjoin the FWS because the Center named the Secretary as a defendant, as countless cases have held.  In *Glacier Park Foundation v. Watt*,[102] in which the Foundation brought an action solely against the Secretary of the Interior, to enjoin the National Park Service from entering into a new long-term concessions contract, the Ninth Circuit reached the merits of the claim against the Service even though it was not a named party.[103]  Likewise, the Tenth Circuit held in *Wyoming v. United States,*[104] that the State of Wyoming could bring an APA claim against FWS even though that the only named defendants were the United States and

---

[101] Fed. Defs.' Mem. at 26 (Doc. 69-1);
[102] *Glacier Park Found. v. Watt*, 663 F.2d 882 (9th Cir. 1981).
[103] *Glacier Park Found.*, 663 F.2d at 886.
[104] *Wyoming v. United States*, 279 F.3d 1214 (10th Cir. 2012); *see also Kerr v. Jewell*, 549 Fed. App'x 635 (9th Cir. 2013) (reversing grant of summary judgment on a Title VII retaliation claim against FWS in a suit naming only Secretary of the Interior Sally Jewell as defendant).

---

Gale A. Norton in her official capacity as Secretary of the U.S. Department of the Interior.[105]

Courts have also held that a Secretary, as a superior officer, is an indispensable party. The Supreme Court set forth the applicable rule in *Williams v. Fanning*: "These cases evolved the principle that the superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him."[106] Thus, the Supreme Court held in a subsequent case that the Secretary of the Interior must be joined as an indispensable party to a challenge to the FWS's enforcement of fishing regulations.[107]

## IV.     The individual Plaintiffs and the Center have standing to bring these claims

Contrary to the arguments Defendants make here, other courts have consistently held that the Center (also referred to as CESAR) has standing to bring claims that the United States (including some of the Federal Defendants in this case) have failed to comply with the ESA. For instance:

- In *CESAR v. Jackson*,[108] the Center challenged re-registration of the pesticide Rotenone. The district court denied EPA's motion to dismiss, and held that CESAR had organizational standing to bring the claim on behalf of its members, stating: "CESAR is a public interest organization that conducts work related to endangered species."[109]

- In *CESAR v. Sacramento Regional County Sanitation District*,[110] the Center challenged the District's discharge of ammonia into the Delta, which harms the delta smelt and, although the case is still in preliminary stages, the Government

---

[105] *Wyoming*, 279 F.3d at 1214, 1239.

[106] *William v. Fanning*, 332 U.S. 490, 493 (1947); *see also* WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 1622 (3d. ed.) (discussing "the leading case of *Williams v. Fanning*").

[107] *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 126 (1949).

[108] *Council for Endangered Species Act Reliability v. Jackson*, No. 3:10-cv-08254 (D. Ariz.). The Center was formerly named the Council for Endangered Species Act Reliability.

[109] *Council for Endangered Species Act Reliability v. Jackson*, No. 3:10-cv-08254, 2011 WL 4479082, at *6 (D. Ariz. Sept. 27, 2011), *reconsideration granted and case dismissed on other grounds*, 2011 WL 5882192 (Nov. 23, 2011).

[110] *Ctr. for Envt'l Science, Accuracy & Reliability v. Sacramento Reg'l Cty. Sanitation Dist.*, No. 1:15-cv-01103 (originally No. 02:15-cv-00342) (E.D. Cal.).

has not challenged the Center's standing to bring that ESA claim.

- In *CESAR v. Salazar*,[111] the Center challenged FWS's failure to act on a petition for reclassification of delta smelt from threatened to endangered, and the Government did not challenge the Center's standing. That case was ultimately settled, and the Government agreed to pay the Center's attorneys' fees.

- And in *CESAR v. Cal. DWR*,[112] a case the Center filed in California Superior Court to challenge construction of a rock-barrier dam across the Delta without CEQA compliance, the California Department of Water Resources also did not challenge the Center's standing.

In addition, Jean Sagouspe, a farmer who relies on CVP water and a member of the Center, also has standing to bring these claims.

A.     **The Center has injury-in-fact sufficient to establish organizational and associational standing**

Of the three issues the Court examines to determine standing (injury-in-fact, causation, and redressability),[113] Federal Defendants challenge only the Center's injury-in-fact (and the City does not raise any standing arguments at all).  But Federal Defendants' standing arguments ignore the nature of the Center's work and the established caselaw on organizational and associational standing.

The Center's mission is

to educate the American public about the science underlying public policy decisionmaking concerning threatened and endangered species under state and federal endangered species laws and regulations; to give guidance and information to persons in and outside of government on the use of 'best available science' in public policy decisionmaking; and to ensure adherence to the laws and regulations concerning 'best available science' in public policy decisionmaking.[114]

That organizational mission is injured by Federal Defendants' refusal to take any steps to avoid

---

[111] *Council for Endangered Species Act Reliabliity v. Salazar*, No. 1:09-cv-02091 (E.D. Cal.).
[112] *Ctr. for Envt'l Science, Accuracy & Reliability v. Cal. Dep't of Water Res.*, No. 34-2015-80002085 (Cal. Sup. Ct.).
[113] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).
[114] Fed. Defs.' Mot. at Ex. 2 (Doc. 69-2).

ongoing harm to the listed Delta species, or even to determine the nature and extent of that harm.

In *Salmon Spawning & Recovery Alliance v. Gutierrez*,[115] the Ninth Circuit held that the Recovery Alliance had established a concrete threatened interest in consultation on a biological opinion concerning the Pacific Salmon Treaty of 1999 based on the Alliance's allegations that it has "scientific, educational, aesthetic, recreational, spiritual, conservation, economic, and business interests in the salmon."[116]  The Center, too, has aesthetic, conservation, economic, and business interests in the application of best available science to regulatory decisionmaking, as Manson, also a member of the Center, states in his declaration:

> The Center's organizational mission includes "educat[ing] the American public about the science underlying public policy decisionmaking concerning threatened and endangered species under state and federal endangered species laws and regulations; to give guidance and information to persons in and outside of government on the use of 'best available science' in public policy decisionmaking; and to ensure adherence to the laws and regulations concerning 'best available science' in public policy decisionmaking."[117]

The Center's stated purpose is to ensure that agencies use "best available science" with regard to their decisions concerning threatened and endangered species[118]—precisely what the Center has alleged Federal Defendants have failed to do here.  Use of best available science is an explicit requirement of the ESA, Congress having mandated that Section 7 consultations are to ensure that agency decisions "shall use the best scientific and commercial data available."[119]

### 1.   The Center has organizational standing

Federal Defendants erroneously assert that the Center's organizational interests are no different from those of the general public.  But the general public does not advocate for "the use

---

[115] *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008).
[116] *Salmon Spawning & Recovery Alliance*, 545 F.3d at 1225, 1229 (internal quotation omitted).
[117] Manson Decl. ¶ 3 (Doc. 65-2).
[118] *See* Fed. Defs.' Mem. at 17 n.8 & Ex. 2 (Docs. 69-1, 69-2).
[119] 16 U.S.C. § 1536(a)(2).

of fact-based science to assist in the conservation of species,"[120] nor does it "educate the American public about the science underlying public policy decisionmaking concerning threatened and endangered species."[121] The Center's very purpose—advocacy and dissemination of best available science in regulatory decisionmaking—is threatened by Federal Defendants' decision to use no science at all and not apply the ESA to the Hetch Hetchy Project.

Federal Defendants also argue that the Center's aesthetic and scientific interest in the Delta smelt or other fish is not germane to the Center's purpose because the Center "is not an organization dedicated to the conservation of fish."[122] But this argument mischaracterizes the Center's purpose and misinterprets the connection between the Center's purpose and its members' interests, which requires only that litigation be related to an organization's purpose. Courts have held that "litigation that merely aims to enhance the [organization]'s success in its central missions is sufficiently germane."[123]

And in *Central Delta Water Agency v. United States*,[124] the Ninth Circuit rejected the argument Federal Defendants make here, that the Center's injury is too speculative because it is only a possibility of an injury in the future, holding that the possibility of future injury constitutes injury-in-fact.[125]

Here, Manson (former Assistant Secretary of the Interior for Parks and Wildlife and one of the Center's members) has described how the Center is "dedicated to the use of fact-based

---

[120] Manson Decl. ¶ 1 (Doc. 65-2).
[121] Manson Decl. ¶ 3 (Doc. 65-2).
[122] Fed. Defs.' Mem. at 21 (Doc. 69-1).
[123] *TOMAC v. Norton*, 193 F. Supp. 2d 182, 190–91 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) (internal quotation omitted).
[124] *Cent. Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002).
[125] *Cent. Delta Water Agency*, 306 F.3d at 947–48 (quoting *Ecological Rights Found. v. Pacific Lumber Co.,* 230 F.3d 1141, 1151 (9th Cir. 2000) and *Friends of the Earth v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 160 (4th Cir. 2000) (en banc)).

science to assist in the conservation of species, and ensuring that sound science forms the basis of species conservation under state and federal statutes."[126]  Sagouspe (another of the Center's members) explains that the Center closely follows agency actions concerning endangered species:

> The Center and I closely monitor the actions of federal agencies to insure their adherence to the requirements of the federal Endangered Species Act (and other statutes) that they apply the best available scientific data in their decision-making, including agency actions that may negatively affect endangered or threatened species or their habitat.[127]

Manson further stated in his declaration that the Center is dedicated to conservation of species and believes that focusing resources on species actually in peril, and the belief that "the use of sound data and analysis in determinations to list or delist species," will result in better conservation of all species.[128]

To this end, the Center has petitioned for delistings and listings based on the best available science.[129]  The Center's members share its interest in the use of strong science to advance species conservation and to focus the limited resources available to the Fish and Wildlife Service.  Sagouspe stated in his declaration that he supports agency decisions concerning listed species be based on best available science to promote species conservation as well as efficient use of the limited resources available to both listed species and farmers in the Central Valley.[130]

In *Bennett*, the Supreme Court held that plaintiff ranch operators and irrigation districts,

---

[126] Manson Decl. ¶ 1 (Doc. 65-2).

[127] Sagouspe Decl. ¶ 1 (Doc. 65-3).

[128] Manson Decl. ¶ 4 (Doc. 65-2).

[129] Manson Decl. ¶ 4 (Doc. 65-2).

[130] *See* Sagouspe Decl. ¶ 5 (Doc. 65-3) ("These current and future less-than-optimal criteria for Hetch Hetchy water extraction reduce the amount of fresh water available in the Delta for fish and people, injuring both my profound commitment to species protection and my economic interests as a farmer.").

---

representing farmers, had standing because the "there is no textual basis for saying that [the ESA's] expansion of standing requirements applies to environmentalists alone." This is precisely what Federal Defendants attempt to do when it argues that "CESAR is not an organization dedicated to the conservation of fish."[131]

Thus, the Center's organizational injury stems from Federal Defendants' failure to even consider imposing the same ESA restrictions on Hetch Hetchy that they impose on every other water user in the Central Valley. The absence of those restrictions harms listed species and the Center's member's aesthetic and professional interests in those species.

### 2.    The Center has associational standing

Federal Defendants misunderstand the doctrine of associational standing, which allows an organization to assert the claims of its members without joining the individual members as plaintiffs, described by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*[132]:

> We have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[133]

The claim of one member, such as Sagouspe or Manson, will suffice: "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."[134]

---

[131] Fed. Defs.' Mem. at 21 (Doc. 69-1).
[132] *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977).
[133] *Hunt*, 432 U.S. at 343.
[134] *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552 (1996).

In *Coalition for a Sustainable Delta v. FEMA,*[135] a case similar to this case in terms of the legal challenge and the plaintiffs' interests, this Court held that a California corporation representing interests of farmers dependent on Delta water had standing to challenge FEMA's administration of the National Flood Insurance Program (NFIP) for its discretionary actions and programs that "may have adverse effects on Listed Species and their critical habitat with the Delta."[136]  The Coalition had challenged FEMA's failure to consult under Section 7 of the ESA,[137] which is essentially the same challenge the Center asserts regarding the National Park Service's failure to consult.[138]

In *Coalition*, this Court started with the proposition that "[w]hen a plaintiff seeks to vindicate a procedural harm, rather than a substantive right, the causation and redressability requirements are relaxed."[139]  The Court then held that the Coalition had established injury-in-fact because it sought in part to "ensure a sustainable and reliable water supply by protecting the Delta and promoting a strategy to ensure its sustainability."[140]  The Court noted that Coalition members have contracts for water delivery from the State Water Project, and that FEMA's actions under the NFIP ultimately impact the Listed Species by increased development, which in turn "significantly alter[] fish habitat quantity and quality," which would ultimately affect the amount of irrigation water available to Coalition members for use on their farms.[141]  The Court found injury-in-fact because reduced water availability and reduced deliveries of SWP water

---

[135] *Coal. for a Sustainable Delta v. F.E.M.A.*, 711 F. Supp. 2d 1152 (E.D. Cal. 2010).

[136] *Coal. for a Sustainable Delta*, 711 F. Supp. 2d at 1160.

[137] *See Coal. for a Sustainable Delta*, 711 F. Supp. 2d at 1156 ("Plaintiffs further allege that FEMA is administering the NFIP in violation of ESA Section 7 . . . .").

[138] *Cf.* Center's Compl. ¶ 20 (Aug. 18, 2014) ("Defendants have failed to consult with the Fish and Wildlife Service or the National Marine Fisheries Service, as required by Section 7 of the Endangered Species Act . . . .").

[139] *Coal. for a Sustainable Delta*, 711 F. Supp. 2d at 1165.

[140] *Coal. for a Sustainable Delta*, 711 F. Supp. 2d at 1162.

[141] *Coal. for a Sustainable Delta*, 711 F. Supp. 2d at 1161.

---

PLS.' COMBINED RESP. & REPLY                31

could have economic impacts on members of the Coalition because such members "are required to pay for the full contractual entitlement, even if the entitlement is not delivered and because the members must develop other sources of water for irrigation of their crops or forego irrigation altogether thus impacting their livelihood."[142]

In addition, Federal Defendants' argument that the Center has no members is both wrong and irrelevant. The record contains declarations from both Sagouspe and Manson stating that they are members of the Center, and the Center has a simple membership application available on its website.[143] There is nothing in the record to show that they are not members of the Center. In addition, associational standing does not require formal membership, as the Supreme Court held in *Hunt*:

> The only question presented, therefore, is whether, on this record, the Commission's status as a state agency, rather than a traditional voluntary membership organization, precludes it from asserting the claims of the Washington apple growers and dealers who form its constituency. We think not. The Commission, while admittedly a state agency, for all practical purposes, performs the functions of a traditional trade association representing the Washington apple industry.[144]

The Ninth Circuit has held that water districts, which are state agencies that do not have actual members, have associational standing to assert the claims of their water users:

> Because the Central Delta and South Delta Water Agencies are charged by the State of California with protecting a dependable supply of high-quality water for the Delta areas concerned here, CAL. WATER CODE APPENDIX, § 116-4.1, both agencies have standing to bring this action under the test established by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).[145]

Finally, by not offering any argument concerning the causal connection between the

---

[142] *Coal. for a Sustainable Delta*, 711 F. Supp. 2d at 1162.

[143] Manson Decl. ¶ 1 (Doc. 65-2); Sagouspe Decl. ¶ 1 (Doc. 65-3); CESAR, Become a Member, http://www.bestscience.org/take-action.html.

[144] *Hunt*, 432 U.S. at 344.

[145] *Cent. Delta Water Agency*, 306 F.3d at 951.

Center's injury and the federal action at issue in this case, Federal Defendants concede that the Center meets this element of standing.[146]

### B.      Plaintiff Sagouspe has injury-in-fact sufficient to support standing

Plaintiff Jean Sagouspe identifies two interests that are injured by Defendants' actions. First, he states that he is "committed to a balanced use of the available water to supply both human needs and species' requirements."[147]  Second, he states that as a farmer growing various crops on 2,600 acres in the Central Valley, he depends on water from the Tuolumne River:  "My crops are dependent on irrigation water supplied by the Central Valley Project. . . .  The extraction of water from the Tuolumne River directly impacts my farming operations and my economic interests by reducing the quantity of water flowing downstream through the San Joaquin River and out into the Delta."[148]  He then states how these interests are injured by Defendants' failure to comply with ESA:

> The Park Service's failure to consult with the species protection agencies means that those agencies have not been allowed to apply their scientific expertise in the biology and habits of the endangered and threatened Delta fish species to propose reasonable and prudent alternatives to the current and proposed future water extraction operations of the Hetch Hetchy Project.  These current and future less-than-optimal criteria for Hetch Hetchy water extraction reduce the amount of fresh water available in the Delta for fish and people, injuring both my profound commitment to species protection and my economic interests as a farmer.[149]

Sagouspe's injury-in-fact is thus indistinguishable from the injury the Ninth Circuit held sufficient to support standing in a Section 7 case: "scientific, educational, aesthetic, recreational, spiritual, conservation, economic, and business interests in the salmon."[150]  And Sagouspe has a strong geographical nexus to the location at issue:  Streamflow from the Tuolumne River affects

---

[146] *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("[A]rguments not raised in the opening brief are waived.").

[147] Sagouspe Decl. ¶ 3 (Doc. 65-3).

[148] Sagouspe Decl. ¶ 2 (Doc. 65-3).

[149] Sagouspe Decl. ¶ 5 (Doc. 65-3).

[150] *Salmon Spawning & Recovery Alliance*, 545 F.3d at 1225, 1229 (internal quotation omitted).

Sagouspe (and other members of CESAR) in the Central Valley.

Federal Defendants' argument that "[t]he ESA consultation procedures are not designed to protect Mr. Sagouspe's economic interest"[151] is irrelevant because that is not the test for Sagouspe's standing.  As the Supreme Court has held, where the results of agency action under Section 7 may release more water to farmers, they have standing to "prevent application of environmental restrictions rather than to implement them."[152]

The Ninth Circuit held in *Natural Resources Defense Council v. Jewell*[153] that "a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests."[154]  In short, to establish standing, Sagouspe need only show that he could receive more water if the requested relief is granted: "These current and future less-than-optimal criteria for Hetch Hetchy water extraction reduce the amount of fresh water available in the Delta for fish and people . . . ."[155]  By not imposing any ESA protections on the Hetch Hetchy Project, the City is able to divert more water than it would otherwise be allowed, leaving less instream flow and a smaller total pool of water for all downstream users, including Sagouspe, thereby meeting establishing Sagouspe's standing: "Hetch Hetchy water extraction reduce[s] the amount of fresh water available in the Delta for fish and people, injuring both my profound commitment to species protection and my economic interests as a farmer."[156]

---

[151] Fed. Defs.' Mem. at 23 (Doc. 69-1).

[152] *Bennett*, 520 U.S. at 166.

[153] *Natural Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014).

[154] *Natural Res. Def. Council*, 749 F.3d at 783 (emphasis in original); *see also Glickman*, 156 F.3d at 613 ("[P]laintiff need not show that the procedural remedy that he is requesting will in fact redress his injury, [but] the plaintiff must nonetheless show that there is a possibility that the procedural remedy will redress his injury.").

[155] Sagouspe Decl. ¶ 5 (Doc. 65-3).

[156] Sagouspe Decl. ¶ 5 (Doc. 65-3).

In *San Luis & Delta-Mendota Water Authority v. Jewell*,[157] the court held that several water districts established the causation element of standing to challenge environmental releases from Lewiston Dam where the releases would result in "a 50% chance that the loss in storage would result in the loss of potential water supply to Plaintiffs."[158] The court discounted the possibility of "very unusual hydrologic conditions."[159] Here, the causal chain is more certain because any increase in the amount of water available in the lower Tuolumne River would result in a larger total sum of water available downstream. [160]

Federal Defendants selectively quote from *National Association of Home Builders v. U.S. Fish & Wildlife Service*,[161] which actually stated that "the warranted-but-precluded determination is a safety valve for the Service, not an escape hatch for beleaguered landowners."[162] In *National Association of Homebuilders*, as the full quote makes clear, the D.C. Circuit held only that under Section 4 of the ESA, petitioners had no statutory rights to comment on a warranted-but-precluded determination and "this is therefore 'not a procedural injury' case."[163] *National Association of Homebuilders* therefore has no relevance to the question of whether a plaintiff asserting an economic interest, not species protection, may assert standing under the procedural rights doctrine.

C.     **Federal Defendants' waived any argument concerning redressability**

Federal Defendants state that the Center cannot "show that it was not merely speculative

---

[157] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 52 F. Supp. 3d 1020 (E.D. Cal. 2014).

[158] *San Luis & Delta-Mendota Water Auth.*, 52 F. Supp. 3d at 1038.

[159] *San Luis & Delta-Mendota Water Auth.*, 52 F. Supp. 3d at 1038.

[160] *Cf. Coal. for a Sustainable Development*, 711 F. Supp. 2d at 1166 ("[I]f Plaintiffs' succeed, FEMA would have to change the manner in which it administers the NFIP; that the change would lead third-party developers to change or limit their development activities; and that this change would lessen the alleged adverse impacts of development on listed species in the Delta.").

[161] *Nat'l Assoc. of Home Builders v. U.S. Fish & Wildlife Serv.*, 786 F.3d 1050 (D.C. Cir. 2015).

[162] *Nat'l Assoc. of Home Builders*, 786 F.3d at 1053.

[163] *Nat'l Assoc. of Home Builders*, 786 F.3d at 1053.

---

that the injury would be redressed by a favorable decision of this Court"[164] but offer no further argument on the issue of redressability, apparently choosing to argue only the issues of causation and injury-in-fact with regard to Sagouspe, and only injury-in-fact with regard to the Center. "[A]rguments not raised in the opening brief are waived."[165]

If this Court were to issue an order requiring Defendants to comply with Section 7's requirements to use all their authorities to assist the listed Delta fish species and to consult and determine reasonable and prudent alternatives to the City's present unregulated extraction of water from the Tuolumne River, this would go a long way toward redressing the harm to the Center, its members (including Sagouspe and Manson)—and the species themselves.[166]

**CONCLUSION**

For all the reasons stated in their opening brief and in this response and reply brief, Plaintiffs ask this Court to grant their motion for summary judgment and to deny Defendants' cross-motions for summary judgment.

Respectfully submitted,

/s/ Roger J. Marzulla
Roger J. Marzulla, SBN 51113
Nancie G. Marzulla,
M. Rhead Enion, SBN 272098
Marzulla Law, LLC
1150 Connecticut Ave. NW
Suite 1050

---

[164] Fed. Defs.' Mem. at 22 (Doc. 69-1); *see also id.* at 23 ("Plaintiffs have failed to meet their burden of proving that Mr. Sagouspe's alleged economic injuries . . . are redressible by this Court.").

[165] *SmithKline Beecham*, 439 F.3d at 1319.

[166] *See, e.g.*, *Coal. for a Sustainable Delta v. F.E.M.A.*, 711 F. Supp. 2d 1152, 1168–69 (E.D. Cal. 2010) ("Plaintiffs' alleged injury is reduced water deliveries due to the biological opinions issued in connection with the joint operation of the CVP and SWP. . . . Accordingly, if it must be assumed for purposes of a motion to dismiss that ordering FEMA to engage in the consultation process will increase delta smelt abundance, it is plausible that this would have a salutary effect on the magnitude of reductions imposed upon the CVP and SWP.").

Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)
roger@marzulla.com
nancie@marzulla.com
rhead@marzulla.com

February 22, 2016                    Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY & RELIABILITY, et al. | ) ) ) | Case No. 14-cv-02063-LJO-MJS |
| | ) | CERTIFICATE OF SERVICE |
| NATIONAL PARK SERVICE, et al., | ) ) | Hon. Lawrence J. O'Neill |
| Defendants, | ) ) ) | Hon. Michael J. Seng U.S. Magistrate Judge |
| and | ) ) | |
| CITY & COUNTY OF SAN FRANCISCO, | ) ) | |
| Defendant-Intervenor. | ) ) | |

**CERTIFICATE OF SERVICE**

This certifies that on Monday, February 22, 2016, I served the Plaintiffs' Combined

Reply in Support of Their Motion for Summary Judgment and Response to Defendants' Cross-

Motions, by filing the document with this Court's ECF system.


February 22, 2016                              By: /s/ M. Rhead Enion
                                                       M. Rhead Enion