1
2
3
4
5

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

6
7
8

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE ACCURACY AND RELIABILITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>Defendants,<br><br>THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>Intervenor-Defendant. | 1:14-cv-02063-LJO-MJS<br><br>MEMORANDUM DECISION AND ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOCS. 65, 69 & 74) |

9
10
11
12
13
14
15
16
17

## I. <u>INTRODUCTION</u>

This case concerns management of the Hetch Hetchy Water and Power Project ("Hetch Hetchy Project" or the "Project"), a system of dams, diversion structures, and hydropower facilities on the Tuolumne River, which includes, among other features, the Hetch Hetchy Reservoir and the O'Shaughnessy Dam, both located within Yosemite National Park ("Yosemite"). Doc. 1 ("Compl."). The San Francisco Public Utilities Commission ("SFPUC"), a department of the City and County of San Francisco (collectively, the "City"), owns and operates the Hetch Hetchy Project. Administrative Record

1

1    ("AR") [1] 2170.

2        Plaintiffs, the nonprofit corporation Center for Environmental Science, Accuracy & Reliability

3    ("CESAR") and Jean Sagouspe, one of CESAR's members (collectively, "Plaintiffs"), filed this lawsuit

4    on August 18, 2014, against the National Park Service ("NPS"), an agency of the U.S. Department of the

5    Interior ("Interior"), and various NPS and Interior officials (collectively, "Federal Defendants"). Compl.

6    The Complaint alleges:

7        (1) Federal Defendants violated Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C.
         § 1536, by approving annually instream flow and other operating requirements for the Hetch

8        Hetchy Project without first consulting with the Fish and Wildlife Service ("FWS") and/or the
         National Marine Fisheries Service ("NMFS"), *id*. at ¶¶ 20-22;

9

10       (2) "[B]y authorizing the diversion of water out of the Tuolumne River," Federal Defendants
         have caused a take of threatened and endangered fish species in violation of Section 9 of the
         ESA, 15 U.S.C. § 1538, *id*. at ¶¶ 23-25; and

11

12       (3) Federal Defendants violated the National Environmental Policy Act ("NEPA") by failing to
         prepare an Environmental Impact Statement ("EIS") before "prescribing the annual instream
         flow and other operating requirements for the Hetch Hetchy Project." *Id*. at ¶¶ 26-28.

13

14   The City was granted permission to intervene as a defendant as of right under Fed. R. Civ. P. 24 on

15   January 20, 2015, Doc. 40, and it filed an answer February 17, 2015. Doc. 41.

16       Before the Court for decision are all parties' cross-motions for summary judgment. Docs. 65, 69

17   & 74. Having reviewed all the parties' filings related to these motions, along with relevant portions of

18   the AR, the Court concludes, pursuant to Local Rule 230(g), that the matter is suitable for decision on

19   the papers without oral argument.

20                **II. FACTUAL BACKGROUND**

21   **A.**    **Yosemite**

22       Yosemite as it exists today pre-dates the establishment of the National Park System. The lands

23   where Project features at issue in this case are now located, in addition to much of the land that now

24   comprises the Park, were set aside by Congress in 1890 as "reserved forest lands" subject to the

25   _____
     [1] The AR was lodged with the Court on Compact Disk. *See* Docs. 46 (original AR) & 64 (supplemental AR).

1   exclusive control of the Secretary of the Interior ("Secretary"). Act of October 1, 1890, § 2 (26 Stat.

2   650) ("1890 Act"). In 1905, Congress divided the forest reservation into two separate areas. Act of

3   February 7, 1905, § 1 and 2 (33 Stat. 702). One area was named the Sierra Forest Reserve, which, for

4   purposes of this case, includes lands within the Stanislaus National Forest (the "Forest") where certain

5   Project facilities are located. *Id.* The larger, remaining portion of the reserve was renamed Yosemite

6   National Park. *Id.*

7       The 1890 Act authorized the Secretary to issue regulations to "provide for the preservation from

8   injury of all timber, mineral deposits, natural curiosities, or wonders within said reservation, and their

9   retention in their natural condition." 1890 Act, § 2. However, the delegation of regulatory authority

10  conferred by the 1890 Act became obsolete upon enactment of the National Park Service Organic Act

11  ("Organic Act"), 54 U.S.C. § 100101(a) *et seq.*, in 1916 and the creation of NPS an agency within

12  Interior. The Organic Act directs the Secretary to "conserve the scenery, natural and historic objects, and

13  the wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural

14  and historic objects, and wild life in such manner and by such means as will leave them unimpaired for

15  the enjoyment of future generations." 54 U.S.C. § 100101(a).

16  **B.    The Tuolumne River Watershed**

17      The Tuolumne River originates in the Sierra Nevada mountain range within Yosemite and then

18  flows generally westward 130 miles to its junction with the San Joaquin River near Modesto. *See* AR

19  2174. The San Joaquin, in turn, then flows generally northward toward the Sacramento-San Joaquin

20  Delta ("Delta"). *See* AR 2170 (Figure 1). Annual runoff in the Tuolumne River basin is highly variable.

21  For example, 1912-2012 computed annual unimpaired inflow to Hetch Hetchy Reservoir averaged

22  748,728 acre feet ("AF")[2], but varied from 206,391 AF to 1,645,246 AF (28% to 220% of the average).

23

24  [2] An acre-foot is a "volume measurement [of] water, or other material, equal to the amount of water that will cover one acre
25  of land to a depth of one foot (approximately 325,830 gallons)." *Black's Law Dictionary*, 1909 (10th ed. 2014).

3

1 AR 2174.

2 **C.    The Delta and Listed Species in the Delta**

3 The Complaint raises concerns regarding the following species: delta smelt (*Hypomesus*

4 *transpacificus*); Central Valley steelhead (*Oncorhynchus mykiss*), the Central Valley spring-run Chinook

5 salmon (*Oncorhynchus tshawytscha*), the winter-run Chinook salmon (*Oncorhynchus tshawytscha*), and

6 the green sturgeon (*Acipenser medirostris*). Compl. at ¶¶ 12-14.

7 The Delta is critical habitat for the threatened delta smelt, AR 3007-30, which "is a small, two-

8 to-three inch species of fish endemic to the San Francisco Bay/Sacramento-San Joaquin Delta Estuary.

9 Once an abundant species in the Bay-Delta ecosystem, the delta smelt is now in imminent danger of

10 extinction." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 595-96 (9th Cir. 2014)

11 (internal citation omitted). The Delta is also critical habitat for the other ESA-listed species mentioned in

12 the Complaint. AR 2999-3006, 3039-3178, 3189-3240.

13 **D.    The Raker Act**

14 In 1913, the Raker Act granted the City lands and rights of way in Yosemite and the Forest for

15 the purpose of building a system of reservoirs, powerhouses, and associated infrastructure to develop a

16 municipal water supply and generate hydroelectric power. Act of December 9, 1913, 38 Stat. 242-251,

17 § 1 ("Raker Act"), AR 1; AR 2982 (map of Hetch Hetchy Project). The Raker Act directed the Secretary

18 to grant the City all necessary rights of way that, in the judgment of the Secretary, may be required

19 
20 
21 
22 
23 
24 
      for the purpose of constructing, operating, and maintaining aqueducts, canals, ditches, pipes, pipe lines, flumes, tunnels, and conduits for conveying water for domestic purposes and uses to the city and county of San Francisco and such other municipalities and water districts as, with the consent of the city and county of San Francisco, or in accordance with the laws of the State of California in force at the time application is made, may hereafter participate in the beneficial use of the rights and privileges granted by this act; for the purpose of constructing, operating, and maintaining power and electric plants, poles, and lines for generation and sale and distribution of electric energy.

25 Raker Act, § 1, AR 1; AR 13. Interior is authorized to approve changes in the location of any such right

4

1    of way necessary to complete the Project. *Id.* § 2, AR 2. The City pays annual rent to the United States

2    for use of the land, *id.* § 7, AR 4, and is required to "conform to all regulations adopted and prescribed

3    by the Secretary of the Interior governing . . . Yosemite." *Id.* § 4, AR 2. Nevertheless, the Raker Act

4    restricts the Secretary's ability to regulate the City's water rights under state law, stating that:

5            nothing herein contained shall be construed as affecting or intending to
             affect or in any way to interfere with the laws of the State of California
6            relating to the control, appropriation, use, or distribution of water used in
             irrigation or for municipal or other uses, or any vested right acquired
7            thereunder [. . .] and the Secretary of the Interior shall act in conformity
             with the laws of said State.

8    *Id.* § 11, AR 9-10.

9    **E.      The Hetch Hetchy Project**

10           The Hetch Hetchy Project is a complex system of water storage dams and reservoirs, diversion

11   dams, regulating reservoirs, powerhouses, tunnels, and pipelines operated to deliver water supply to 2.6

12   million people in the San Francisco Bay Area. AR 2170, 2174. The Project also generates hydropower

13   for the City's municipal uses, the Turlock Irrigation District and Modesto Irrigation District, and other

14   public agencies in California. *Id*. The Project includes three major dams and associated reservoirs:

15   O'Shaughnessy Dam, which impounds Hetch Hetchy Reservoir on the main stem Tuolumne River;

16   Cherry Valley Dam, forming Lake Lloyd (also known as Cherry Lake) on Cherry Creek, and Eleanor

17   Dam, forming Lake Eleanor on Eleanor Creek. AR 2174. Eleanor Dam, completed in 1918, was the first

18   dam constructed. *Id*. O'Shaughnessy Dam was completed in 1923 and enlarged in 1938, increasing the

19   storage capacity of Hetch Hetchy Reservoir from 260,000 AF to 360,360 AF. *Id*. Cherry Valley Dam

20   was completed in 1955. *Id*.

21           In the mid-1960's, Canyon Power Tunnel and Kirkwood Powerhouse were completed along the

22   main stem of the Tuolumne River, and diversions via Canyon Power Tunnel from O'Shaughnessy Dam

23   to Kirkwood Powerhouse began in 1967. AR 2175. Prior to completion of Canyon Power Tunnel, water

24   stored at O'Shaughnessy Dam was released year-round into the Tuolumne River and diverted at Early

25

1  Intake Diversion Dam ("Early Intake") into Mountain Tunnel. *Id.* Following completion of Canyon

2  Power Tunnel and Kirkwood Powerhouse, under normal operating conditions water is no longer

3  released into the Tuolumne River below O'Shaughnessy Dam for diversion at Early Intake into

4  Mountain Tunnel. *Id.* The City's diversions now flow directly from O'Shaughnessy Dam through

5  Canyon Power Tunnel and the Kirkwood Powerhouse into Mountain Tunnel for delivery to the Bay

6  Area or are released into the Tuolumne River below Early Intake, thus bypassing the approximately 12-

7  mile stretch of the Tuolumne River between O'Shaughnessy Dam and Early Intake known as the "Hetch

8  Hetchy Reach." AR 2171; 2175-2181. Once in Mountain Tunnel, water continues to Moccasin

9  Powerhouse before it enters the conveyance system to the San Francisco Bay Area. AR 2175.

10  **F.     Development of Project Facilities**

11       In 1914, the Secretary approved rights-of-way for the construction of O'Shaughnessy Dam and a

12  12-mile tunnel aqueduct in Yosemite and the Forest between O'Shaughnessy Dam and Early Intake

13  Dam that would be part of the future Canyon Power Project. AR 122-23, 313-314. In 1917, the City

14  received authorization from Interior for other components of the Canyon Power Project. AR 123. By

15  1930, the City had constructed many of the major components of the Project including O'Shaughnessy

16  Dam and Lake Eleanor Dam within the Park, and Early Intake Dam within the Forest. AR 40-42; 822.

17  **G.     Modification of the Tunnel Aqueduct Rights-of-Way & 1961 Stipulation.**

18       In 1958, upon reconsideration of further engineering studies, the City requested Interior's

19  approval to move the rights-of-way required for the tunnel aqueduct between O'Shaughnessy Dam and

20  Early Intake, and related facilities such as the penstocks and power plant, from the south to the north

21  side of the Tuolumne River in order to reduce construction costs substantially. AR 122-123, 166-167,

22  182, 187. NPS, FWS, U.S. Forest Service ("USFS"), and the California Department of Fish and Game

23  ("CDFG") (now the California Department of Fish and Wildlife), used this opportunity to initiate

24  discussions with the City regarding measures to protect fishery, recreational, and aesthetic values in the

25  Hetch Hetchy Reach that had not been provided for in the Raker Act or the original rights-of-way. AR

6

150, 174, 177-85. The City challenged the federal government's authority to require it to release minimum instream flows from O'Shaughnessy Dam as a condition of granting approval for the change in location to the 1914 and 1917 rights-of-way. AR 133-134, 166. However, on July 9, 1959, another Interior sub-agency, the Bureau of Land Management ("BLM") issued a decision conditioning approval of the City's request upon its execution of two stipulations, one with NPS and one with FWS, which prescribed minimum instream flow requirements for O'Shaughnessy Dam. AR 187-188. The City filed an administrative appeal. AR 189-200, 273-285, 822-824.

On June 21, 1960, after more than two years of negotiations, the City agreed that the federal government could lawfully condition an amendment to a right-of-way on a stipulation requiring minimum instream flows from O'Shaughnessy Dam. AR 315. In 1961, the City and DOI entered into a stipulation ("1961 Stipulation") that provided for specific temporary minimum instream flow requirements. AR 350-355.

> Approval of a relocated right-of-way for the proposed Canyon power project tunnel-aqueduct . . . is conditioned upon acceptance by the City and the County of San Francisco of firm stipulations that park and forest lands would be protected and adequate supplies of water would be released for fishery, recreational and consumptive needs in the national park and the national forest

AR 360.

Provision 6 of the 1961 Stipulation provided fixed instream flow schedules based on the time of year, *i.e.*, a release of 75 cubic feet per second ("cfs") between May 1st and September 15th, and 35 cfs between September 16th and April 30th. AR 351. Provision 6 also directed NPS, USFS, and FWS to conduct "a fishery, recreational (including aesthetic) study . . . to determine whether the above schedule is adequate, and, if not, to determine the magnitudes of the minimum flows required," and stated that "a modified schedule of releases between 35 cfs and 75 cfs may be recommended" if the stipulated flows were found to be "inadequate for the spawning of trout." AR 351-352. Secretary Udall, acting under his Raker Act authority, approved the City's relocation of the tunnel aqueduct, penstocks, and power house

1    for the Canyon Power Project (*i.e.*, Kirkwood Powerhouse), subject to the provisions of the 1961

2    Stipulation, citing, among other reasons, that "the interests in sport fishery and recreation can be

3    protected by requiring continuing releases of water from O'Shaughnessy Dam to maintain the Tuolumne

4    as a live stream between the dam and Early Intake." AR 334-337, 364-370, 824, 2184.

5         In 1965, the City and DOI executed a subsequent stipulation ("1965 Stipulation") to include an

6    additional 2.53 acres of land in the right-of-way for the Canyon Power Project for the power plant site.

7    AR 373-378. The 1965 Stipulation expressly prohibited reducing the "magnitude of water releases from

8    O'Shaughnessy Dam for fish." AR 358.

9    **H.   1985 Stipulation**

10        In 1976, following interagency consultation and field work by FWS, NPS, USFS and CDFG, and

11   the completion of the study required by the 1961 Stipulation, FWS issued a report recommending

12   increased releases for fishery, recreational and aesthetic values "associated with the 12.1-mile reach of

13   the river traversing lands within Yosemite National Park and Stanislaus National Forest between

14   O'Shaughnessy Dam and Early Intake and the 1.5-mile reach of river from Early Intake to Cherry Creek

15   confluence." AR 408-474, at 448-50. The City initially objected to the recommendation. AR 475-476.

16   Following negotiations, the City and Interior ultimately reached agreement on a three-tiered flow

17   schedule with different release levels for normal and wetter, dry and critically dry water year types. AR

18   1378-1379, 1380-1382, 1434, 1435-1437. In 1985, DOI and the City executed the agreement ("1985

19   Stipulation"). AR 1494-1499.

20        Provision 6 of the 1985 Stipulation provides that should the City ever seek to expand, alter, or

21   otherwise modify the project in a manner that could alter flows in the Hetch Hetchy Reach, such a

22   proposal would be subject to Interior review for the purpose of determining whether a change in the

23   stipulated flow release schedule should be made. AR 1495. Provision 6 further states that as part of its

24   environmental review of any such proposed modification, the City would be required to conduct a study

25   of potential impacts to fish, wildlife, recreational and aesthetic values formulated in coordination with

1  FWS, NPS, USFS and the CDFG, and subject to Interior approval, and if FWS recommended changes to

2  the flow release schedule based on the study, any such recommendation would become part of the 1985

3  Stipulation unless the City formally objected to Interior. AR 1495-96.

4  **I.     1987 Stipulation**

5          Shortly after the 1985 Stipulation was executed, the City requested Interior's review and

6  concurrence with a proposal to add a third generator to the Kirkwood Powerhouse on the Tuolumne

7  River in accordance with Provision 6 of the 1985 Stipulation, thus triggering the requirement for

8  additional studies to assess potential impacts to fish, wildlife, and recreational and aesthetic values. AR

9  1511-1537, 1558-1563, 1728, 1849. After further negotiations, the City and Interior entered in a new

10  Stipulation that amended and supplemented the 1985 Stipulation ("1987 Stipulation"), in which Interior

11  approved construction of a third generator at Kirkwood Powerhouse and the City agreed to pay for four

12  years of studies focused on "habitat for and populations of resident fish species [] between

13  O'Shaughnessy Dam and Early Intake." AR 1849-1850. Provision 2 of the 1987 Stipulation provides

14  that if "as a result of the foregoing studies [FWS] preliminarily determines . . . that flows in the upper

15  region of the Tuolumne River between O'Shaug[h]nessy Dam and Early Intake should be increased,"

16  the City will augment its releases above what was required in the 1985 Stipulation up to specified

17  volumes of water, as identified in Provision 2, for each of the three designated water year types, "to

18  mitigate any deficiency in the existing flow release schedule shown to be required as a result of the

19  studies." AR 1850-1852.

20          In addition to identifying specific volumes, or blocks, of water to be used for mitigation,

21  Provision 2 provides that whenever diversions "through Canyon Tunnel exceeds 920 cfs the flow release

22  schedule at O'Shaughnessy Dam will be increased an additional 64 cfs." AR 1850-1851. Following

23  execution of the 1987 Stipulation, the City has complied with this requirement. AR 2186. Thus, the City

24  currently releases instream flow from O'Shaughnessy Dam in accordance with the flow schedule set

25  forth in Exhibit A to the 1985 Stipulation, and releases an additional 64 cfs when diversions through

1    Canyon Tunnel exceed 920 cfs. *Id*. Provisions 4 and 5 of the 1987 Stipulation also provide that once the

2    fishery studies were completed, further increases in minimum instream flows could potentially be

3    required if the studies indicated they were necessary. AR 1854-1855. Significantly, the 1987 Stipulation

4    expressly requires "that water releases made by the City at Hetch Hetchy provided herein shall remain in

5    the Tuolumne River between O'Shaughnessy Dam and New Don Pedro Reservoir, and the timing of

6    these releases will be such as to coincide with the documented causes for the decrease in the habitat for

7    or populations of resident fish species in the affected stretch of the river." AR 1852.

8    **J.    1987-1992 Flow Studies Pursuant to the 1987 Stipulation**

9          On August 5, 1987, the City and FWS entered into an agreement whereby the City committed to

10   fund the four-year FWS fish population, habitat and instream flow studies required by Provision 1 of the

11   1987 Stipulation. AR 1862-1864, 1849-1850. The agreement contemplated that FWS would publish the

12   results by December 1992. AR 1863. On July 17, 1992, FWS issued a "rough draft" of a report titled

13   "Instream Flow Requirements for Rainbow and Brown Trout in the Tuolumne River Between

14   O'Shaughnessy Dam and Early Intake." AR 1931-2016. The rough draft report recommended varying

15   minimum flow rates depending on time of year and climatic factors. AR 1965-1967. However, the draft

16   report was not finalized by FWS and a modified release schedule was not implemented by the City. *See*

17   AR 2172, 2135.

18   **K.    The Draft O'Shaughnessy Dam Instream Flow Management Plan**

19          In June 2006, the SFPUC adopted the "Water Enterprise Environmental Stewardship Policy"

20   ("Stewardship Policy") and directed the policy be integrated into the planning and operation of the

21   SFPUC water system infrastructure, including Project dams and diversions. AR 2063, 2146-2147. The

22   policy established a management directive to protect and rehabilitate ecosystems affected by water

23   system operations, within the context of meeting water supply, power generation, water quality, and

24   existing minimum instream flow requirements. AR 2063. The Stewardship Policy states that "[r]eleases

25   from SFPUC reservoirs will . . . mimic the variation of the seasonal hydrology (*e.g.*, magnitude, timing,

1    duration, and frequency) of their corresponding watersheds in order to sustain the aquatic and riparian

2    ecosystems upon which these native fish and wildlife species depend." AR 2146. The SFPUC's new

3    approach was based, in part, on the evolution of resource management practices to "consider a wide

4    range of values beyond recreational fishing, including ecology, geomorphology, aquatic habitat, riparian

5    habitat, plant and wildlife resources, and native fish." AR 2058.

6    Following adoption of the Stewardship Policy, the SFPUC initiated the Upper Tuolumne River

7    Ecosystem Program ("UTREP") with the goal of conducting long-term, collaborative, science-based

8    investigations designed to: (1) describe historical and present day upper Tuolumne River ecosystem

9    conditions; (2) assess their relationship to Project operations; and (3) develop projects and plans for

10    improving ecosystem conditions on a long-term, adaptively managed basis. AR 2171. The UTREP

11    provides data and analyses to implement the Stewardship Policy downstream of Project facilities. *Id.*

12    On July 7, 2009, the SFPUC issued the "Upper Tuolumne River Ecosystem Project

13    O'Shaughnessy Dam Instream Flow Evaluation Study Plan," which is described as "an initial study plan

14    towards developing initial flow recommendations for the Hetch Hetchy Reach by December 2009 and

15    final recommendations by December 2010." AR 2066.

16    In 2010, the National Park Service and SFPUC entered into a Memorandum of Agreement

17    ("MOA") providing for:

18    collaborative efforts to improve environmental stewardship of the Upper
      Tuolumne River ecosystem . . . [that] will [] assist in carrying out

19    stipulations entered into by the SFPUC with the Department of the Interior
      that were required as part of the approval of a third generator at Kirkwood

20    Powerhouse under provisions of the Raker Act.

21    AR 2090.

22    On April 14, 2014, the Park Service, the City, and other collaborating agencies published a

23    "Stakeholder Draft" of an O'Shaughnessy Dam Instream Flow Management Plan, which is intended to

24    "represent[ ] a fundamental shift in the instream flow management paradigm for the Hetch Hetchy

25    Reach when compared to the primary management focus in the 1985/1987 Stipulations" pursuant to

11

1   which "[t]he SFPUC proposes to replace existing stipulations (including the 1985/1987 Stipulations)

2   relevant to instream flow management with a new stipulated agreement with the DOI based on the

3   IFMP." AR 2354.

4   ### III. **PROCEDURAL HISTORY**

5       The Complaint in this case was filed on August 18, 2014, in the United States District Court for

6   the District of Columbia. Doc. 1. Attached to the Complaint was a copy of an April 18, 2014 "60-day

7   notice of intent to sue" letter addressed to the Secretary of Interior, the Secretary of Commerce, the

8   Director of NPS, as well as to FWS and NMFS. Doc. 1-1 ("60-Day Notice"). On December 10, 2014,

9   the then-assigned district judge granted Federal Defendants' motion to transfer the case to this Court.

10  Doc. 32. Pending at the time of transfer was a motion to intervene filed by the City. Doc. 14 (filed Oct.

11  1, 2014). The undersigned granted that motion on January 20, 2015, Doc. 40, and the City filed its

12  answer February 17, 2015. Doc. 41.

13      The Joint Scheduling Report filed by Plaintiffs on behalf of all parties on March 19, 2015,

14  indicated: "[t]he parties agree that this case will be decided on summary judgment," and specifically that

15  the case "will not require a trial." Doc. 42 at 29, 33. The Scheduling Order therefore indicated: "[t]he

16  parties agree that this case will be resolved without trial and instead on rulings on motions for summary

17  judgment based upon review of the administrative record." Doc. 44 at 2.[3]

18      On July 15, 2015, Plaintiffs filed a motion to "supplement and complete the record and for

19  limited discovery," sought solely in connection with the NEPA claim. Doc. 47. Specifically, Plaintiffs

20  requested: an order requiring Federal Defendants add to the AR certain documents; leave to supplement

21  the record with the declaration of James R. Snow; and permission to take the deposition of NPS's Hetch

22  Hetchy Program Manager or a similar NPS official. *Id*. That motion was denied in its entirety. Doc. 61.

23  _____

24  [3] In a footnote in their Opposition/Reply brief, CESAR indicates that it "reserves its objection that its Section 9 claim against
    the City should be tried de novo, not on the administrative record." Doc. 77 at 14. As mentioned, the parties indicated that
25  this case would not require a trial. Plaintiffs have not even attempted to make the requisite showing to depart from the
    Scheduling Order that embodied this agreement.

Although the Scheduling Order did permit the filing of a motion for discovery on or before July 15, 2015, Doc. 44 at 4, apart from the request for a deposition included in the motion discussed above, no additional motion for discovery was filed by either party.[4]

## IV. STANDARD OF DECISION

The Administrative Procedure Act ("APA") standard of review applies to Plaintiffs' NEPA claim. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Because review under the APA of such a claim would be limited to the AR, a slightly modified approach to summary judgment would be applied, whereby the Court would determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). However, as discussed below, Plaintiffs have waived their NEPA claim by failing to raise it in their motion for summary judgment. The Court therefore need not discuss further the APA summary judgment approach.

A more traditional summary judgment burden-shifting approach applies to Plaintiffs' Section 7(a)(2) failure to consult and Section 9 Claims.[5] Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment in

---

[4] Plaintiffs acknowledged in their motion to supplement and for discovery that the requested deposition "could be combined with any other discovery required for [CESAR]'s ESA citizens' suit claims, which are not limited to the administrative record." Doc. 47-1 at 17. But, CESAR never requested any such "other discovery."

[5] While some claims brought under Section 7(a)(2) would arise under the APA and therefore be limited to the AR, *see, e.g., San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (limiting review to the administrative record in challenge to <u>substance</u> of biological opinion issued pursuant to Section 7(a)(2)), no such constraint appears to apply to Plaintiffs' Section 7(a)(2) failure to consult claim. *See Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1105 (E.D. Cal. 2011) ("Where . . . the claim for relief is that a federal agency failed to consult under ESA § 7, there is no administrative record of a consultation to limit the court's scope of review."); *see also Ellis v. Housenger*, No. C-13-1266 MMC, 2015 WL 3660079, at *4 (N.D. Cal. June 12, 2015) (same). So, while a court reviewing such a claim would borrow the <u>standard</u> of review from the APA because the ESA does not establish a standard of review, it would not similarly borrow the <u>scope</u> of review such that a court could, in theory, look outside the AR to resolve a Section 7(a)(2) failure to consult claim. *Id*. Likewise, Section 9 claims are not limited to the AR, at least in theory. *See Oregon Nat. Desert Ass'n v. Kimbell*, 593 F. Supp. 2d 1213, 1216 (D. Or. 2008). The issue here is that, in practice, Plaintiffs sought supplementation of the AR as to their NEPA claim, which was denied, but they never sought to submit any additional material pertaining to either their Section 7(a)(2) or Section 9 claims. At the same time, they agreed all of their claims could be resolved on summary judgment without a trial.

1  this traditional context "always bears the initial responsibility of informing the district court of the basis

2  for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories,

3  and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of

4  a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation

5  marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue

6  on which summary judgment is sought is one in which the movant or the nonmoving party carries the

7  ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). If

8  the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that

9  "no reasonable trier of fact could find other than for the moving party." *Id.* In contrast, if the nonmoving

10 party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is

11 an absence of evidence to support the nonmoving party's case." *Id*. (citing *Celotex*, 477 U.S. at 323).

12      If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in

13 its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a

14 jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in

15 original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id*. at 929; *see*

16 *also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the

17 moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

18 there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a

19 whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for

20 trial." *Matsushita*, 475 U.S. at 587.

21      In this case, as mentioned, the parties agreed that all claims can be resolved without trial on

22 motions for summary judgment based upon the Court's review of the AR. Doc. 44 at 2. This might

23 produce an awkward procedural situation if the Court determined any genuine factual disputes exist as

24 to either the Section 7(a)(2) failure to consult claim or the Section 9 claim. However, no such situation

25 arises here.

# V. DISCUSSION

## A. Scope of Claims and Threshold Jurisdictional Issues

### 1. Section 7 Claim is Confined to "Failure to Consult" under Section 7(a)(2)

Plaintiffs' First Claim for Relief seeks to "require NPS to consult regarding jeopardy to endangered and threatened fish species." Compl. at 9. This Claim alleges, specifically, that NPS "annually approves instream flow and other operating requirements for the Hetch-Hetchy Project" and that NPS violated the ESA by failing to consult as required by Section 7(a)(2) with FWS and NMFS over how these annual instream flow approvals would impact listed species. *Id*. at ¶¶ 20-22. Plaintiffs move for summary judgment that "Federal Defendants' failure to consult regarding Hetch Hetchy water extraction . . . over which they have discretionary authority, violates Section 7 of the [ESA]." Doc. 65-1 at 14.

In their papers, Doc 65-1 at 15; Doc. 77 at 1, 5, Plaintiffs appear to rely in some measure on ESA § 7(a)(1) ("Section 7(a)(1)"), 16 U.S.C. § 1536(a)(1), which provides:

> The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

As a threshold matter, while the Complaint and 60-Day Notice do allege Federal Defendants failed to comply with Section 7(a)(2)'s consultation requirement, neither document mentions any failure to "carry[] out programs for the conservation of endangered species," or otherwise provides Federal Defendants or Defendant-Intervenors notice of a claim based upon Section 7(a)(1). Plaintiffs suggest that notice of a Section 7(a)(1) claim was giving by virtue of the inclusion in their 60-Day Notice of the statement that "[i]t is time for the Secretaries of Interior and Commerce [to] step up to their species protection responsibilities and ensure the operation of Hetch Hetchy contributes to the conservation of listed species." Not so. This generic policy pronouncement does nothing to notify any defendant that

1  they might have violated Section 7(a)(1)'s requirement to "utilize" existing programs and/or "carry[] out

2  programs" for the conservation of endangered species," particularly in light of the fact that both the 60-

3  Day Notice and the Complaint repeatedly and specifically references Section 7(a)(2), contains repeated

4  allegations concerning the failure to consult, and never mentions Section 7(a)(1). Therefore, the Court

5  will not consider any such claim.

6  **2.     Plaintiffs Waived Their Section 9 and NEPA Claims Against Federal Defendants**

7       In their complaint, Plaintiffs assert claims against Federal Defendants under Section 9 and

8  NEPA. Doc. 1 at 11-12. Plaintiffs, however, do not move for summary judgment against Federal

9  Defendants on either claim. *See* Doc. 69-1. Nor do Plaintiffs address or dispute Federal Defendants'

10 argument that Plaintiffs' failure to move for judgment on the claims means that they have waived and

11 abandoned them. *See* Doc. 81 at 22. Further, Plaintiffs do not address Federal Defendants' alternative

12 arguments that these claims fail on the merits. *See* Doc. 69-1; Doc. 81 at 22.

13      The Court agrees with Federal Defendants that Plaintiffs' have waived their Section 9 and NEPA

14 claims against Federal Defendants by failing to mention them in any of their papers. *See Klamath-*

15 *Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1249 (N.D. Cal.

16 2015) (finding failure to raise a claim on summary judgment constitutes a waiver and dismissing waived

17 claim rather than granting summary judgment thereon). As a result, Federal Defendants are entitled to

18 dismissal of these claims for failure to prosecute. *Id.*

19 **3.     Section 9 Claim Against the City**

20      Plaintiffs move for summary judgment that the City's diversion of water "out of the San Joaquin

21 watershed is a take of endangered species prohibited by Section 9 of the [ESA]." Doc. 65-1 at 24. The

22 City cross-moves as to this claim, asserting, among other things, that this Court lacks subject matter

23 jurisdiction over the Section 9 Claim against the City because no such allegation was included in

24 Plaintiffs' 60-Day Notice letter. Doc. 74-1 at 17.

25 //

16

a.   **Failure to Name the City in the Complaint**

The City points out that Plaintiffs' complaint, filed August 18, 2014, names only the various Federal Defendants. Doc. 1. On January 20, 2015, the Court granted the City's motion to intervene in this matter as a defendant. Doc. 40. Plaintiffs never filed or sought leave to file an amended complaint naming the City in any claim, but point to compelling authority that suggests no such amendment is required. Intervenors "enter the suit with the status of original parties and are fully bound by all future court orders." *United States v. State of Or.*, 657 F.2d 1009, 1014 (9th Cir. 1981); *see also Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985) ("When a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party."); *Alvarado v. J.C. Penney Co.*, 997 F.2d 803, 805 (10th Cir. 1993) ("We agree that when a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party.") (internal citation and quotation omitted). "This explains [Rule 24's] requirement that the proposed intervenor file its own 'pleading that sets out the claim or defense for which intervention is sought.'" *In re Holocaust Victim Assets Litig.*, No. 14-CV-00890 ERK JO, 2014 WL 2440612, at *8 (E.D.N.Y. May 30, 2014) (quoting Fed. R. Civ. P. 24(c)). Here, the City's Answer addresses the allegations contained in each of the three claims in the original Complaint and asserts numerous affirmative defenses against all of those claims. *See* Doc. 41. To now suggest that Plaintiffs should have been required to file an amended complaint to name the City is without merit. The purpose of Rule 8 pleading is to give notice. The City was on notice of the claims in this case, voluntarily intervened, and filed a responsive pleading as to those claims. Plaintiffs' failure to name the City in an amended complaint is not fatal to Plaintiffs' assertion of its Section 9 claim against the City.

b.   **Failure to Include Section 9 Allegations Against the City in the 60-Day Notice**

More problematic is that Plaintiffs' 60-Day Notice does not mention the City. The ESA provides that "no action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. §

1   1540(g)(2)(A).). "The notice requirement provides agencies with 'an opportunity to review their actions

2   and take corrective measures if warranted.'" *Alliance for the Wild Rockies v. U.S. Dep't of Agric.*, 772

3   F.3d 592, 601 (9th Cir. 2014) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,

4   143 F.3d 515, 520 (9th Cir. 1998)). Thus, to satisfy the notice requirement, a plaintiff must "provide

5   sufficient information of a violation so that [the defendant] could identify and attempt to abate the

6   violation." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 522. The requirement is a "mandatory

7   condition [ ] precedent to commencing suit" under the ESA. *Id.* (quoting *Hallstrom v. Tillamook Cnty.*,

8   493 U.S. 20, 31 (1989)). "A failure to strictly comply with the notice requirement acts as an absolute bar

9   to bringing suit under the ESA." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 520. A district court may

10  not disregard such a notice requirement at its discretion. *See Hallstrom*, 493 U.S. 20 at 31.

11         The first paragraph of the 60-Day Notice, addressed only to federal agency departments and

12  officials, gives notice to those agencies and departments of their "continued failure to comply with the

13  [ESA] with respect to [NPS]-permitted diversions of approximately 265,000 acre-feet of water annually

14  from the Tuolumne River for consumptive use in San Francisco and surrounding communities." Doc. 1-

15  1 at 1. Thereafter, the 60-Day Notice warns that "[t]hese NPS-permitted diversions of substantial

16  Tuolumne River flows without regard for their adverse effects on endangered and threatened species

17  violate . . . Section 9 which prohibits the take of listed species." *Id.* at 1-2. It further warns that "should

18  [NPS] fail to institute Section 7 consultations with [FWS] and [NMFS] (as to anadromous species)

19  within the 60 days allowed by this notice, [CESAR] and its members will have no alternative but to file

20  suit to protect these species from the danger of extinction." *Id.* at 2. The only mention of the City is a

21  reference to its operation of the Hetch Hetchy Project pursuant to a lease from NPS:

22              Operated by the city of San Francisco under a lease from the National
                Park Service, the Hetch Hetchy Project is located within Yosemite
23              National Park and is thus subject to regulation by NPS. Yet in its lease
                negotiations, regulation of operations, and management of the Hetch
24              Hetchy Project, the Park Service has never considered the adverse effects
                of Tuolumne River diversions on the endangered species whose habitat is
25              the San Joaquin River and Sacramento Delta.

18

*Id*. at 4.

Assuming the 60-Day Notice provides proper notice of a Section 9 Claim against Federal Defendants, the question becomes: for pleading purposes, does the City step into the shoes of the Federal Defendants for the purposes of the 60-Day Notice? In other words, the question is whether Plaintiffs were required to amend their 60-Day notice to include the City. Plaintiffs assume, without providing any specific supporting authority, that the authorities discussed in the previous section, which answer in the affirmative the question of whether a defendant-intervenor steps into the shoes of the original defendant for purposes of pleading, apply with equal force to the ESA's 60-Day-Notice requirement. *See* Doc. 77 at 19-20. The only case the Court has been able to identify that addresses this specific issue is *Kitlutsisti v. ARCO Alaska, Inc*., 592 F. Supp. 832 (D. Alaska 1984), *vacated on other grounds*, 782 F.2d 800 (9th Cir. 1986), which specifically held that a defendant-intervenor did step into the shoes of the original defendants for purposes of the Clean Water Act's ("CWA") 60-day notice requirement,[6] rejecting the intervernor's argument that it was not mentioned in the 60-day notice. *Id*. at 842 at n.8. But, *Kitlutsisti* was premised on a now-invalid line of authority permitting district courts to interpret the 60-day notice requirement "pragmatically" and allowing "substantial compliance" with it. *Id*. at 842. That line of authority has been overruled by the Ninth Circuit, which now interprets the ESA's 60-day notice requirement as a "mandatory condition [ ] precedent to commencing suit." *Alliance for the Wild Rockies,* 772 F.3d at 601 (quoting *Hallstrom*, 493 U.S. at 31). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 520.

In the absence of any Ninth Circuit authority remotely suggesting it would be appropriate to depart from strict enforcement of the ESA's 60-day notice requirement under the circumstances presented here, the Court finds that Plaintiffs have not provided notice to the City as to its Section 9

---

[6] The CWA contains a 60-day notice provision similar to that contained in the ESA. 33 U.S.C. § 1365(b).

1   claim. Therefore, this Court lacks subject matter jurisdiction over any Section 9 claim against the City.

2   Accordingly, the City's motion for summary judgment as to the Section 9 claim is GRANTED, and

3   Plaintiffs' cross-motion is DENIED.

4   **B.      Standing**

5          **1.      General Legal Standard**

6          Standing is a judicially created doctrine that is an essential part of the case-or-controversy

7   requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001). "To satisfy the

8   Article III case or controversy requirement, a litigant must have suffered some actual injury that can be

9   redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984).

10  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits

11  of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The doctrine of

12  standing "requires careful judicial examination of a complaint's allegations to ascertain whether the

13  particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468

14  U.S. 737, 752 (1984). The Court is powerless to create its own jurisdiction by embellishing otherwise

15  deficient allegations of standing. *See Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990)

16         To have standing, a plaintiff must show three elements.

17             First, the plaintiff must have suffered an "injury in fact"–an invasion of a
               legally protected interest which is (a) concrete and particularized and (b)
18             actual or imminent, not conjectural or hypothetical. Second, there must be
               a causal connection between the injury and the conduct complained of-the
19             injury has to be fairly traceable to the challenged action of the defendant,
               and not the result of the independent action of some third party not before
20             the court. Third, it must be likely, as opposed to merely speculative, that
               the injury will be redressed by a favorable decision.
21
22  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

23  The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as

    follows:
24
25             Since [the standing elements] are not mere pleading requirements but
               rather an indispensable part of the plaintiff's case, each element must be

20

1

2

3

4

5

6

> supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

7

*Id*. at 561.[7]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

   Standing jurisprudence draws a distinction between "substantive" and "procedural" claims. "One who challenges the violation of 'a procedural right to protect his concrete interests can assert that right without meeting all the normal standards' for traceability and redressibility." *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 782-83 (9th Cir. 2014) (quoting *Lujan*, 504 U.S. at 572 n.7). NEPA claims are potentially subject to this relaxed "procedural injury" standard, *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011), as are alleged violations of Section 7(a)(2)'s consultation requirement. *Jewell*, 749 F.3d at 783. Section 9 claims are considered substantive claims, so are not subject to these relaxed standing requirements. *See Karuk Tribe of California v. U.S. Forest Serv*., 681 F.3d 1006, 1028 (9th Cir. 2012) (indicating allegations based on Section 9 are substantive in nature); *Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1094 (E.D. Wash. 2006) (by advancing a Section 9 claim, plaintiffs "are alleging a substantive violation of the ESA rather than a procedural violation").

   Standing is evaluated on a claim-by-claim basis. "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'" *Oregon v. Legal Servs. Corp*., 552

22

23

24

25

---

[7] Here, Plaintiffs and Federal Defendants have cross-moved for summary judgment on the issue of standing. Doc. 65-1 at 26; Doc. 69-1 at 15. Under most circumstances, even in a case that would otherwise be decided on the administrative record case, if standing cannot be resolved at summary judgment, trial on that issue may be necessary. *See Coalition for a Sustainable Delta v. John McCamman*, 725 F. Supp. 2d 1162, 1190 (E.D. Cal. 2010). Here, however, as mentioned, the parties agreed that the case can be resolved without trial on motions for summary judgment based upon this Court's review of the AR. Doc. 44 at 2. Regardless, the Court finds that trial would be unnecessary even if the parties had not waived the right to one, because Plaintiffs' standing theories either fail as a matter of law or there is a total absence of evidence to support the relevant standing elements.

1    F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

2    "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

3
      > The actual-injury requirement would hardly serve the purpose . . . of
      > preventing courts from undertaking tasks assigned to the political branches
4     > [,] if once a plaintiff demonstrated harm from one particular inadequacy in
      > government administration, the court were authorized to remedy all
5     > inadequacies in that administration.

6    *Id*. at 357.

7           The two Plaintiffs in this case are Sagouspe and CESAR. Plaintiffs present the Declaration of

8    Jean Sagouspe ("Sagouspe Decl."), Doc. 65-3, seeking to establish standing on his own behalf and as a

9    member of CESAR, and the Declaration of Craig Manson ("Manson Decl."), Doc. 65-2, CESAR's

10   executive director. For purposes of analytical efficiency, the Court begins its discussion with an analysis

11   of Sagouspe's standing regarding the Section 9 claim. The Court then proceeds to evaluate Sagouspe's

12   standing regarding the Section 7(a)(2) claim. Finally, the Court evaluates whether CESAR has standing

13   to pursue either claim.

14          **2.      Sagouspe's Standing**

15                 **a.      Section 9 Claim**

16          As discussed above, Section 9 claims are considered substantive claims for purposes of standing.

17   Therefore, the standard standing analysis applies.

18          Sagouspe advances two primary theories to establish that he has standing. He testifies that

19   Defendants have caused him to suffer injuries as (1) a member of CESAR, who has a "profound

20   commitment to species protection" and (2) as a farmer whose farms and economic interests are "directly

21   impact[ed] . . . by reducing the quantity of water flowing downstream through the San Joaquin River and

22   out into the Delta." *See* Sagouspe Decl., Doc. 65-3 at ¶¶ 1-2.

23                 **(1)      Interest in Species Protection**

24          Sagouspe's generalized interest in species protection has three aspects: (1) he has a desire to

25   protect threatened and endangered fish species; (2) he does species protection "work"; and (3) he

1   "closely monitor[s] the actions of federal agencies to insure their adherence to the requirements of the

2   [ESA] (and other statutes) [so] that they apply the best available scientific data in their decision-

3   making." *Id.* at ¶ 1.

4       "The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately

5   shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species

6   and that that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber*

7   *Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). "[G]eneralized harm to . . . the environment" is not sufficient.

8   *Summers v. Earth Island Institute*, 555 U.S. 488, 489 (2009).

9       Sagouspe provides no explanation of his purported interest in the species[8] beyond stating in a

10  conclusory manner that he is committed to protecting them. The Supreme Court has addressed why this

11  vague, unspecific interest is insufficient to establish an injury in fact at the summary judgment stage. *See*

12  *Lujan*, 504 U.S. 555. In *Lujan*, the plaintiffs, various organizations, including the Defenders of Wildlife,

13  "dedicated to wildlife conservation and other environmental causes," *id.* at 559, claimed they suffered

14  injury because the defendants' "lack of consultation with respect to certain funded activities abroad

15  'increase[d] the rate of extinction of endangered species and threatened species." *Id.* at 563. The Court

16  noted that "the desire to use or observe an animal species . . . is undeniably a cognizable interest for

17  purposes of standing," but explained that, to establish standing at the summary judgment stage, the

18  plaintiffs had to submit "evidence showing, through specific facts, not only that listed species were in

19  fact being threatened . . . but also that one or more of [their] members would thereby be 'directly'

20  affected [by] the defendants' challenged action or inaction] apart from their 'special interest' in the

21  subject." *Id.* (quotation marks and citations omitted).

22      When assessing whether the plaintiffs had made that showing, the Court first focused on the

23  _____

24  [8] Sagouspe does not indicate which threatened or endangered fish species he seeks to protect, though he suggests that "important scientific studies regarding the conservation and recovery of listed salmon, smelt, and sturgeon will not be undertaken" if the Park Service's alleged failure to conduct ESA consultations continues. *Id.* at ¶ 6. Given that CESAR argues the challenged diversions will threaten these species, *see* Doc. 65-1 at 34, the Court assumes Sagouspe also seeks to

25  protect them.

1    affidavits of two members of the Defenders of Wildlife. *Id.* Those members testified that they had

2    traveled to Africa and Sri Lanka personally to observe the natural habitat of various endangered species,

3    and intended to do so again in the future in hopes of actually observing the elusive species. *Id.* at 563-64.

4    They claimed, however, that the defendants' conduct threatened the survival of the species and their

5    habitats. *Id.* Assuming this was true, the Supreme Court held that the affiants' stated intent to observe

6    the endangered animals in the future, without any explanation as to when or how that would occur, was

7    insufficient to establish that their alleged injury was "actual or imminent." *Id.* at 565. The Court

8    reasoned:

9                    We shall assume for the sake of argument that [the standing] affidavits
                     contain facts showing that certain agency-funded projects threaten listed
10                   species—though that is questionable. They plainly contain no facts,
                     however, showing how damage to the species will produce "imminent"
11                   injury to [plaintiff's members]. That the women "had visited" the areas of
                     the projects before the projects commenced proves nothing. As we have
12                   said in a related context, "'Past exposure to illegal conduct does not in
                     itself show a present case or controversy regarding injunctive relief . . . if
13                   unaccompanied by any continuing, present adverse effects.'" [Citation].
                     And the affiants' profession of an "inten[t]" to return to the places they
14                   had visited before—where they will presumably, this time, be deprived of
                     the opportunity to observe animals of the endangered species—is simply
15                   not enough. Such "some day" intentions—without any description of
                     concrete plans, or indeed even any specification of when the some day
16                   will be—do not support a finding of the "actual or imminent" injury that
                     our cases require.
17
     *Id.* at 564 (citations omitted).
18
             The Court then addressed the plaintiffs' other "novel standing theories." *Id.* at 565. Under those
19
     theories, "anyone who has an interest in studying or seeing the endangered animals anywhere on the
20
     globe," and "anyone with a professional interest in such animals" would have standing to challenge the
21
     defendants' conduct. *Id.* at 566. The Court rejected both theories, reasoning that:
22
23                   It is clear that the person who observes or works with a particular animal
                     threatened by a federal decision is facing perceptible harm, since the very
24                   subject of his interest will no longer exist. It is even plausible—though it
                     goes to the outermost limit of plausibility—to think that a person who
25                   observes or works with animals of a particular species in the very area of
                     the world where that species is threatened by a federal decision is facing

24

such harm, since some animals that might have been the subject of his interest will no longer exist. It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.

*Id.* at 566-67 (citation and footnote omitted).

Here, Sagouspe has made less of a factual showing that he has suffered an actual injury than did the *Lujan* plaintiffs. Sagouspe states that he has a "profound commitment to species protection" and that he does some kind of "work of species protection" related to certain "threatened and endangered fish species downstream" from Hetch Hetchy. Sagouspe Decl. at ¶¶ 4-5. But he does not provide <u>any</u> explanation of that work, which fish species it involves, how he conducts it, or how it may be affected by Defendants' alleged actions (or inaction). Critically, he also does not articulate any facts that would suffice to show any harm to him would be imminent (*e.g.*, facts regarding the frequency of his activities related to species protection, his intent to continue those in the future, or any specific information about those future intentions). Sagouspe essentially argues he has standing because he wants to preserve certain unidentified threatened and endangered fish species and performs some certain unidentified work to do so. The Court cannot find—and Plaintiffs do not provide—any authority that suggests this could meet Plaintiffs' burden of proof at this stage of the litigation. As *Lujan* provides: "In response to a summary judgment motion . . . the plaintiff must set forth by affidavit or other evidence specific facts" sufficient to establish standing "which for purposes of the summary judgment motion will be taken to be true." 504 U.S. at 566 (internal citations and quotations omitted). But, even assuming the truth of all the facts set forth in Sagouspe's Declaration, he fails to demonstrate an "actual or imminent" concrete interest in the protection of the species purportedly threatened by Defendants' actions.

Sagouspe's next ground for establishing standing is his interest in ensuring that Defendants (1) comply with the ESA (and other unidentified statutes) and (2) use the best available science in their decision-making. Even assuming Defendants have not complied with the ESA and other laws, "an

1    asserted right to have the government act in accordance with law is not sufficient, standing alone, to

2    confer jurisdiction on a federal court." *Wright*, 468 U.S. at 754.

3        In sum, Sagouspe's generalized interest in "species protection" and his concomitant desire that

4    Defendants comply with the law and use the best available science when decision-making are

5    insufficient to establish any injury in fact.

6                **(2)**      **Interest in Protecting Water Supply**

7        Sagouspe's second primary basis for standing is that he is "a farmer in the Central Valley" whose

8    "crops are dependent on water supplied by the [CVP]," and "[t]he extraction of water from the

9    Tuolumne River directly impacts [his] farming operations and [his] economic interests by reducing the

10   quantity of water flowing downstream through the San Joaquin River and out into the Delta." Sagouspe

11   Decl. at ¶ 2.

12               **(a)**      **Injury-In-Fact**

13       As a general matter "the loss of affordable irrigation water for . . . agricultural lands" is an injury

14   in fact and "the adverse consequences flowing from a reduction in water delivery are concrete and

15   particularized and actual or imminent." *San Luis & Delta-Mendota Water Auth. v. United States*, 672

16   F.3d 676, 701 (9th Cir. 2012). Although, as discussed below, Sagouspe's proof of injury-in-fact is

17   conclusory and therefore insufficient, the Court will assume, for purposes of discussion, that he has

18   satisfied this element.

19               **(b)**      **Causation**

20       Constitutional standing requires a showing of "a causal connection between the injury and the

21   conduct complained of." *Lujan*, 504 U.S. at 560-61. More specifically, "the injury has to be fairly

22   traceable to the challenged action of the defendant, and not the result of the independent action of some

23   third party not before the court." *Id.* (internal quotations omitted). A "chain of causation [may have]

24   more than one link," so long as the connection between the injury and cause is not "hypothetical or

25   tenuous." *Nat'l Audubon Soc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002). Put another way, the plaintiff

1    must "establish the reasonable probability of the challenged action's threat to [his] concrete interest."

2    *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (citation and quotation marks omitted). It is Plaintiffs'

3    burden to establish that their theory of causation is at least "plausible." *See Davis*, 307 F.3d at 849.

4    "Thus, the causal connection put forward for standing purposes cannot be too speculative, or rely on

5    conjecture about the behavior of other parties." *Ecological Rights Found.*, 230 F.3d at 1152.

6        "When the suit is one challenging the legality of government action or inaction, [and] plaintiff is

7    himself an object of the action (or forgone action) at issue . . . there is ordinarily little question that the

8    action or inaction has caused him injury, and that a judgment preventing or requiring the action will

9    redress it." *Lujan*, 504 at 561-62. But when, as here, "plaintiff's asserted injury arises from the

10   government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is

11   needed." *Id.* at 562.

12       In *Central Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002), for instance,

13   there was "little dispute" that plaintiffs established a sufficient causal chain between defendants'

14   conduct and harm to their water supply, which, in turn, harmed their crops. Defendants controlled the

15   salinity level of plaintiffs' water supply vis-à-vis their decisions to release (or not release) waters from a

16   reservoir under their control at certain times. *Id.* The salinity level could damage or destroy plaintiffs'

17   crops. *Id.* Critically, none of this was disputed because plaintiffs substantiated their position with

18   documents defendants had prepared that showed the salinity levels for the subject timeframe were

19   projected to be higher than permitted by the applicable (and required) state-issued permits. *See id.* at

20   948-49.

21       As mentioned above, *Lujan* explains that the elements of standing "are not mere pleading

22   requirements but rather an indispensable part of the plaintiff's case, [and] each element must be

23   supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with

24   the manner and degree of evidence required at the successive stages of the litigation." 504 U.S. at 561.

25   //

1

2

3

4

5

> At the pleading stage, general factual allegations of injury resulting from
> the defendant's conduct may suffice, for on a motion to dismiss we
> presume that general allegations embrace those specific facts that are
> necessary to support the claim. In response to a summary judgment
> motion, however, the plaintiff can no longer rest on such "mere
> allegations," but must "set forth" by affidavit or other evidence "specific
> facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary
> judgment motion will be taken to be true. And at the final stage, those
> facts (if controverted) must be supported adequately by the evidence
> adduced at trial.

6

*Id.*

7

8        To evaluate the sufficiency of Sagouspe's standing declaration it is helpful to examine how

9    injury-in-fact has been analyzed in somewhat similar cases at both the pleading and summary judgment

10   stages. In *Coalition for a Sustainable Delta v. Carlson*, No. 1:08-CV-00397 OWW GSA, 2008 WL

11   2899725, at *3-4 (E.D. Cal. July 24, 2008), a coalition of agricultural water users dependent on State

12   Water Project ("SWP") deliveries from the Delta challenged the promulgation of certain regulations

13   designed to protect striped bass populations in the Delta, asserting that the regulations caused the

14   unlawful "take" of ESA-listed fish species. The *Coalition* plaintiffs <u>alleged</u>:

15

16

17

18

19

20

21

22

23

24

25

> The continued operation of the SWP is . . . dependent on the overall health
> of the Delta and its ecosystem, which includes the maintenance of viable
> populations of species living in the Delta and protected by the ESA, such
> as the Sacramento River winter-run chinook salmon, Central Valley
> spring-run chinook salmon, Central Valley steelhead, and delta smelt. In
> 2007, a federal district court ruled that deliveries of SWP water to parties
> with water contracts, such as the Coalition members, must be reduced
> substantially to protect the delta smelt. *NRDC v. Kempthorne,* 2007 U.S.
> Dist. LEXIS 48261 (E.D. Cal. 2007). Recently, the California Department
> of Water Resources reported that in an average water year, the court's
> order in *NRDC v. Kempthorne* would reduce water exports from the Delta
> by 22 to 30 percent. Department of Water Resources Advisory, DWR
> Releases Water Delivery Impact Estimates Following [the] Wanger
> Decision (Dec. 24, 2007). Violations of the ESA by defendants, including
> the take of the Federally-Protected species, contribute to a decline in the
> health of the Delta ecosystem. Furthermore, such violations contribute to
> declines of the populations of species in the Delta protected by the ESA.
> The illegal and unmitigated take of the Federally-Protected species,
> including the delta smelt, by defendants injures the Coalition because it
> reduces the population of the Federally-Protected species thereby
> worsening the baseline status of the species, which must be taken into
> account by FWS and NMFS when they determine whether proposed SWP

28

1

> exports from the Delta comply with the ESA. Therefore, defendants' ESA
> violations threaten deliveries of SWP water to members of the Coalition.
> In sum, because the CFGC and CDFG have contributed to the decline of
> the delta smelt population by violating the ESA, they have contributed to
> the reduction in SWP water deliveries to members of the Coalition.
> Reduced deliveries of SWP water have an economic impact on members
> of the Coalition. Thus, Coalition members have been, and will continue to
> be, harmed by defendants' violations of the ESA.

2

3

4

5

*Id.* at *3.

6

        As to causation, the district court observed in *Coalition*:

7

> [Plaintiffs] assert that they are being harmed because the striped bass
> regulations protect striped bass, which prey upon listed species, which
> predation, in turn, affects the "baseline" condition of those species. This
> less robust baseline, according to the [pleadings], "must be taken into
> account by FWS and NMFS when they determine whether proposed SWP
> exports from the Delta comply with the ESA. Therefore, defendants' ESA
> violations threaten deliveries of SWP water to members of the Coalition."
> "In sum," the [plaintiffs] allege[], "because the [defendants] have
> contributed to the decline of the delta smelt population by violating the
> ESA, they have contributed to the reduction in SWP water deliveries to
> members of the Coalition. Reduced deliveries of SWP water have an
> economic impact on members of the Coalition."

8

9

10

11

12

13

14

*Id.* at *7 (internal record references omitted). The district court found these allegations to be sufficient

15

for pleading purposes. *Id.*

16

        At the summary judgment stage, however, <u>facts</u> must support an assertion of causation. For

17

example, at the summary judgment stage of the *Coalition* case, the district court examined specific

18

statistical information demonstrating that striped bass would consume up to "6 percent of the

19

Sacramento River winter-run Chinook salmon population, 3.1 percent of the Central Valley Spring-run

20

Chinook salmon population, and 5.3 percent of the delta smelt population." *Coal. for a Sustainable*

21

*Delta v. John McCamman*, 725 F. Supp. 2d 1162, 1193 (E.D. Cal. 2010).

22

        Here, Sagouspe's declaration is <u>entirely conclusory</u> on the issue of causation. The only relevant

23

statement in his declaration is as follows:

24

> I am . . . a farmer in the Central Valley of California. I farm 2,600 acres,
> growing almonds, pistachios, and pomegranates. My crops are dependent
> on irrigation water supplied by the Central Valley Project. And the

25

29

1

2

availability of Central Valley Project irrigation water, in turn, depends primarily on snowmelt from the Sierra Nevada mountains-including the snowmelt that creates the flows of the Tuolumne River. <u>The extraction of water from the Tuolumne River directly impacts my farming operations and my economic interests by reducing the quantity of water flowing downstream through the San Joaquin River and out into the Delta</u>.

3

4

Doc. 65-3 at ¶ 2. Critically, Sagouspe fails to explain how "[t]he extraction of

5

water from the Tuolumne River directly impacts [his] farming operations and [his] economic interests by reducing the quantity of

6

water flowing downstream through the San Joaquin River and out into the Delta." Sagouspe Decl., Doc.

7

65-3 at ¶2. In other words, he entirely fails to connect the extraction of water from the Tuolumne <u>to</u>

8

<u>reduced deliveries of water to his farming operations</u>.[9] Plaintiffs point to no other judicially noticeable

9

facts or any other material that would close this loop. As a result, Plaintiffs fail to meet their burden of

10

proof as to this standing element.

11

(c)      **Redressability**

12

13

Constitutional standing also requires a showing that it is "likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal

14

citations and quotations omitted). "Relief that does not remedy the injury suffered cannot bootstrap a

15

plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v.*

16

*Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). When the redress of injury "depends on the

17

unfettered choices made by independent actors not before the courts," a court should "have much less

18

confidence in concluding that relief is likely to follow from a favorable decision." *Asarco, Inc. v.*

19

*Kadish*, 490 U.S. 605, 614-15, (1989).

20

As to Sagouspe's water supply, Plaintiffs fail to satisfy the redressibility requirement for largely

21

22

_____

23

[9] The Court is cognizant of the fact that it denied Plaintiffs' motion to augment the administrative record for purposes of Plaintiffs' NEPA claim with the Declaration of John Snow, in part because the factual proposition Snow's declaration

24

supported—"that water diverted out of the Tuolumne decreases the amount of fresh water flowing into the delta"—was "indisputable and has been relied upon in numerous prior cases." *See* Doc. 61. As a threshold matter, nothing in Snow's declaration addressed whether, as a matter of fact, modifying Hetch Hetchy operations would result in the delivery of

25

additional water to any CVP contractors, let alone Sagouspe. Nothing precluded Plaintiffs from presenting additional standing declarations to demonstrate standing in this case; they simply failed to do so.

1    the same reason they fail to satisfy the causation requirement: they provide no argument, explanation, or

2    facts demonstrating redressibility. Again, Plaintiffs simply assume that if the Court were to order

3    Plaintiffs' sought-after relief (*i.e.*, to enjoin Defendants' challenged diversions), then Sagouspe's injury

4    would be redressed. This is entirely speculative. Plaintiffs nowhere explain how Sagouspe, whose water

5    is supplied by the CVP (a project managed by the Bureau of Reclamation, an agency which is not a

6    party to this case) at some unidentified location in the Central Valley, would receive more water if the

7    diversions did not occur. The CVP "is the largest federal water management project in the United States

8    . . . [and] consists of 20 dams and reservoirs, 8 powerplants, and approximately 500 miles of major

9    canals and aqueducts." *Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir. 2002). There

10   are countless individuals and entities with contracts for CVP water. Plaintiffs offer no reason for the

11   Court to assume (much less conclude) that Sagouspe's water supply would be impacted in any way if

12   the relief they request is granted.[10]

13          "There is no redressability, and thus no standing, where . . . any prospective benefits depend on

14   an independent actor who retains broad and legitimate discretion the courts cannot presume either to

15   control or to predict." *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.*, 465 F.3d

16   1123, 1125 (9th Cir. 2006) (citations and quotation marks omitted). The Court therefore finds Plaintiffs

17   have failed to establish that Sagouspe has standing. *See Associated Gen. Contractors of Am., San Diego*

18   *Chapter v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (party must submit "competent

19   evidence, not mere allegations" to establish standing).

20                        **b.**   **Section 7(a)(2) Claims**

21          While a Section 7(a)(2) failure to consult claim is procedural in nature, *see Karuk Tribe*, 681

22   _____

23   [10] Plaintiffs cite *San Luis & Delta-Mendota Water Authority v. Jewell*, 52 F. Supp. 3d 1020, 1038 (E.D. Cal 2014), in which
     this Court found redressibility was present based upon detailed record evidence demonstrating that there was a 50% chance
     that environmental releases from a particular reservoir would result in the loss of potential water supply to Plaintiffs.

24   Plaintiffs suggest that the "causal chain is more certain" here because "any increase in the amount of water available in the
     lower Tuolumne River would result in a larger total sum of water available downstream." Doc. 77 at 35. The problem is that
     Plaintiffs neither produced record evidence to demonstrate this, nor to demonstrate that a "larger total sum of water available

25   downstream" would result in increased deliveries to Sagouspe.

1   F.3d at 1028, and in theory could be subject to the relaxed procedural standing analysis, Sagouspe is not

2   entitled to take advantage the "relaxed" standing standards for causation and redressability. As noted

3   above, Sagouspe may satisfy the injury-in-fact requirement by showing "that the procedures in question

4   are designed to protect some threatened concrete interest of [his] that is the ultimate basis of [his]

5   standing." *Ctr. for Biological Diversity*, 807 F.3d at 1043.

6       As this Court has previously discussed:

7           The ESA § 7 consultation procedures at issue directly promote the goal of
            species protection. *See Salmon Spawning & Recovery Alliance v.*
8           *Gutierrez*, 545 F.3d 1220, 1225–26 (9th Cir. 2008). Therefore, a plaintiff
            organization with the stated purpose of preserving an endangered species
9           may invoke ESA § 7 procedural protections to achieve standing. *Id.*

10  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 52 F. Supp. 3d 1020, 1041-42 (E.D. Cal. 2014),

11  *appeal docketed*, No. 14-17539 (9th Cir. Dec. 23, 2014). Here, however, Sagouspe's stated interests in

12  species conservation have been deemed too non-specific to be considered "concrete interests" for

13  purposes of standing. This leaves only Sagouspe's stated interest in protecting the water supply for his

14  farming operation. This interest is not protected by Section 7(a)(2)'s consultation requirement, at least

15  not in relation to the Section 7(a)(2) claim made in this case. In *Jewell*, this Court acknowledged that

16          there is authority to support the proposition that ESA § 7's "best available
            science" standard encompasses a range of interests, including an impacted
17          litigant's interest in avoiding additional ESA regulatory burdens.

18  *Id.* at 1042 n.11 (citation omitted). But, the complaint in this case alleges Federal Defendants failed to

19  consult as required by Section 7(a)(2). While Section 7(a)(2) does provide that, "in fulfilling the

20  requirements of this paragraph each agency shall use the best scientific and commercial data available,"

21  this so-called "best available science" requirement is utilized to challenge the <u>substance</u> of documents

22  produced during consultation. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997) (addressing

23  challenge to biological opinion issued under the ESA as "unsubstantiated" and not based upon the best

24  "available scientific and commercial data"). Where, as here, a complaint alleges that no consultation has

25

1    taken place, there is no ripe, concrete[11] challenge based upon Section 7(a)(2)'s "best available science"

2    requirement. Therefore, the broader range of interests hypothetically implicated by that requirement

3    does not open the door to considering those interests in this case. *See Jewell*, 52 F. Supp. 3d at 1042; *see*

4    *also Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv*., 786 F.3d 1050, 1052-53 (D.C. Cir.

5    2015) (holding relaxed standing standards did not apply to plaintiff-landowners' ESA claims because

6    challenged ESA procedures were not designed to protect plaintiffs' interests). Accordingly, the standing

7    analysis articulated above in connection with the Section 9 claim applies with equal force to the Section

8    7(a)(2) claim.

9        **3.    CESAR's Standing.[12]**

10            **a.    CESAR's Standing to Sue on Its Own Behalf**

11           The same three-part analysis used to determine whether an individual has standing (injury in

12    fact, causation, and redressability) is used to determine whether an organization has standing to sue on

13    its own behalf. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083,

14    1088 (9th Cir. 2010) (citation omitted). "An organization suing on its own behalf can establish an injury

15    when it suffered both a diversion of its resources and a frustration of its mission." *Id.* (citation and

16    quotation marks omitted). This requires the organization to "show that it would have suffered some

17    other injury if it had not diverted resources to counteracting the problem." *Id.*

18           CESAR fails to do so. CESAR argues its "very purpose—advocacy and dissemination of [the]

19    best available science in regulatory decisionmaking—is threatened by Federal Defendants' decision to

20    use no science at all and not apply the ESA to the Hetch Hetchy Project." Doc. 77 at 36. CESAR's

21    alleged injury, then, is Federal Defendants' purported failure to follow the law. *See id.* at 38 ("Thus,

22    _____

23    [11] As discussed, the generic grievance that an agency has not complied with the best available science requirement is insufficient to establish standing.

24    [12] The Court rejects Plaintiffs assertion, *see* Doc. 77 at 33, 36, that Federal Defendants have conceded certain aspects of CESAR's standing by failing to raise relevant arguments in their motion for summary judgment. The Court has a *sua sponte*

25    obligation to evaluate all elements of standing at every stage of a case. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 870 F. Supp. 2d 943, 965 (E.D. Cal. 2012)

1  [CESAR's] organizational injury stems from Federal Defendants' failure to even consider imposing the

2  same ESA restrictions on Hetch Hetchy that they impose on every other water user in the Central

3  Valley."); *see also* Doc. 65-1 at 32-34. This may be sufficient to show that Federal Defendants' conduct

4  has frustrated CESAR's mission. *See Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir.

5  2004) (holding that any violation of fair housing laws would frustrate mission of organization "with the

6  principal purpose of helping to eliminate discrimination against individuals with disabilities by ensuring

7  compliance with laws").

8      However, CESAR has made no attempt to show that it has diverted its resources in response to

9  Defendants' challenged conduct, much less that it would have suffered another injury had it not done so.

10  CESAR simply argues, without any meaningful explanation, that its goals are "threatened" by Federal

11  Defendants' acts and inaction. CESAR does not argue, for instance, that Defendants' allegedly unlawful

12  conduct has led to a drain on CESAR's resources or has otherwise affected its ability to pursue its

13  mission. *See Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) ("The record supports

14  the district court's finding that Fair Housing's resources were diverted to investigating and other efforts

15  to counteract Combs' discrimination above and beyond litigation."); *see also Pac. Props.*, 358 F.3d at

16  1105-06 (allegations that organization diverted resources from other efforts to address the defendant's

17  allegedly unlawful conduct was sufficient). Because CESAR does not demonstrate that it suffered an

18  injury in fact, it does not have independent organizational standing.

19                    **b.    CESAR's Associational Standing**

20      A plaintiff-organization has associational standing when:

21          (a) its members would otherwise have standing to sue in their own right;
            (b) the interests it seeks to protect are germane to the organization's
22          purpose; and (c) neither the claim asserted nor the relief requested requires
            the participation of individual members in the lawsuit.
23

24  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). CESAR attempts to establish

25  its organizational standing through two of its members, Sagouspe and Manson. For the reasons

34

1   discussed above, Sagouspe lacks standing. Accordingly, CESAR only has associational standing if

2   Manson does. *See id.*

3          Manson is a member and the Executive Director of CESAR. Manson Decl., Doc. 65-2 at ¶ 1. He

4   claims "a profound personal interest in seeing that sound scientific data is generated and used in the

5   identification, conservation, and recovery of threatened and endangered species, particularly those

6   dependent on the San Joaquin River and Sacramento Delta." *Id.* at ¶ 2. As a CESAR member, he has

7   "aesthetic and professional interests in the endangered species in the [Delta]," and claims "the Hetch

8   Hetchy project challenges the ecological integrity of all downstream species and habitats." *Id.* at ¶ 5.

9   According to Manson, CESAR and its members believe the "best available science" has not been used

10  to assess the effects that the challenged diversions have on those species and habitats. *Id.* Relatedly,

11  Manson contends that Federal Defendants' failure to initiate Section 7 consultation has "deprived

12  [CESAR] of the vital scientific data that a consultation would provide" and therefore CESAR and its

13  members do not have "any information regarding the nature and extent to which extraction of water

14  from the Tuolumne River through the Hetch Hetchy Project may affect [threatened and endangered]

15  downstream species." *Id.* at ¶ 6.[13] Again, this amounts to an assertion that Manson has suffered an injury

16  because Defendants have not complied with the law and, accordingly, he and other CESAR members

17  have been deprived of data that is relevant to their "aesthetic and professional interests." These

18  "generally available grievance[s] about government" are insufficient to establish injury in fact. *Lujan*,

19  504 U.S. at 573; *see also Wright*, 468 U.S. at 754.[14]

20  _____

21  [13] The analysis concerning Sagouspe's alleged injury to his water supply does not apply to Manson as he does not allege any such injury.

22  [14] Manson makes reference to a CESAR member, Bryan Manly, who "studies [D]elta smell habitat selection and factors contributing to the smelt's decline." Doc. 65-2 at ¶ 5. According to Manson, Manly "has done research on the smelt for the Metropolitan Water District of Southern California and the San Luis and Delta-Mendota Water Authority," and has an

23  "interest in the efficacy of scientific modeling of ecological resources, such as the delta smelt." *Id.* Plaintiffs do not present a first-person declaration from Manly and do not mention him in any of their briefs. Even assuming it is appropriate to consider

24  information about Manly presented in the declaration of a third person, which is questionable, *see* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."), the

25  limited information provided about Manly's interests is insufficient to establish injury in fact. Like a person asserting an

1      In the context of a claim of procedural injury CESAR may satisfy the injury-in-fact requirement

2  by showing "that the procedures in question are designed to protect some threatened concrete interest of

3  [theirs] that is the ultimate basis of [their] standing." *Ctr. for Biological Diversity*, 807 F.3d at 1043.

4  But, having failed to articulate a concrete interest that is aligned with the interests protected by Section

5  7(a)(2)'s consultation requirement, they cannot take advantage of the relaxed procedural injury inquiry

6  regarding causation and redressability.

7      In sum, none of the Plaintiffs in this case has standing to sue. Plaintiffs point out that other courts

8  have found that CESAR has standing to bring claims against the United States for failing to comply with

9  the ESA. Doc. 77 at 25. Those decisions were based upon the records in those cases and are inapposite

10  here. Because Plaintiffs bear the burden of proof as to all elements of standing, to satisfy their initial

11  burden in connection with their motion for summary judgment they must demonstrate, with affirmative

12  evidence, that "no reasonable trier of fact could find other than for [them]." *Soremekun*, 509 F.3d at 984.

13  Here, there are no disputes as to material facts regarding standing. Plaintiffs' have not presented

14  evidence to entitle them to summary judgment. Relatedly, this absence of evidence on key elements

15  satisfies Federal Defendants' and the City's initial burden and means that Plaintiffs cannot establish a

16  genuine issue of material fact. As discussed above, Federal Defendants and the City are entitled to

17  judgment as a matter of law on the issue of standing. Accordingly, Federal Defendants' and the City's

18  motions for summary judgment on this issue are GRANTED; Plaintiffs' cross-motion is DENIED.

19  //

20  //

21

22  aesthetic interest, an individual asserting a scientific interest in a species must go beyond simply demonstrating a past interest

23  in that species. They must demonstrate "concrete plans" to continue exploring that interest in specific ways that connect them to the species in a way that demonstrates the challenged action will harm them. *Lujan*, 504 U.S. at 564 ("[S]ome day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do

24  not support a finding of the "actual or imminent" injury that our cases require.); *see also Summers*, 555 U.S. at 496 ("vague desire" to continue activity insufficient to demonstrate "actual or imminent" injury). The Court has no way of knowing what Dr. Manly intends in the future, as no such information was presented to the Court. Manly therefore cannot confer standing

25  on CESAR.

36

1  **C.**     **Alternative Merits Analyses**

2          In an abundance of caution and to avoid needless waste of resources if this case were to be

3  remanded, the Court addresses the merits of the Section 7(a)(2) claim against Federal Defendants and

4  the Section 9 Claim against the City.

5          **1.**     **Section 7(a)(2) Claim Against Federal Defendants**

6                  **a.**     **Relevant Legal Background**

7          "Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with

8  identifying threatened and endangered species and designating critical habitats for those species."

9  *Jewell*, 749 F.3d at 779 (citing 16 U.S.C. § 1533). FWS and the NMFS administer the ESA on behalf of

10 the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a),

11 223.102, 402.01(b). Section 7(a)(2) requires federal agencies to ensure that their activities do not

12 jeopardize the continued existence of listed endangered or threatened species or adversely modify those

13 species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe*, 681 F.3d at 1020. Section

14 7(a)(2)'s implementing regulations provide that "[e]ach Federal agency shall review its actions at the

15 earliest possible time to determine whether any action may affect listed species or critical habitat[s]." 50

16 C.F.R. § 402.14(a). An agency proposing to take an action (often referred to as the "action agency")

17 must first inquire of FWS or NMFS[15] whether any threatened or endangered species "may be present" in

18 the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1). If endangered species may be present, the

19 action agency must prepare a "biological assessment" ("BA") to determine whether such species "is

20 likely to be affected" by the action. *Id*. If the BA determines that a threatened or endangered species "is

21 likely to be affected," the agency must formally consult with FWS. *See id*. § 1536(a)(2); 50 C.F.R.

22  _____

23 [15] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted
24 jurisdiction over fish species which (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*. FWS exercises jurisdiction over the delta smelt; NMFS
25 exercises jurisdiction over the winter-run and spring-run Chinook.

402.14(a).

Formal consultation results in the issuance of a "biological opinion" ("BiOp") by FWS. *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward unless FWS can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a RPA to the agency action that avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not violate Section 7(a)(2), the consulting agency can issue an "Incidental Take Statement," which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Administrator, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

> a.     **Plaintiffs' 60-Day Notice Is Sufficient to Pursue a Section 7(a)(2) Claim Against NPS**

Plaintiffs' First Claim for Relief seeks to "require NPS to consult regarding jeopardy to endangered and threatened fish species." Compl. at 9. This Claim alleges, specifically, that NPS "annually approves instream flow and other operating requirements for the Hetch-Hetchy Project" and that NPS violated the ESA by failing to consult as required by Section 7(a)(2) with FWS and NMFS over how these annual instream flow approvals would impact listed species. *Id*. at ¶¶ 20-22.

Federal Defendants and the City argue that this Court lacks jurisdiction over Plaintiffs' failure to consult claim because Plaintiffs failed to give Federal Defendants proper notice of this claim in its 60-Day Notice. Federal Defendants take issue with the fact that the 60-Day Notice does not mention NPS's alleged "discretion to regulate instream fish flows," Doc. 69-1 at 25, which is indisputably the focus of Plaintiffs' Complaint and motion for summary judgment. The first paragraph of the 60-Day Notice focused generically on Federal Defendants' alleged "failure to comply with the [ESA] with respect to

1   [NPS]-permitted diversions of approximately 265,000 acre-feet of water annually from the Tuolumne

2   River for consumptive use in San Francisco and surrounding communities." Doc. 1-1 at 1 (emphasis

3   added). Thereafter, the 60-Day Notice repeatedly referenced "diversions" and "NPS-permitted

4   diversions" from the Tuolumne River:

5           These diversions are jeopardizing several species of threatened fish whose
            critical habitat consists of the Tuolumne and San Joaquin Rivers and the
6           Sacramento Delta by depriving the rivers and Delta of much-needed water
            for fish flows, salinity control and similar purposes related to conservation
7           and recovery of these species. These NPS-permitted diversions of
            substantial Tuolumne River flows without regard for their adverse effects
8           on endangered and threatened species violate Sections 7(a)(2),1 7(a)(3),
            and Section 7(d)3 of the Endangered Species Act, which require
9           consultation for federal agency actions that "may" affect an endangered or
            threatened species and prohibit the adverse modification of critical habitat,
10          and violate Section 9 which prohibits the take of listed species.

11          As the Ninth Circuit Court of Appeals recently stated, "[a]s more water is
            diverted from the rivers that feed the Delta … the salinity of the Delta and
12          its estuaries increases along with the threat to the species that thrive
            there."
13
    Id. at 1-2 (emphasis added).
14
            After reviewing the conservation status of allegedly impacted listed species of the Delta
15
    watershed, see id. at 2-3, the 60-Day Notice proceeded to allege how diversions from the Tuolumne
16
    impact flows in the Delta.
17
            The centerpiece of the Hetch Hetchy Project is the O'Shaughnessy dam,
18          which blocks the flow of the Tuolumne River and creates Hetch Hetchy
            reservoir. The Hetch Hetchy Project diverts approximately 265,000 acre-
19          feet per year out of the Tuolumne and into the Hetch Hetchy aqueduct, a
            pipeline that carries the water 167 miles to San Francisco. This diversion
20          decreases Tuolumne River flows by about fifteen percent and, because the
            Tuolumne runs into the San Joaquin River and thence to the Sacramento
21          Delta, also decreases the fresh water flows necessary to maintain fish
            habitat.
22
    Id. at 3-4 (emphasis added).
23
            Critically for purposes of the present analysis, the 60-Day Notice specifically challenged NPS's
24
    failure to consider impacts to listed species during "lease negotiations, regulation of operations, and

25

                                                    39

1    management of the Hetch Hetchy Project."

2              Operated by the city of San Francisco under a lease from the National
       Park Service, the Hetch Hetchy Project is located within Yosemite
3      National Park and is thus subject to regulation by NPS. Yet in its lease
       negotiations, regulation of operations, and management of the Hetch
4      Hetchy Project, the Park Service has never considered the adverse effects
       of Tuolumne River diversions on the endangered species whose habitat is
5      the San Joaquin River and Sacramento Delta.

6    *Id.* at 4. The question is whether this provides "sufficient information" to permit Federal Defendants to

7    "identify and attempt to abate the violation" eventually challenged in the Complaint. *See Sw. Ctr. For*

8    *Biological Diversity*, 143 F.3d at 522. The Court concludes that it does. The 60-Day Notice's reference

9    to "lease negotiations, regulation of operations, and management of the Hetch Hetchy Project" is

10   sufficient to put Federal Defendants on notice that Plaintiffs are challenging Federal Defendants'

11   ongoing management of Hetch Hetchy operations and asserting that such management is subject to

12   Section 7(a)(2)'s consultation requirement.

13           Federal Defendants do not cite and the Court is unable to identify authority requiring further

14   specificity in a 60-Day Notice. Recently, in *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, the Ninth

15   Circuit emphasized that a citizen plaintiff "is not required to list every specific aspect or detail of every

16   alleged violation. Nor is the citizen required to describe every ramification of a violation." 797 F.3d 645,

17   651 (9th Cir. 2015) (internal citation and quotation omitted). "Rather, the analysis turns on the overall

18   sufficiency of the notice." *Id.* (internal citation and quotation omitted). "A reviewing court may examine

19   both the notice itself and the behavior of its recipients to determine whether they understood or

20   reasonably should have understood the alleged violations." *Id.* Moreover, the Ninth Circuit considered

21   relevant any information that was "readily available" to the defendant agency. *Id.* at 653. Here, overall,

22   the 60-Day Notice was sufficient to put NPS on notice that Plaintiffs believed NPS's actions to "regulate

23   operations" and "manage" O'Shaughnessy dam triggered a consultation obligation. Doc. 1-1 at 4. NPS

24   was in the best position to determine what, if any, "regulation" or "management" actions NPS took in

25   connection with O'Shaughnessy dam.

                                                     40

1

          **a.**     <u>**Insufficient 60-Day Notice as to Any Section 7(a)(2) Claim Against FWS**</u>

2

      Plaintiffs repeatedly appear to move for summary judgment on their Section 7(a)(2) claim

3

against FWS, Doc. 65-1 at 16, 28, and specifically seek declaratory relief against FWS. *Id.* at 29. Federal

4

Defendants correctly point out that the 60-Day Notice fails to suggest how FWS may have acted

5

unlawfully. While the Notice is addressed to FWS's director, as the citizen suit provision specifically

6

requires of <u>any</u> claim brought thereunder concerning a species under FWS jurisdiction, *see* 16 U.S.C. §

7

1040(g), and mentions the fact that FWS listed the delta smelt as threatened in 1993 and designated the

8

Delta as the delta smelt's critical habitat in 1994, the only other mention of FWS in the Notice is in the

9

following sentence:

10

        [S]hould [NPS] fail to institute Section 7 consultations with [FWS] and
        [NMFS] (as to anadromous species) within the 60 days allowed by this

11

        notice, the Center and its members will have no alternative but to file suit
        to protect these species from the danger of extinction.

12

Doc. 1-1 at p. 2 of 3. While this puts NPS on notice of its failure to consult, it does not put FWS on

13

notice that it acted or failed to act in any unlawful manner. Therefore, even assuming the Complaint

14

asserts claims against FWS, which it does not appear to do, given that FWS is not named as a defendant

15

in the caption and is barely mentioned in the text, this Court has no jurisdiction to adjudicate any such

16

claims because the ESA's notice requirement has not been satisfied.

17

      Plaintiffs argue that the ESA's 60-day notice requirement does not apply to their claims, which

18

they assert are brought under the APA, not the ESA's citizen suit provision. Doc. 77 at 19. In support of

19

this proposition, Plaintiffs cite *Bennett*, 520 U.S. 154, and *Am. Rivers v. National Marine Fisheries*

20

*Serv.*, 126 F.3d 1118, 1124-25 (9th Cir. 1997). In *Bennett*, the Supreme Court held that challenges to the

21

<u>adequacy</u> of biological opinions levied against the Secretary of the Interior, when acting in his or her

22

capacity as Administrator of the ESA, are not properly pled as citizen suit claims but rather as claims

23

under the APA. 520 U.S. at 173-77; *see also Am. Rivers*, 126 F. 3d at 1124-25 (same). A primary

24

problem here is that Plaintiffs <u>advance no such claim against FWS</u>, nor could they, as FWS has not been

25

1  asked nor otherwise taken action to prepare any document in its capacity as an administrator of the ESA.

2  In contrast, the Ninth Circuit has clearly held in *Western Watersheds Project v. Kraayenbrink*, 632 F.3d

3  472, 495-96 (9th Cir. 2011), that a "failure to consult claim" is to be raised "under the ESA" and

4  therefore is subject to the ESA's citizen-suit provision, which includes the 60-Day Notice requirement.

5  To the extent Plaintiffs argue that FWS is an "action agency" that allegedly authorized the City's

6  diversions from Hetch Hetchy, such a claim would be subject to the 60-day notice requirement. *See* 16

7  U.S.C. § 1040(g). Because no such notice was provided, the Court lacks subject matter jurisdiction over

8  any such claim against FWS.

9          **b.**    <u>**Merits of Section 7(a)(2) Claim**</u>

10       In their opening brief, Plaintiffs move for summary judgment on their claim arising under

11  Section 7(a)(2), arguing that: (1) the City's annual diversion of an average of 220,000 AF of water from

12  the Tuolumne River harms endangered and threatened species and (2) "[NPS] and [FWS,[16]], both of

13  which have discretion to regulate instream fish flows from the Hetch Hetchy Project, have failed to

14  determine whether [ ] reduced Delta fresh water flows affect downstream species listed under the [ESA]

15  and to consult with the relevant [wildlife agency] as required by [Section 7(a)(2)]." Doc. 64-1 at 14.

16       For purposes of evaluating the merits of this particular claim, the Court will assume without

17  deciding that the first argument above is true. Plaintiffs' second argument turns on the legal proposition

18  that Section 7(a)(2) "requires consultation whenever a federal agency has discretionary authority over

19  actions that could benefit the listed species." *Id.* Plaintiffs maintain that the Section 7(a)(2) consultation

20  obligation is triggered here because NPS has "broad statutory authority to regulate the use of resources

21  within [Yosemite]—including the extraction of water from the Tuolumne River through the Hetch

22  Hetchy Project, which occurs wholly within Yosemite." Doc. 65-1 at 16.

23       Plaintiffs' focus on "discretionary authority" is myopic. The Ninth Circuit has made clear that

24  

25  [16] As discussed above, Plaintiffs have not named FWS as a defendant in this action nor given any notice to FWS pursuant to the ESA's citizen suit provision, so the Court disregards this reference.

1  "ESA implementing regulations limit Section 7's application to agency <u>actions</u> in which there is

2  discretionary Federal involvement or control." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d

3  1006, 1020 (9th Cir. 2012) (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S.

4  644, 666 (2007) (quoting 50 C.F.R. § 402.03)) (emphasis added and quotation marks omitted). This

5  limitation "harmonizes the ESA consultation requirement with other statutory mandates that leave an

6  agency no discretion to consider the protection of listed species." *Id.* at 1020-21 (citing *Home Builders*,

7  551 U.S. at 665-66).

8       *Karuk Tribe* provides further guidance regarding the application of the "agency action"

9  requirement in the context of the ESA:

10           Our "agency action" inquiry is two-fold. First, we ask whether a federal
             agency affirmatively authorized, funded, or carried out the underlying
11           activity. Second, we determine whether the agency had some discretion to
             influence or change the activity for the benefit of a protected species.

12  *Id.* at 1021. In defining "agency action," the ESA's use of the term "agency action" is "to be construed

13  broadly." *Id.*

14           Examples of agency actions triggering Section 7 consultation include the
15           renewal of existing water contracts, *Natural Res. Def. Council v. Houston*,
             146 F.3d 1118, 1125 (9th Cir. 1998), the creation of interim management
16           strategies, *Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293-94
             (9th Cir. 1992), and the ongoing construction and operation of a federal
17           dam, *Tenn. Valley Auth.*[ *v. Hill*], 437 U.S. [153,] 173-74 [(1978)]. We
             have also required consultation for federal agencies' authorization of
18           private activities, such as the approval and registration of pesticides,
             *Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1031-33 (9th
19           Cir. 2005), and the issuance of permits allowing fishing on the high seas,
             *Turtle Island*, 340 F.3d at 974.

20  *Id.*

21       "An agency must consult under Section 7 only when it makes an affirmative act or

22  authorization." *Id.* (internal citations and quotation omitted). "Where private activity is proceeding

23  pursuant to a vested right or to a previously issued license, an agency has no duty to consult under

24  Section 7 if it takes no further affirmative action regarding the activity." *Id.*

25

43

1    Plaintiffs entirely fail to address the affirmative act requirement in either of their papers.

2    Plaintiffs do point to certain actions in an effort to demonstrate that NPS "exercised [its] discretionary

3    authority over Hetch Hetchy operations." Doc. 65-1 at 24.[17] In an abundance of caution, the Court will

4    examine whether any of those actions constitutes an affirmative act or authorization that could possibly

5    support a cognizable Section 7(a)(2) claim.

6               **(1)     1987, 1988, 1989, 1990, 1991, 1992, 2009, and 2010 Communications**

7    Plaintiffs specifically point to a number of communications they claim demonstrate how NPS

8    and FWS "exercised their discretionary authority over Hetch Hetchy Operations [by] authoriz[ing] the

9    City to deviate from the prescribed fish flow regime" in 1987 (AR 1859-61), 1988 (AR 1882-83), 1989

10   (AR 1909-11), 1990 (AR 1917-18), 1991 (AR 1923-24), 1992 (AR 2017-18), 2009 (AR 3303), and

11   2010 (AR 3335). Doc. 65-1 at 24. For example, the 1987 communication, dated July 16, 1987, a few

12   months after execution of the 1987 Stipulation (amending instream flow requirements to require the

13   City's water releases from Hetch Hetchy be timed to benefit downstream fish species), recommended

14   adjustment of flow releases form O'Shaughnessy Dam be adjusted in particular ways to meet the goals

15   of the 1987 Stipulation. AR 1859-61. The remaining communications are similar in nature.

16   Because the ESA contains no express statute of limitations, the applicable statute of limitations is

17   found in title 28 U.S.C. § 2401(a), the general statute of limitations for civil actions against the federal

18   government. *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089,

19   1106 (E.D. Cal. 2011); *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154, 1160 (D. Or. 2001).

20   Section 2401(a) provides: "Every civil action commenced against the United States shall be barred

21   unless the complaint is filed within six years after the right of action first accrues." Accordingly, claims

22   based upon the 1987, 1988, 1989, 1990, 1991, and 1992 communications are time-barred.

23

24   _____

25   [17] Plaintiffs also point, generically, to various legal authorities, including the Raker Act and Section 7(a)(1), which they assert empower NPS with discretion to regulate Hetch Hetchy for the benefit of the listed species of concern. The Court declines to address the scope of any such discretion, as Plaintiffs' Section 7(a)(2) claim fails on multiple alternative grounds.

1   Only two communications could possibly fall within the statute of limitations in light of the fact

2   that this lawsuit was filed on August 18, 2014: a July 20, 2009 Letter from Kathleen Wood, Assistant

3   Field Supervisor at FWS to Tim Ramirez, an employee at SFPUC, authorizing a deviation from

4   authorized fish flows to allow SFPUC to implement a "flow evaluation study plan," AR 3303, and a

5   similar email sent from Wood to Ramirez on March 22, 2010. Critically, neither of these

6   communications involves NPS. As discussed previously, FWS is not a defendant in this case, so any

7   action taken by FWS cannot constitute an "affirmative act" for purposes of the claims in this case.

8   Accordingly, none of these communications could support a Section 7(a)(2) claim.

9                           **(2)      2010 MOA**

10   As discussed above, NPS and the City entered into the 2010 MOA that provided "for

11   collaborative efforts to improve environmental stewardship of the Upper Tuolumne River ecosystem . . .

12   [that] will [] assist in carrying out stipulations entered into by the SFPUC with the Department of the

13   Interior that were required as part of the approval of a third generator at Kirkwood Powerhouse under

14   provisions of the Raker Act." AR 2090. Plaintiffs argue, apparently in an attempt to establish that NPS

15   took an affirmative action to regulate water releases, that the 2010 MOA states that water releases,

16   including from Hetch Hetchy, will "mimic the variation of the seasonal hydrology (e.g., magnitude,

17   timing, duration, and frequency) of their corresponding watersheds in order to sustain the aquatic and

18   riparian ecosystems upon which these native fish and wildlife species depend." Doc. 65-1 at 10 (quoting

19   AR 2109). The problem is that Plaintiffs are not quoting the 2010 MOA itself; rather, the language in

20   question comes from the City's own "Water Enterprise Environmental Stewardship Policy," which is

21   attached to the 2010 MOA as an appendix that is referenced in the 2010 MOA only for background

22   purposes. *See* AR 2091. Plaintiffs fail to explain how a document authored by the City and never

23   formally adopted by NPS could serve to trigger Section 7(a)(2) consultation obligations.

24                    **(3)      Draft O'Shaughnessy Dam Instream Flow Management Plan**

25   Plaintiffs also argue that "federal Defendants also must consult on the effects of the

45

1   O'Shaughnessy Dam Instream Flow Management Plan." Doc. 65-1 at 21. Apart from the obvious

2   problem that Plaintiffs never asserted any such claim in their Complaint or their 60-Day Notice, the

3   document is only a "Stakeholder Draft" that has not been finalized, and thus does not yet reflect any

4   affirmative agency action by any agency, let alone a federal agency. *See* AR 2172, 2354 (noting that

5   "required environmental review" with input from agencies and the public is needed before any of Draft

6   Plan's recommendations could be implemented). As this Court has previously found, "the 2014 Draft

7   Flow Plan is just that, a draft. The 2014 Draft Flow Plan is therefore not a 'decision' subject to this

8   Court's jurisdiction under the APA." Doc. 61 at 7.

9               **(4)      Reserved Water Right**

10          Plaintiffs next argue that "the Park Service has discretion to protect its senior water right, created

11  in 1890 when Congress withdrew Yosemite National Park from the public domain, against excessive

12  Hetch Hetchy withdrawals." Doc. 65-1 at 20-21 (citing *Cappaert v. United States*, 426 U.S. 128, 138

13  (1976)). Federal Defendants correctly point out Yosemite's reserved water rights do not encompass the

14  ability to claim water for the preservation of fish in the Delta. "The implied reservation-of-water-rights

15  doctrine . . . reserves only that amount of water necessary to fulfill the purpose of the reservation, no

16  more." *Cappaert*, 426 U.S. at 141. *Cappaert* held that a federal reservation of land to a national

17  monument encompassed water rights to protect an endangered fish that was found within a pool inside

18  the monument; in fact, the reservation's specific purpose was to protect that very fish ("a peculiar race

19  of desert fish" found "nowhere else in the world"). *Id*. at 132. In contrast, the land that became Yosemite

20  was reserved to preserve the natural resources "within said reservation." 1890 Act, § 2. The ESA-listed

21  fish addressed in the complaint reside in the Delta and its tributaries. No party suggests and the record

22  could not support a finding that any such species reside "within" Yosemite National Park.[18] There is no

23  _____

24  [18] Plaintiffs point out, correctly, that there is record evidence indicating that the Tuolumne River once supported annual runs
    of Chinook salmon ranging upward of 100,000 fish. Doc. 77 at 7 (citing AR 413). But nothing suggests those runs existed

25  within recent time, let alone within the applicable six-year statute of limitations. Section 7(a)(2) does not impose an ever-
    lasting obligation to restore wildlife populations or habitat; rather, it requires the action agency to consult with FWS and/or

1  basis to conclude that the reservation of land that created Yosemite could give rise to any obligation

2  related to the protection of Delta species. Moreover, Plaintiffs fail to connect the federally reserved

3  water right to any affirmative act that would trigger a Section 7(a)(2) obligation.

4          **(5)      Conclusion**

5          Summary judgment is appropriate when the pleadings and the record demonstrate that "there is

6  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

7  Fed. R. Civ. P. 56(a). It is clear here that there are no disputes as to material facts and Federal

8  Defendants are entitled to judgment as a matter of law on Plaintiffs' Section 7(a)(2) claim. The record

9  does not reveal any affirmative act undertaken by NPS within the statutory period that would trigger

10  Section 7(a)(2) consultation obligations. Accordingly, if the Court had jurisdiction to adjudicate this

11  claim, Federal Defendants' motion for summary judgment would be GRANTED; Plaintiffs' cross

12  motion would be DENIED.

13          **2.      Section 9 Claim Against the City**

14          To prevail on a Section 9 claim, a plaintiff must prove by a preponderance of the evidence that a

15  "reasonably certain threat of imminent harm to a protected species" exists. *Marbled Murrelet v. Babbitt*,

16  83 F.3d 1060, 1066 (9th Cir. 1996). Thus, Plaintiffs have the burden of proving that the City's

17  diversions will harm one of the five listed fish species identified in the complaint "by killing or injuring

18  it." *Protect Our Water v. Flowers*, 377 F. Supp. 2d 844, 880 (E.D. Cal. 2004) (citing *Defs. of Wildlife v.*

19  *Bernal*, 204 F. 3d 920, 925 (9th Cir. 2000)).  Habitat modification may constitute "harm" to a listed

20  species, but only if it "actually kills or injures wildlife." *Babbitt v. Sweet Home Chapter of Communities*

21  *for a Great Oregon*, 515 U.S. 687, 691 (1995) (quoting and affirming the definition in 50 C.F.R. § 17.3).

22  A "potential" injury to the species is "inadequate to establish Section 9 liability." *Swinomish Indian*

23

---

24  NMFS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the
   continued existence of any endangered species or threatened species or result in the result in the destruction or adverse
25  modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected
   States, to be critical." 16 U.S.C. § 1536(a)(2).

1   *Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1270 (W.D. Wash. 2008) (quoting

2   *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995)).

3          Take can result from *direct* harm to a single, individual animal. *See, e.g.*, *United States v.*

4   *Nuesca*, 945 F.2d 254 (9th Cir. 1991) (affirming criminal convictions under the ESA for the direct take

5   by hunting of a single Hawaiian monk seal and two green sea turtles). In contrast, "the balance of the

6   authority suggests that a population level effect is necessary for harm resulting from habitat modification

7   to be considered a take." *Coal. for a Sustainable Delta*, 725 F. Supp. 2d at 1170 (collecting cases).

8          To be blunt, the "evidence" put forth by Plaintiffs on the subject is either not evidence or is

9   grossly insufficient to satisfy Plaintiffs' burden. Plaintiffs first cite numerous other cases to support their

10  contention that "the City's continued water extraction from the Tuolumne is a take of the listed species

11  under . . . Section 9." *See* Doc. 77 at 12-13. For example, in footnote 45 of their Opposition Reply Brief,

12  *id.* at 12, Plaintiffs cite a portion of the factual background section from *Pacific Coast Federation of*

13  *Fishermen's Associations v. Gutierrez*, 606 F. Supp. 2d 1122, 1143 (E.D. Cal. 2008), that states, <u>based</u>

14  <u>upon information contained in the administrative record of that case</u>, that because Central Valley

15  Steelhead habitat continues to be degraded by water diversions from dam projects, the Steelhead

16  population is on the verge of extinction. To the extent Plaintiffs are attempting to rely on this judicial

17  decision in a prior case to meet their burden of proof, they run afoul of the rules of evidence. While a

18  court may take judicial notice of "adjudicative facts," Fed. R. Evid. 201, those are "simply the facts of

19  the particular case." *Id.*, Advisory Committee Notes. As defined in th Rule 201, an "adjudicative fact" is

20  a fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's

21  territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy

22  cannot be reasonably questioned." Fed. R. Evid. 201(b). For example, in *Prescott v. Higgins*, 538 F.3d

23  32, 44 (1st Cir. 2008), the First Circuit upheld the lower court's refusal to take judicial notice of

24  statistics that showed a disparate impact in a different case because the validity of the statistics was "at

25  issue" in that case and therefore not beyond "reasonable controversy." A "high degree of indisputability

1   is the essential prerequisite" of an adjudicative fact." Fed. R. Evid. 201, Advisory Committee Notes.

2        A court may also take judicial notice of judicial decisions, but not for the truth of facts stated

3   therein. "While 'a court may take judicial notice of the existence of matters of public record, such as a

4   prior order or decision,' it should not take notice of 'the truth of the facts cited therein.'" *Bennett-*

5   *Wofford v. Bayview Loan Serv., LLC*, 2015 WL 8527333, at *4 (N.D. Cal. Dec. 11, 2015) (quoting

6   *Marsh v. San Diego Cty.*, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006)); *see also M/V Am. Queen v. San*

7   *Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) ("[A] court may not take judicial

8   notice of proceedings or records in another case so as to supply, without formal introduction of

9   evidence, facts essential to support a contention in a case then before it."[19] For this same reason, the

10  "facts" pulled from various judicial decisions cited on pages 13 and 14 of Plaintiffs' Opposition/Reply

11  Brief cannot be considered evidence in support of their Section 9 claim.[20]

12        Plaintiffs next cite documents from the AR in an attempt to show that the City's water extraction

13  "harms the species." Doc. 77 at 14-17 (citing AR 413, U.S. Fish & Wildlife Serv., Tuolumne River Flow

14  Study: Canyon Power Project, California at 3 (1976), for the factual proposition that "[a]s early as 1976

15  the California Department of Fish and Game warned that the City's increased diversions may eliminate

16  salmon completely from the Tuolumne River"). More specifically, this reference appears to be to a

17  single paragraph from the 1976 Flow Study that states, in pertinent part:

18        Fishery resources of the Tuolumne River are significant . . . The
       Tuolumne River once supported annual runs of Chinook salmon ranging
19     upward of 100,000 fish. Modern runs have declined because of the
       adverse effects of gravel extraction, dams, and water diversions. The 1974
20     spawning run of adult Chinook salmon was estimated at only 1,000 fish.

21

22  [19] Also in footnote 45 of their Opposition/Reply, Plaintiffs cite *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 637 F. Supp. 2d 777 (E.D. Cal. 2008), *reconsidered*, 624 F. Supp. 2d 1197 (2009), *aff'd sub nom. San Luis & Delta-Mendota Water Auth. v. United States*, 627 F.2d 676 (9th Cir. 2012), without explanation or specific page citation. The

23  connection between the *San Luis* case, which concerns a challenge to accounting procedures used to implement fish protection actions required by the Central Valley Project Improvement Act, and Plaintiffs' evidentiary burden under Section 9, is a complete mystery to the Court. That there are multiple statutory and regulatory programs designed to protect and

24  enhance fish populations does nothing to establish that the City's conduct is a Section 9 take.
    [20] Likewise, Plaintiffs' citation to *United States v. Glenn-Colusa Irrigation District*, 788 F. Supp. 1126 (E.D. Cal. 1992), *see*

25  Doc. 65-1 at 24, is unavailing. There, it was undisputed that members of a listed species were taken by defendant's operations. *Id.* at 1133.

1

> [CDFG] has indicated that increased diversions <u>may</u> result in the complete
> elimination of salmon from the Tuolumne.

2

3

AR 413. Plaintiffs also cite the CDFG letter referenced in the Flow Study, which states, in part:

4

> Studies show a strong correlation between spring outflow and the number
> of young salmon which survive to return as adults. . . . Increasing demands
> on Tuolumne water by the City of San Francisco and the irrigation
> districts <u>may</u> make it impossible to maintain adequate spring flows in the
> river.

5

6

AR 1011-1012. Several things are critical about these paragraphs for purposes of Plaintiffs' Section 9

7

claim: the timeframe, the repeated use of the word "may," and the identification of multiple sources of

8

potential harm to chinook salmon. The Court agrees with the City that these equivocal statements—

9

made forty years ago—cannot satisfy Plaintiffs' burden to show a "reasonably certain threat of imminent

10

harm to a protected species." It is also true that concepts of proximate cause apply to Section 9 claims.

11

*See Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012) (collecting cases

12

supporting the proposition that "[i]t is well accepted that proximate cause is an element of ESA Section

13

9 claims," and explaining that "[i]n the context of the ESA, proximate cause issues entail determining

14

whether the alleged injury . . . is fairly traceable to the challenged action of [d]efendants.").

15

Accordingly, even if the above citations were temporally relevant, they fail to establish proximate

16

causation, as they implicate multiple (tenuous) sources of harm.

17

    Plaintiffs next ask the Court to take judicial notice of several documents authored by NMFS to

18

support the proposition that NMFS has "identified the Upper Tuolumne River above Don Pedro

19

Reservoir as a candidate area for the reintroduction of steelhead and spring-run Chinook salmon to

20

further recovery of these species," and is considering requiring that Don Pedro Dam include fish passage

21

to allow movement between the Lower and Upper Tuolumne River below Hetch Hetchy." Doc. 77 at 15

22

(citations omitted). These documents do nothing to meet Plaintiffs' burden. Although the Court can take

23

judicial notice of the existence of these documents and what they say (*e.g.*, to make findings regarding

24

what NMFS stated therein), they cannot be used to establish the truth of what they say.

25

> [P]ublic record[s] downloaded from a public agency's official website . . .
> are subject to judicial notice under Federal Rule of Evidence 201. *See*
> *Cachil Dehe Band of Wintun Indians of the Colusa Indian Comm'ty v.*
> *California*, 547 F.3d 962, 968-69 n. 4 (9th Cir. 2008) (taking judicial
> notice of gaming compacts located on official California Gambling
> Control Commission website); *Santa Monica Food Not Bombs v. City of*
> *Santa Monica*, 450 F.3d 1022, 1025 n. 2 (9th Cir. 2006) (taking judicial
> notice of "public records" that "can be accessed at Santa Monica's official
> website"). However, judicially noticed documents may be considered only
> for limited purposes. Public records "are subject to judicial notice under
> [Rule] 201 to prove their existence and content, but not for the truth of the
> matters asserted therein. This means that factual information asserted in
> these document[s] or the meeting cannot be used to create or resolve
> disputed issues of material fact." *Coalition for a Sustainable Delta v.*
> *McCamman*, 725 F.Supp.2d 1162, 1183-84 (E.D. Cal. 2010) (emphasis
> added).

*Coal. for a Sustainable Delta*, 812 F. Supp. 2d at 1093. For the same reason, Plaintiffs' reliance on various other NMFS documents from outside the AR does not help meet Plaintiffs' evidentiary burden. *See* Doc. 77 15-16 n.63- n.65

Plaintiffs next point to the Stakeholder Draft of the O'Shaughnessy Instream Flow Management Plan, arguing that the document recognizes "the importance of water flows to the downstream ecosystem," Doc. 77 at 16 (citing AR 2152), and pointing out that the stated purpose of the Plan is "to describe the development and implementation of a new instream flow regime for O'Shaughnessy Dam that is designed to mimic natural hydrology and provide broad support for physical processes, habitats, and native species within the Hetch Hetchy Reach of the upper Tuolumne River." *Id*. (quoting AR 2170). Neither the generic "importance of water flows to the downstream ecosystem" nor the fact that a plan is being developed to make the instream flow regime for O'Shaughnessy Dam mimic natural hydrology helps to satisfy Plaintiffs' evidentiary burden to establish a "reasonably certain threat of imminent harm to a protected species" exists. *Marbled Murrelet*, 83 F.3d at 1066.

Plaintiffs then cite to the Final Rule for critical habitat designation of the Green Sturgeon to establish that the presence of Green Sturgeon has been confirmed in the Delta. Doc. 77 at 16 (citing AR 3192). Plaintiffs follow this citation with references to numerous documents from outside the AR.

51

1   Again, while the Court can take judicial notice of these documents, it cannot rely on them for the truth

2   of matters stated therein. Accordingly, the factual propositions for which they are cited cannot be

3   considered. (Even if they could be relied upon for the truth, the factual propositions proffered are so

4   generic as to be entirely insufficient for purposes of supporting a Section 9 claim.)

5          Plaintiffs' citation to the critical habitat designation for the delta smelt is equally unavailing.

6   Plaintiffs Opposition/Reply Brief simply states:

7          The delta smelt has historically occurred from Suisun Bay upstream to the
           City of Sacramento to the San Joaquin River. [AR 3007, Critical Habitat
8          Determination for the Delta Smelt, 59 Fed. Reg. 65,256 (Dec. 19, 1994).]
           FWS's reclassification of the delta smelt from threatened to endangered
9          resulted from "the significant declines in delta smelt abundance that have
           occurred since 2001." [AR 3289, Endangered and Threatened Wildlife and
10         Plants; Review of Native Species That are Candidates for Listing as
           Endangered or Threatened; Annual Notice of Findings on Resubmitted
11         Petitions; Annual Description of Progress on Listing Actions; Proposed
           Rule, 78 Fed. Reg. 70,104, 70,151 (Nov. 22, 2013).] The primary threats
12         FWS cites as contributing to delta smelt population declines are "summer
           and fall increases in salinity and water clarity resulting from decreases in
13         freshwater flow into the estuary." [AR 3289, 78 Fed. Reg. at 70,151.]

14  Doc. 77 at 17. Plaintiffs make no effort to connect these generic harms to the actions challenged in this

15  case, let alone in a manner that would satisfy the requirements of proximate causation.[21]

16         Because Plaintiffs bear the burden of proof as to their Section 9 claim, to satisfy their initial

17  burden in connection with its motion for summary judgment they must demonstrate, with affirmative

18  evidence, that "no reasonable trier of fact could find other than for [them]." *Soremekun*, 509 F.3d at 984.

19  As with the Section 7(a)(2) failure to consult claim, there are no disputes as to material facts regarding

20  the Section 9 claim. Plaintiffs' case presents a complete absence of evidence, making it impossible to

21  find that "no reasonable trier of fact could find other than for [Plaintiffs]." *Id.* Relatedly, this absence of

22  evidence satisfies the City's initial burden and means that Plaintiffs cannot establish a genuine issue of

23

24  [21] Plaintiffs do not appear to acknowledge entirely their Section 9 burden, arguing, for example, that "the City's continued extraction of water from the Tuolumne River removes large quantities of fresh water flows that, properly managed, could assist in the preservation of downstream endangered species," Doc. 65-1 at 25 (emphasis added), and even reversing the

25  burden by arguing that "the record, quite simply, does not support a finding that the City's actions are not a take of the ESA-listed fish species." Doc. 77 at 17 (emphasis added).

material fact. *See id.* Accordingly, if the Court had jurisdiction to adjudicate this claim, the City's motion for summary judgment would be GRANTED; Plaintiffs' cross motion would be DENIED

## VI. CONCLUSION

For the reasons set forth above:

   (1)  Plaintiffs' motion for summary judgment is DENIED IN ITS ENTIRETY;

   (2)  Federal Defendants' and the City's motions are GRANTED to the extent described above; and

   (3)  The Clerk of Court is directed to enter judgment against Plaintiffs and in favor of Federal Defendants and the City.

IT IS SO ORDERED.

Dated: __August 29, 2016__    _____/s/ Lawrence J. O'Neill_____
                UNITED STATES CHIEF DISTRICT JUDGE